# UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| Tom Hensiek and Jason Gill, on behalf of themselves individually, and on behalf of similarly situated participants and beneficiaries of the Casino Queen Employee Stock Ownership Plan,<br><br>          Plaintiffs,<br><br>   v.<br><br>Board of Directors of CQ Holding Company, Inc. (a/k/a Casino Queen Board of Directors), the Administrative Committee of the Casino Queen Employee Stock Ownership Plan, Charles Bidwill III, Timothy J. Rand, James G. Koman, Jeffrey Watson, Robert Barrows, and John and Jane Does 1-20,<br><br>          Defendants. | Case No.: 3:20–cv–377<br><br>**CLASS ACTION COMPLAINT** |

## I.      INTRODUCTION

1.      This is a civil enforcement action brought pursuant to Sections 502(a)(2) and 502 (a)(3) of the Employee Retirement Income Security Act of 1974, as amended ("ERISA"), 29 U.S.C. § 1132(a)(2) and (a)(3), by Plaintiffs Tom Hensiek and Jason Gill, on behalf of themselves individually and other participants and beneficiaries in the Casino Queen Employee Stock Ownership Plan ("Casino Queen ESOP," "the ESOP," or "the Plan").

2.      The Casino Queen ESOP is an ERISA-protected retirement plan where the individual retirement accounts of current and former employees are invested entirely in the stock of CQ Holding Company, Inc. ("the Company"). *See* 29 C.F.R. § 2550.407d–6 (definition of "employee stock ownership plan").

3.      As participants in the Casino Queen ESOP, Plaintiffs were told initially that the ESOP was a great opportunity that would lead to the creation of wealth for Casino employees. However, this alluring promise was revealed to be a mere illusion in 2019 when the value of Casino Queen stock – the sole asset held in the participants' ESOP accounts – was disclosed to be worth vastly less than what the ESOP's fiduciaries led Plaintiffs to believe it was worth. This followed years in which the ESOP's fiduciaries concealed both that the ESOP had significantly overpaid for the company stock in 2012, and that they engaged in other ERISA violations, including selling all of the Casino's real property out from under the ESOP.

4.      ERISA imposes exacting requirements on retirement plan fiduciaries because such plans all too often "are abused by those responsible for their management who manipulate them for their own purposes or make poor investments with them." *Mass. Mutual Life Ins. Co. v. Russell*, 473 U.S. 134, 140 n.8 (1985) (quoting 3 Leg. Hist. 4811; 120 Cong. Rec. 29957 (1974)). Under ERISA, fiduciaries must abide by strict fiduciary standards, including the duties of loyalty and prudence, 29 U.S.C. § 1104(a)(1)(A) and (B), and prohibited transaction rules, which categorically bar specific types of transactions that Congress found likely to injure the plan. *Harris Tr. and Sav. Bank v. Salomon Smith Barney, Inc.*, 530 U.S. 238, 241-43 (2000). As discussed herein, Defendants did not come close to meeting their obligations under the statute.

5.      The Casino Queen Hotel & Casino ("Casino Queen") is a former riverboat gambling house which moved on land in 2007, to East St. Louis, Illinois. Casino Queen was owned by a group of investors (the "Selling Shareholders") who tried unsuccessfully for years to sell the Casino to third party buyers – from approximately 2006 until 2011.

6.      Three of the Selling Shareholders who stood to profit handsomely from the sale of the Casino were also members of the Casino Queen Board of Directors (hereinafter these three

2

Shareholders are collectively referred to as the "Selling Board Members"); the majority of the other Sellers were family members of individuals on the Board.

7.     Given their inability to find a buyer willing to pay what the Selling Shareholders wanted for Casino Queen, the Selling Board Members created their own buyer for the Company by establishing the ESOP to buy it outright.

8.     Specifically, the Casino Queen ESOP was established on December 1, 2012 solely for the purpose of purchasing 100% of outstanding common stock of the Company (the "CQ stock").

9.     The Board of Directors handpicked two of their own Board Members to be the Co-Trustees of the ESOP charged with approving the 2012 transaction, where the ESOP purchased all of the CQ stock for $170 million, the entirety of which it had to borrow (the "2012 Transaction").[1] In that role, the Trustees were explicitly instructed to take direction from an Administrative Committee that the Board set up for the ESOP, which (not coincidentally) consisted of the Board members and officers of the company.  The Board retained the power to dismiss the Co-Trustees (who continued serving on the Board while charged with approving the 2012 Transaction) and Administrative Committee members, and thus controlled their decision-making.

10.    The Selling Board Members were the direct beneficiaries of the 2012 Transaction and were therefore deeply conflicted. The Board-appointed Co-Trustees – Defendants Watson and Barrows – were the only Board members who were not also Selling Shareholders at the time of the Transaction.

---

[1] As explained in detail below, Plaintiffs do not know the exact purchase price of the ESOP. The Company submitted documentation of the 2012 Transaction to the Securities and Exchange Commission stating that the sale price was $175 million, while reporting to the Department of Labor that the sale price was only $4 million. Media reports at the time of sale indicated that the Company was sold for $170 million.

11.     Because the Board Members retained power over the Co-Trustees, and also over the Administrative Committee on which the Board Members served, each of them was an ERISA fiduciary to the ESOP. The Board Members also held fiduciary authority with respect to the 2012 Transaction pursuant to the terms of the plan document which governed the ESOP, as alleged in detail below. This fiduciary status required that the Board Members act prudently and loyally towards the ESOP and its participants, and avoid ERISA prohibited transactions.

12.     Instead, the Selling Board Members – with the assistance of the Co-Trustees and Administrative Committee – indulged their significant conflicts and violated ERISA through two major transactions, the details of which were largely concealed from employee participants and the public.

13.     First, through their control over the ESOP's Co-Trustees and Administrative Committee, the Selling Board Members (in their fiduciary capacity) facilitated, and directed the Co-Trustees to approve, the 2012 Transaction wherein the ESOP overpaid for the CQ stock purchased from the Selling Shareholders. The inflated price paid for the CQ stock was based, in part, on financial projections for Casino Queen's future profitability, which the Board knew or should have known were unreliable, unrealistic, and/or inaccurate.

14.     The Administrative Committee and the Co-Trustees they directed were bound to conduct a prudent and loyal investigation to ensure that the 2012 Transaction was in the best interest of the ESOP participants and to abide by ERISA's strict prohibited transaction rules. Although the Co-Trustees served as directed trustees in connection with the 2012 Transaction (who were directed by the Administrative Committee), the Co-Trustees were precluded from approving the 2012 Transaction if they had reason to believe that the Transaction was not in conformance with ERSIA's strict fiduciary provisions and prohibited transaction rules. Despite these duties, the

4

Co-Trustees approved and effectuated the Transaction at an inflated stock price that did not account for the sustained decline in revenues and diminished prospects for future profitability at Casino Queen at the time of the Transaction. The Co-Trustees also acted imprudently, and not in the best interest of the ESOP participants, when they approved the $170 million debt the ESOP took on to complete the purchase of CQ stock, which was guaranteed by Casino Queen. In both respects, the Co-Trustees imprudently went ahead with the 2012 Transaction at the direction of the Administrative Committee (which acted as an arm of the Board).

15. As a result of the 2012 Transaction, Casino Queen employees were forced to invest their employer-sponsored retirement savings in Casino Queen stock at a price and terms approved by the ESOP Trustee without employee input. Indeed, Casino Queen employees did not learn that the ESOP had purchased Casino Queen until *after* the Transaction was completed and the purchase price of $170 million was agreed to by the Selling Shareholders and the Co-Trustees. After the Transaction, Casino Queen's management told employees that the ESOP was a great opportunity to become "owners" of Casino Queen and boasted that employees would be able to buy second homes due to their ESOP participation.

16. Together, the Board Members, Administrative Committee, and Co-Trustees violated their ERISA fiduciary duties to act prudently and in the best interest of the ESOP participants, and engaged in ERISA-prohibited transactions, through the 2012 Transaction.

17. Second, after the 2012 Transaction, the Board Members and Co-Trustees (who, after the 2012 Transaction, served as discretionary trustees, rather than directed trustees) facilitated and caused the sale of virtually all of the Company's real property to pay off the debt owed to the Selling Board Members. Specifically, the proceeds of this sale provided an accelerated payment on the 2012 Transaction loans held by the Selling Board Members. This real property sale was an

5

extraordinarily bad deal for the Company and the ESOP, but it benefitted the Selling Board Members and their families.

18.     The sale of the Company's property and the refinancing of the Transaction debt required a majority vote of Company shareholders. At all times following the Transaction, the majority of the ESOP's shares were voted by the Co-Trustees, so the sale and refinancing were controlled by Co-Trustees appointed by the Board. Thus, through this asset sale, the Co-Trustees and Board Defendants again violated their ERISA duties of prudence and loyalty and engaged in prohibited transactions.

19.     Thereafter, the Co-Trustees, Administrative Committee, and Board Members concealed these ERISA violations for years. Specifically, they concealed that the ESOP had paid significantly greater than fair market value for Casino Queen by telling the employee participants that the CQ stock was worth more than $170 million and misleading employees to believe their ESOP retirement accounts were growing at amazing rates. However, in 2019, Plaintiffs and other ESOP participants learned the unfortunate truth: that the value of CQ stock, the only investment in their ESOP accounts, was worth approximately 95% less than was reported to employees for years and was worth just 1.6% of what the ESOP originally paid for it.

20.     In summary, despite ERISA's mandate that plan fiduciaries administer the Casino Queen ESOP solely in the interests of the participants and beneficiaries, the Board Members, Administrative Committee, and Co-Trustees orchestrated a highly leveraged and imprudent purchase designed to benefit corporate insiders and then concealed this fact from ESOP participants and beneficiaries until 2019.

21.     Defendants' ERISA violations caused tens of millions of dollars in losses to the ESOP participants, who overpaid for the Company stock and will not receive the deferred compensation they had earned.

22.     Plaintiffs bring this lawsuit on behalf of themselves and other ESOP participants to obtain redress for Defendants' fiduciary breaches and prohibited transactions, including restoration of the losses that they suffered, disgorgement of the profits that Defendants wrongfully obtained, and other equitable and remedial relief as provided by ERISA and applicable law.

## II.     JURISDICTION AND VENUE

23.     **Subject Matter Jurisdiction**. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331. This Court also has subject matter jurisdiction pursuant to ERISA § 502(a) and (e)(1), 29 U.S.C. § 1132(a), (e)(1).

24.     **Personal Jurisdiction**.  This Court has personal jurisdiction over Defendants because they transact business in, and have significant contacts with, this District, and because ERISA § 502(e)(2), 29 U.S.C. § 1132(e)(2), provides for nationwide service of process.

25.     **Venue.**  Venue is proper in this district pursuant to ERISA § 502(e)(2), 29 U.S.C. § 1132(e)(2). Among other things:

(a)     The ESOP is administered in this district;

(b)     The fiduciary breaches at issue took place in this district;

(c)     Casino Queen, which was the subject of the 2012 Transaction, is located in East St. Louis, Illinois;

(d)     Defendant Jeffrey Watson resides in this district because, on information and belief, he resides in Belleville, Illinois, which is in St. Clair County;

(e)     Defendant Robert Barrows resides in this district because, on information and belief, he lives in Edwardsville, Illinois, which is in Madison County;

(f)     Plaintiff Tom Hensiek resides in this district, as he lives in Troy, Illinois, which is in Madison County; and

7

(g)     Plaintiff Jason Gill resides in this district, as he lives in Nashville, Illinois, which
is in Washington County.

### III.     PARTIES

**A.     Plaintiffs**

    **(1)     Tom Hensiek**

26.     Plaintiff Tom Hensiek is a former employee of Casino Queen and was a participant in the Casino Queen ESOP during the relevant period.

27.     Mr. Hensiek began working at Casino Queen in 1999 and left his position as a Manager in April 2018. At the time Mr. Hensiek left Casino Queen, he was fully vested in the shares of CQ stock held in his ESOP account.

28.     Mr. Hensiek was a Casino Queen employee when the Company was sold to the ESOP. Mr. Hensiek had no knowledge of – and was provided no information regarding – any substance of deliberations of the fiduciaries who represented the ESOP in the 2012 Transaction.

29.     Plaintiff Hensiek left his job at Casino Queen in April 2018, with the understanding that he would receive his first payment from his ESOP account at the end of 2019.

30.     However, in October 2019, Plaintiff Hensiek was surprised to learn that his ESOP account had lost about 95% of its value, and that his ESOP account was being closed.

31.     Plaintiff Hensiek had planned to use the first distribution from his ESOP to supplement his income in 2019. Plaintiff Hensiek also intended to rely on his ESOP account as a source of income in retirement.

    **(2)     Jason Gill**

32.     Plaintiff Jason Gill is a former employee of Casino Queen and was a participant in the Casino Queen ESOP during the relevant time period.

33.     Mr. Gill began working at Casino Queen in 2013 and left his position as a Dealer in July 2018. At the time Mr. Gill left Casino Queen, he was fully vested in the shares of CQ stock held in his ESOP account.

34.     Plaintiff Gill left his job at Casino Queen in July 2018, with the understanding that he would receive the first payment from his ESOP account at the end of 2019.

35.     However, near the end of 2019, Plaintiff Gill learned that his ESOP account had lost about 95% of its value, and that his ESOP account was being closed.

B.      **Defendants**

(1)     The Board Defendants

36.     The Board of Directors of CQ Holding Company Inc., and the individual members thereof are collectively referred to as the "Board Defendants."

37.     As alleged below, Defendants Charles Bidwill, Timothy Rand, James Koman, Jeffrey Watson and Robert Barrows were members of the Board of Directors for CQ Holding Company Inc (the "Board" or the "Board of Directors").

38.     To the extent there are other individuals who served on the Board of Directors during the relevant period, their identities are unknown to Plaintiffs and are thus named as John and Jane Does 1-10. Plaintiffs will substitute their names as soon as their identities are disclosed.

39.     As alleged in detail below, each of the Board Defendants was and is a fiduciary to the ESOP within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), because each of them: (1) exercised discretionary authority control respecting management of the ESOP; (2) exercised authority and control over the ESOP's assets; and/or (3) have discretionary authority or discretionary responsibility in the administration of the ESOP.

2668185 v1

a)      The Board of Directors of CQ Holding Co. Inc.

40.     The Board of Directors at all relevant times had the sole authority to appoint and remove the ESOP Trustees and therefore were fiduciaries under ERISA. Through their full power and discretion to hire and fire the ESOP Trustee(s), the Board of Directors had power and control over the ESOP.

41.     At the time the ESOP was created, the Board Defendants appointed two of their own Board members – Jeffrey Watson and Robert Barrows – as Co-Trustees of the Casino Queen ESOP. The Board maintained Watson and Barrows as the Co-Trustees of the ESOP from the time of the ESOP's inception until at least 2018.

42.     The Board also had authority and discretion to appoint members of the Administrative Committee. The Plan Document provides that the Board determines the members of the Administrative Committee, and further provides that Board members and company officers may serve on the Administrative Committee. On information and belief, the Board members appointed themselves to serve as Administrative Committee members.

43.     Alternatively, if no Administrative Committee members were actually appointed by the Board, the Plan Document further provides that the Board (acting for the Company at the time) had all the powers, responsibilities and duties of the Administrative Committee.

44.     Accordingly, each of the Board Defendants had the powers and responsibilities provided to the Administrative Committee in the ESOP Plan Document. These included the power to direct the Co-Trustees whenever they were acting as "directed trustees" as set forth in the ESOP Plan Document and in accordance with the provisions of ERISA § 403(a)(1), 29 U.S.C. § 1103(a)(1); the power and responsibility to manage the ESOP's assets; the power and responsibility to prepare and distribute account statements and relevant information about the

10

ESOP to participants in compliance with ERISA; the power and responsibility to prepare, attest to and file accurate and reliable annual reports for the ESOP with the Department of Labor; and responsibility for all aspects of the administration of the Plan.

45.     At all relevant times, the Board Defendants also effectively controlled the ESOP through Defendants Watson and Barrows, who were both Co-Trustees and Board members themselves. This included but was not limited to the Board Defendants' power to direct the Co-Trustees Watson and Barrows concerning the 2012 Transaction and the power to direct them about how to manage the ESOP's assets.

46.     Based on the recent investigation of counsel, the Board Defendants instructed the Co-Trustees concerning their actions in connection with the 2012 Transaction and directed them about how to manage the ESOP's assets.

b)      Charles Bidwill, III

47.     Defendant Charles Bidwill, III, a sports and gambling investor, was a founder and former President of Casino Queen. Defendant Bidwill also was a member of the Board during the relevant period. While a Board member, Defendant Bidwill sold his shares of CQ stock to the ESOP for several millions of dollars.

c)      Timothy J. Rand

48.     Defendant Timothy J. Rand, an entrepreneur and business owner, was a founding investor in Casino Queen and a member of the Board during the relevant period. While a Board member, Defendant Rand sold his shares of CQ stock to the ESOP for several millions of dollars.

d)      James G. Koman

49.     Defendant James ("Jim") G. Koman is the CEO of an investment firm focused on commercial real estate development and was a member of the Board during the relevant period.

11

Defendant Koman's father was one of the original founding investors in Casino Queen. While Defendant Koman was a Board member, he sold his shares of CQ stock to the ESOP for several millions of dollars.

e)      Jeffrey Watson

50.     Defendant Jeffrey Watson was a member of the Board during the relevant period. Defendant Watson served as the President of CQ Holding Co. from the time of the 2012 Transaction until on or around January 20, 2019. He also served as General Manager of the Casino from 2012 to 2018, and General Counsel to the Casino from 2000 to 2018. On information and belief, Defendant Watson lives in Belleville, Illinois.

51.     Defendant Watson also served as a Co-Trustee of the ESOP, alongside Defendant Robert Barrows, after the 2012 Transaction until at least sometime in 2018. As Co-Trustee, Watson was a directed trustee for the 2012 Transaction, but as a Board member he retained and exercised fiduciary power over the Transaction.   In addition, after the 2012 Transaction, as Co-Trustee, Watson  was a fiduciary to the ESOP under ERISA § 3(21)(A)(i), 29 U.S.C. § 1002(21)(A)(i) because the ESOP Plan document gives the Trustee authority to hold and manage all assets of the Trust Fund as a **discretionary** trustee.

f)      Robert Barrows

52.     Defendant Robert ("Bob") Barrows was a member of the Board during the relevant period. Further, Defendant Barrows served as the Chief Financial Officer of Casino Queen from 1993 until approximately 2017; served as Vice President, Secretary, and Treasurer of Casino Queen Holding Co. from the time of the transaction until at least 2018. On information and belief, Defendant Barrows lives in Edwardsville, Illinois.

12

53.    Defendant Barrows also served as a Co-Trustee of the ESOP, alongside Defendant Watson, after the 2012 Transaction until approximately 2018. As Co-Trustee, Barrows was a directed trustee for the 2012 Transaction, but he nonetheless retained and exercised fiduciary power over the Transaction as a Board member. In addition, after the 2012 Transaction, as Co-Trustee, Barrows was a fiduciary to the ESOP under ERISA § 3(21)(A)(i), 29 U.S.C. § 1002(21)(A)(i) because the ESOP Plan document gives the Trustee authority to hold and manage all assets of the Trust Fund as a **discretionary** trustee.

(2)    The Selling Board Members

54.    As alleged above, Defendants Bidwill, Rand, and Koman reported to the U.S. Securities and Exchange Commission in disclosures recently obtained by counsel, that they collectively received $46,278,000 in proceeds from the 2012 Transaction.

55.    The Board Members who sold their shares of CQ stock to the ESOP during the 2012 Transaction are collectively referred to as the "Selling Board Members."

(3)    Administrative Committee Defendants John and Jane Does 11-20

56.    The Administrative Committee was and is a named fiduciary of the ESOP under Article IX of the Plan Document and ERISA § 502(a), 29 U.S.C. § 1102(a).

57.    The Administrative Committee also was and is a fiduciary to the ESOP within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), because it: (1) exercised discretionary authority control respecting management of the ESOP; (2) exercised authority and control over the ESOP's assets; and/or (3) exercised discretionary authority or discretionary responsibility in the administration of the ESOP. The Administrative Committee had the power to direct the Co-Trustees in connection with the 2012 Transaction and other matters as set forth in the Plan

13

document. The Administrative Committee also had general responsibility under the Plan document for the administration of the trust and the management of trust assets.

58.     As alleged above, the Administrative Committee was appointed by the Board, and the members of the Board served on the Administrative Committee.

59.     To the extent that the Board appointed members of the Administrative Committee that are not Board members, those individuals are named as John and Jane Does 11-20. Once their identities are ascertained, Plaintiffs will substitute their names.

## IV.     FACTS

### A.     Casino Queen

60.     Casino Queen opened in 1993 in East St. Louis, Illinois. At all relevant times, Casino Queen has been a closely-held private corporation and its stock has not traded on any public market or exchange.

61.     The casino brought over a thousand jobs to East St. Louis, and at least for a time, it was one of the largest employers in a city which had struggled for decades with high rates of unemployment and crime.

62.     Casino Queen was among the first casinos in the East St. Louis area when it opened in 1993. However, over the next several years, numerous other casinos opened nearby, increasing competition with Casino Queen and leading to declining revenues from 2007 to the present.

63.     Prior to the 2012 Transaction, the Casino Queen was owned by a group of private investors, the Selling Shareholders, who attempted to sell the Casino Queen to a third-party investor in 2006 for $200 million.  That deal was unsuccessful and fell through in 2007.

64.     Thereafter, the Selling Shareholders "pitched" selling Casino Queen to numerous prospective buyers who considered purchasing the casino and evaluated its business, including

Delaware North, which operates casinos and gaming entities. However, the Selling Shareholders were never able to complete the sale.

65.     After years of trying and failing to sell the Casino Queen to outside buyers, the Selling Shareholders decided to create a new retirement plan for employees, the Casino Queen ESOP, which would purchase the Company from the employees in a leveraged transaction controlled by the Board Defendants, at least three of whom themselves were Selling Shareholders.

66.     Prior to the creation of the ESOP, Casino Queen employees were eligible to participate in a non-ESOP retirement plan which offered a menu of funds such as equity funds, target date funds, fixed income funds, and principal preservation funds from which they could choose to invest their own contributions and contributions made by the Company on their behalf. Shortly after the 2012 Transaction, the Company stopped making employer contributions to that other retirement plan. Instead, the Company contributed solely to the ESOP which holds only Casino Queen stock, a stock that lacks a public market.

67.     In October of 2012, the Selling Shareholders created a holding company, CQ Holding Company, Inc. for Casino Queen, in order to facilitate the sale to the ESOP.

68.     Prior to the 2012 Transaction, Casino Queen had outstanding debt of approximately $35 million.

69.     On December 26, 2012, the Board Defendants acting for CQ Holding Company, Inc. (as the plan sponsor) established the ESOP to purchase 100% of the then-outstanding CQ stock from the Selling Shareholders.

70.     During an Illinois Gaming Commission meeting a few days before the 2012 Transaction, Defendant Watson told the gaming board about how excited his employees were

15

2668185 v1

about the ESOP, though they had not been told about the ESOP at that time. Employee-participants were not told about the 2012 Transaction until after it was completed on December 26, 2012.

71.     After the 2012 Transaction was completed, Defendant Watson held an employee meeting to announce to that the newly created ESOP had purchased the Company from the Selling Shareholders, including the Selling Board Members.

**B.     The Casino Queen ESOP**

72.     At all relevant times, the ESOP was an "employee pension benefit plan" governed by ERISA and was intended to constitute an "employee stock ownership plan" or "ESOP" within the meaning of 29 U.S.C. § 1107(d)(6).

73.     The Plan covers eligible employees of Casino Queen Hotel & Casino in East St. Louis, Illinois, and Casino Queen Marquette in Iowa. During the Class Period, the ESOP has had between 512 and 631 participants.

74.     ERISA requires that every retirement plan, including the Casino Queen ESOP, "be established and maintained pursuant to a written instrument. Such instrument shall provide for one or more named fiduciaries who jointly or severally shall have authority to control and manage the operation and administration of the plan." *See* ERISA Section 402(a)(l), 29 U.S.C. § 1102(a)(1).

75.     ERISA § 402(a)(2), 29 U.S.C. § 1102(a)(2) clarifies that "For purposes of this subchapter, the term "named fiduciary" means a fiduciary who is named in the plan instrument, or who, pursuant to a procedure specified in the plan, is identified as a fiduciary (A) by a person who is an employer or employee organization with respect to the plan or (B) by such an employer and such an employee organization acting jointly."

76.     Here, the written instrument is entitled the Casino Queen Employee Stock Ownership Plan (the "Plan Document" or the "ESOP Plan Document").ERISA also requires that

every retirement plan, including the Casino Queen ESOP, have one or more "trustees [who] shall have exclusive authority and discretion to manage and control the assets of the plan, except to the extent that—(1) the plan expressly provides that the trustee or trustees are subject to the direction of a named fiduciary who is not a trustee, in which case the trustees shall be subject to proper directions of such fiduciary which are made in accordance with the terms of the plan and which are not contrary to this chapter [of ERISA.]" ERISA § 403(a)(l), 29 U.S.C. § 1103(a)(1).

77.     Based on the Plan Document, here the Administrative Committee and its members, the Co-Trustees of the ESOP, and the Board Defendants were all "named fiduciaries" within the meaning of ERISA § 402(a)(2), 29 U.S.C. § 1103(a)(2).

**C.     The 2012 Transaction**

78.     The Board Defendants, including the Selling Board Members, orchestrated and caused the sale of CQ stock to the ESOP in the 2012 Transaction to enrich themselves at the expense of the retirement security of the Casino Queen ESOP participants.

79.     Specifically, the Board Defendants (acting directly and/or through the Administrative Committee and Co-Trustees) caused the ESOP to pay the Selling Board Members significantly more than fair market value for the CQ stock purchased from them. This allowed the Sellers – many of whom were Board members or their family members – to obtain ill-gotten gains and profits through the 2012 Transaction.

80.     The Board Defendants appointed two of themselves to be Co-Trustees to the ESOP at all relevant times, including during the ESOP's purchase of CQ stock from the Selling Shareholders.

81.     The Board Defendants' power to hire and fire the ESOP Trustee(s) created a conflict because the Trustee(s) were incentivized to act in the best interests of the Board rather than the employees who participated in the ESOP.

82.     Indeed, based on the recent investigation of counsel, the Board Defendants up until the Transaction was completed, directed the Co-Trustees in the 2012 Transaction (either directly or through the Administrative Committee) and thereby exercised fiduciary control over the Transaction.

83.     The ESOP Plan Document confirms this, as it provides that the "Trustee shall be a directed trustee with respect to the initial purchase of Stock by the Trust and related transactions occurring contemporaneously therewith in accordance with the provisions of ERISA Section 403(a)(l). When acting as a directed trustee, the Trustee shall follow all proper directions received from the **Sponsor**, an investment manager or any other **named fiduciary** which are made in accordance with the terms and provisions of the Plan and this Trust Agreement and which are not contrary to ERISA." (emphasis added).

84.     The Board Defendants were responsible for the actions of both the Company (as "Sponsor") prior to the Transaction and the Administrative Committee (a "named fiduciary"), and had the power to direct the directed trustees in connection with the 2012 Transaction. As such, the Board Defendants had fiduciary responsibility for the 2012 Transaction under ERISA. Likewise, the Administrative Committee on which they served had such fiduciary responsibility.

85.     Because the Board Defendants and Administrative Committee directed the Trustees "with respect to the initial purchase of" CQ stock, and because of their power over the ESOP Trustees, the Board Defendants and Administrative Committee caused the ESOP to purchase the CQ stock for at least $170 million, which was greater than fair market value.

18

86.     As alleged above, Defendants Watson and Barrows, in addition to serving as Board members and Co-Trustees, simultaneously held high-level management positions at Casino Queen during the relevant period.

87.     The 2012 Transaction was announced to employees only after it was completed; at that time, employees were told that the Casino had been sold to the ESOP for $170 million, but that the Casino was actually worth $174 million. Employees were not told how many shares the ESOP was purchasing for $170 million and thus, the employees did not know the per share price the ESOP paid for CQ stock.

88.     To this day, Plaintiffs do not know the share price of the stock purchased in the 2012 Transaction.

89.     Further, Plaintiffs were not provided with a copy of the valuation report, nor have they ever had access to the valuation report underlying the 2012 Transaction price paid by the ESOP.

90.     At the same meeting, ESOP participants were told that, because they had become owners of the Company, they would have enough money to purchase vacation homes.

91.     Employees were also told that, as the new owners of the Company, they would get to vote on any transaction entered into by Casino Queen that was greater than three million dollars. This did not happen.

92.     As described in further detail below, in 2013 the Company sold its real property for $140 million. The Company also later acquired a small casino in Iowa (the subsequently renamed Casino Queen Marquette) for $40 million. The employees were not permitted to vote on either of those transactions.

93.     On December 27, 2012, the Company reported publicly that "[t]he ESOP will effectively create an enhanced retirement benefits plan tied to the performance of the Property and provide liquidity for employees when they retire or leave the Company. The private nature of the ESOP permits management to focus on strategies for the long-term benefit of the Company and creation of wealth for its employees."  However, the 2012 Transaction did not enhance employees' retirement benefits or provide them with a long-term benefit. The chief beneficiaries of the 2012 Transaction were the Selling Shareholders.

94.     Defendants knew that the Company was not worth the $170 million the ESOP paid for it because the Selling Board Members had tried for years to sell the Company and were not able to find a third-party buyer to pay $170 million.

95.     Defendants also knew or should have known that the valuation report used to justify a $170 million purchase price was based on unreliable and unrealistic financial projections of the Company's future earnings and cash flows. They also knew or should have known that Casino Queen's revenues had dropped significantly for years due to Casino Queen's market share decreasing and that the Company had struggled since 2007 as the number of competitors grew.

96.     Casino Queen's long-term financial prospects were also diminished by an Illinois smoking ban and St. Louis's removal of its $500 loss limit rule, which removed an edge Illinois casinos had previously enjoyed over competitors across the river.

97.     Further, the Casino Queen was more limited in its ability to attract customers compared to its competitor casinos that were part of gaming giants.

98.     Despite knowledge that all of the above problems facing Casino Queen indicated that it was not worth the $170 million the ESOP paid for the Company, the Board Defendants and

Administrative Committee instructed the Co-Trustees to arrange and complete the 2012 Transaction.[2]

99.     Because the Board Defendants and Administrative Committee had the power to direct the Co-Trustees during the 2012 Transaction, they should have directed the Co-Trustees to **not complete** the 2012 Transaction, which they knew or should have known was not prudent or in the best interest of the ESOP participants. Further, the Co-Trustees independently knew or should have known that it was not prudent or in the best interest of participants to proceed with the 2012 Transaction, and therefore should not have authorized the 2012 Transaction regardless of the direction that they received.

100.    The Board Defendants, Administrative Committee, and Co-Trustees also knew or should have known that it was imprudent and not in the participants' best interest to have the ESOP borrow all of the money necessary to complete the 2012 Transaction.

101.    According to governmental filings, the Company guaranteed all of the debt the ESOP took out to complete the Transaction. Because it was the guarantor, the Company had to classify the ESOP's debt on its balance sheet, which deeply burdened the small Company with debt and cannibalized the common equity owned by the ESOP.

102.    Further, as guarantor, the Company was and continues to be obligated to make cash contributions to the ESOP sufficient to cover the loan payments due in a given year, which resulted in a significant cash drain on the Company. These required cash contributions, which service the

---

[2] Even if the Board Defendants did not directly instruct the Co-Trustees to consummate the 2012 Transaction, they effectively exercised power over the Co-Trustees' decision-making through the Administrative Committee, and also because the Board had hiring and firing power over the Co-Trustees, who were themselves Board Members.

ESOP's debt, significantly impaired the Company's cash flows and earnings after the 2012 Transaction.

103.    The real beneficiaries of the 2012 Transaction and ESOP loan were not the ESOP participants, but rather the Selling Shareholders.  In filings that Plaintiffs' counsel recently obtained from the U.S. Securities and Exchange Commission, it was disclosed that the Selling Board Members – Defendants Bidwill, Rand and Koman – pocketed $46.3 million in cash immediately through the 2012 Transaction and were owed millions more by the ESOP as they financed a large portion of the ESOP's $170 million Transaction debt.

104.    The Board Defendants – at least three of whom had a manifest conflict as the sellers of CQ stock to the ESOP – caused the imprudent and disloyal 2012 Transaction where the ESOP overpaid for CQ stock and overleveraged itself and the Company the ESOP purchased.

105.    The Board Defendants also failed to monitor the Co-Trustees during the 2012 Transaction to ensure that the ESOP did not pay greater than fair market value for the Company.

106.    The Co-Trustees who approved the 2012 Transaction at the behest of the Board and the Administrative Committee did so based on inaccurate and unrealistic information concerning the financial viability of the Company, including the Company's financial projections for future cash flow, which were used to justify the $170 million purchase price.

107.    The Board Defendants failed to ensure that the Co-Trustees who approved the 2012 Transaction received all information necessary for them to fulfill their fiduciary duties, including facts related to their many unsuccessful attempts to sell Casino Queen to a third-party buyer.

108.    The Co-Trustees knew or should have known and that the cash flow problems created by the $170 million Transaction debt taken on by both the ESOP and the Company as guarantor were not prudent and in the best interest of the ESOP participants.

109.    Ultimately, the 2012 Transaction was designed and executed to benefit the Selling Board Members and their families, who profited handsomely from it. The Board Defendants' ERISA violations significantly harmed the participants in the ESOP, which all along was a house of cards that toppled after the Board Defendants could no longer conceal their scheme.

110.    Further, as described in detail below, Defendants concealed relevant information from the ESOP participants and the Department of Labor in publicly available filings for the ESOP from the 2012 Transaction until October 2019.

**D.      Following the 2012 Transaction, the Board Members and Co-Trustees Violated ERISA by Approving a Deal that was Imprudent and Disloyal.**

111.    Pursuant to the Plan Document, the Co-Trustees have the power to vote unallocated shares of CQ stock, which has been the majority of CQ shares since the 2012 Transaction. The Co-Trustees, therefore, at all relevant times were able to vote an absolute majority of all outstanding shares.

112.    Among other things, the Co-Trustees, who were themselves Board Defendants, had the power to "vote" to continue to re-elect themselves and the other members to the Company's Board. The relationship between the Board Defendants and the Co-Trustees therefore was deeply conflicted and self-perpetuating.

113.    In 2013, the Co-Trustees, selected by the Board members, voted to approve a transaction which sold substantially all of the Company's real property to Gaming and Leisure Properties ("GLPI") and refinanced all the ESOP's debt owed to the Selling Shareholders, which were loans guaranteed by the Company. This transaction is referred to hereinafter as the "Asset Sale."

114.    As part of this Asset Sale, the Co-Trustees (appointed by the Board), caused all of the debt related to the 2012 Transaction to be refinanced. Through this refinancing, the Selling

Board Members and Shareholders were able to cash out their remaining profits from the 2012 Transaction. However, the refinancing was based on unfavorable financial terms for the ESOP and the Company.[3]

115.    For example, the Asset Sale required the Company to transfer ownership over all of the Company's primary assets – its land, hotel, casino, and an RV park – to GLPI for $140 million.

116.    But the Company agreed to lease the sold property back from GLPI for approximately $14 million per year, over a 15-year term. Thus, over the full term of the lease, the Company agreed to pay $210 million in rent for property it sold for only $140 million.

117.    In contrast to the $14 million annual rent bill, the real property sold to GLPI had a tax-assessed total value of about $12.1 million dollars.

118.    As part of the lease agreement, the Company also agreed to pay all property expenses, including property taxes, insurance, and maintenance of the property, and utilities, in addition to rent, in an arrangement known as a "triple net lease."

119.    The Company has paid $14 million annually in rent, plus all property expenses from 2013 to the present, for real property independently valued at just $12.1 million. GLPI continues to list Casino Queen as a tenant on its website.

120.    GLPI agreed to provide Casino Queen with a new $43 million term loan, which allowed the Selling Board Members to monetize the remainder of their Seller gains from the 2012 Transaction because it provided the Company (and hence the ESOP) with cash to pay off all of the ESOP's outstanding loans owed to the Selling Board Members.

---

[3] The Company took on a new $43 million loan from GLPI which had a five-year maturity and an interest rate of 7%.

121.    In other words, because the Asset Sale refinanced the Company and ESOP's then-existing loans (some of which were owed to the Selling Shareholders), the refinancing of corporate and ESOP debt to GLPI as the new lender allowed the Selling Shareholders to cash out their remaining profits from the 2012 Transaction.

122.    In a statement regarding the Asset Sale, Defendant Watson said that "[t]his transaction offers us the opportunity to reorganize our capital structure, with a long-term solution that provides stability for our employee-owners. Further, by unlocking the value in our real estate assets, we are able to focus on efficiently operating our business in a less restrictive, asset-lite environment."

123.    The Company needed this "long-term solution" precisely because the ESOP purchased the Company for greater than fair market value and the Company was forced to guarantee the ESOP's $170 million Transaction debt. At the time of the 2012 Transaction, the ESOP had no assets and no credit. Following the Transaction, the ESOP subsequently had no way to service the debt long term, necessitating the Asset Sale – which sold off the primary assets of the Company the ESOP had purchased less than a year earlier.

124.    Pursuant to the Plan Document, major decisions of the Company require a shareholder vote; such decisions include refinancing of the Company's debt or the sale of a substantial proportion of the Company's assets. Thus, in order to complete the Asset Sale, Co-Trustees Watson and Barrows had to approve the Asset Sale and the restructuring of the Company's debt because they had the power to vote the majority of all outstanding CQ stock as of 2013.

25

125.     The Board Defendants knowingly participated in the Asset Sale and the refinancing of the Company's Transaction debt. In so doing, the Selling Board Members were conflicted because they stood to gain from the accelerated payoff of the ESOP loans owed to them.

126.     The disloyal and imprudent actions of the Board members, including Watson and Barrows in connection with the Asset Sale used to refinance the Company's Transaction debt, caused the value of the Company stock held in participants' ESOP accounts to be further impaired.

127.     According to a 2012 news article recently discovered by counsel, the Selling Board Members planned to remain on the Casino Queen Board until the loans they made to the ESOP were paid in full, which was estimated to be three to five years.

128.     Based on the news articles and governmental filings recently discovered by counsel, the Selling Board Members expedited their payout on the debt the ESOP owed them from the 2012 Transaction by arranging the Asset Sale and related debt refinancing, through Watson and Barrows who voted to approve them.

129.     The Asset Sale that was used to refinance the Transaction debt left Casino Queen as a shell of a company that did not own any real property assets and which did not have sufficient cash flow to service its remaining debts.

130.     But by 2014, this was no longer the concern of Defendants Bidwill, Rand, and Koman as they succeeded in having the portion of the Transaction loans owed to them fully repaid.

131.     Shortly after they were paid in full for the Company that the ESOP was forced to purchase (indeed, at an inflated price), Defendants Bidwill, Rand, and Koman relinquished their Board memberships.

**E.    ESOP Fiduciaries Concealed the Violations of ERISA By Inaccurately Reporting the Price the ESOP Paid for the Company and Misrepresenting the Stock Value as Increasing from 2012 - 2019.**

132.    Plaintiffs were unaware of the material facts relating to the fiduciary breaches and prohibited transactions set forth herein until at least October 2019 because Defendants engaged in a pattern of fraud and/or concealment of material facts concerning the 2012 Transaction and the Asset Sale. Despite their exercise of reasonable due diligence, Plaintiffs did not know nor could they have known of Defendants' violations of ERISA, because Defendants made several misstatements of material of fact concerning the 2012 Transaction and the Asset Sale to conceal evidence of their wrongdoing.

**(1)    Statements to Employee Participants During Meetings About the ESOP**

133.    First, Plaintiffs attended Company meetings about the ESOP, wherein the Co-Trustees repeatedly told employees/participants that the ESOP would provide significant retirement savings and even create wealth for participants. For example, at one meeting employees were told by Company management that they would be able to purchase second homes with the money they would earn as employee-owners of Casino Queen.

134.    Employees also were told that they could look forward to making the equivalent of nearly their entire salary through the ESOP.

135.    Even as late as mid-2018, when Plaintiff Gill left Casino Queen for what he believed were better employment opportunities elsewhere, Company management told Gill that he was making a big mistake by moving to another casino, because Casino Queen's ESOP was a unique opportunity that would provide "the best retirement you'll ever have."

27

### (2)   Annual Form 5500s Filed with the Department of Labor

136.   Second, Defendants concealed that the ESOP overpaid for CQ stock and took on imprudent levels of debt by misreporting the purchase price the ESOP paid and the amount of debt acquired to complete the Transaction in the ESOP's required annual filings with the Department of Labor ("DOL").

137.   CQ Holding Company, as the sponsor of the ESOP, was required to file financial reports disclosing information regarding the ESOP's financial condition, including its assets, liabilities, and income on an annual basis.

138.   The Board Defendants, as members of the Administrative Committee or acting for the Company as the Plan Administrator, prepared and caused to be filed with DOL the ESOP's Form 5500s. Each of these governmental filings are signed by a Casino Queen executive who swears to the truth, completeness, and correctness of the report under penalties of perjury.

139.   The Form 5500s filed for plan years 2012, 2013 and 2014 were signed by Defendant Barrows, and the Form 5500s filed after that were signed by William Vandersand.

140.   The ESOP repeatedly misrepresented the price it paid for CQ stock in each Form 5500 filed during the relevant time (2012-2019), though the misrepresentations were not consistent.

141.   The ESOP's 2012 Form 5500 is only 11 pages long, and does not include any accounting statement or notes describing the 2012 Transaction.

142.   The 5500 filings for 2012, as well as 2013, 2014, 2015 and 2016, stated that the ESOP's cost of purchase for the CQ stock was only $4 million, and that the ESOP took out $4 million of debt for the purchase.

143.    However, the 2017 Form 5500 stated that the ESOP's cost of purchase for the CQ stock was less – $3,898,388 – and that the ESOP took out $3,898,388 in debt for the purchase.

144.    The 2018 5500 filing stated that the ESOP's cost of purchase for the CQ stock was even less – $3,885,302 – and that the ESOP took out $3,885,302 in debt for the purchase.

145.    In contrast, the Form D which Defendant Watson filed in January 2013 with the U.S. Securities and Exchange Commission on behalf of CQ Holding Company, Inc., stated that the purchase price of the CQ stock was $175 million. However, the Form D did not disclose how much of the purchase price was borrowed.

146.    None of the ESOP's governmental filings state the per share price paid by the ESOP for CQ stock in the 2012 Transaction.

147.    The Form 5500s reported that the value of CQ stock consistently went up in the years following the 2012 Transaction, then abruptly lost about 95% of its value in 2018, as shown in Table 1, below.

29

| Table 1 | | | | |
|---|---|---|---|---|
| **Date of Disclosure** | **Cost of CQ stock as reported** | **Value of CQ stock as reported** | **Valuation Date** | **Yr over Yr Gain or Loss** |
| 10/14/2013 | $4,000,000 | $5,400,000 | 12/31/2012 | 35% |
| 10/15/2014 | $4,000,000 | $28,294,972 | 12/31/2013 | 424% |
| 10/15/2015 | $4,000,000 | $30,914,969 | 12/31/2014 | 9% |
| 10/14/2016 | $4,000,000 | $33,189,967 | 12/31/2015 | 7% |
| 9/20/2017 | $4,000,000 | $48,962,106 | 12/31/2016 | 48% |
| 10/10/2018 | $3,898,388 | $53,169,149 | 12/31/2017 | 9% |
| Oct. 15, 2019 | $3,885,302 | $2,792,561 | 12/31/2018 | -95% |
| Source: Casino Queen ESOP Form 5500s filed between 2013 and 2019. | | | | |

148.    Immediately following the 2012 Transaction, the ESOP reported having approximately $5,400,000 in assets, just weeks after the ESOP purchased the Company stock for a reported $4 million. This indicates a 35% increase in the value of CQ stock.

149.    The reported CQ stock value continued to rise every year thereafter until plummeting in 2018, as shown in Table 1.

150.    The reported increases were sometimes astronomical, such as in 2013 when the stock value was reported to have increased by 424% in a single year

151.    The reported growth in value in the period prior to 2018 did not reflect reality, as the ESOP fiduciaries never reported to DOL the true sale price of the Company stock at the time of the 2012 Transaction, nor the approximately $170 million in debt that the ESOP acquired to purchase that stock.

30

152.    The information provided in the Form 5500s was intended to conceal, and did conceal, that the ESOP overpaid for CQ stock in the 2012 Transaction.

153.    It was not until October 15, 2019, when the Company filed its 2018 Form 5500 with the DOL—after all the Board Defendants involved in the 2012 Transaction had left their positions as Board Members and Trustees—that the ESOP fiduciaries disclosed the true value of Company stock.

154.    In the DOL filing dated October 15, 2019, the ESOP disclosed for the first time that there was "substantial doubt [about CQ Holding Company's] ability, and therefore the [ESOP's] ability, to continue as a going concern beyond one year from issuance of these financial statements. The [ESOP] may be unable to realize its assets and discharge its liabilities in the normal course of business."

155.    The ESOP also disclosed for the first time in its Form 5500 for Plan year 2018 (filed on October of 2019) that the Company "has not been in compliance with certain debt covenants since December 31, 2017."

### (3)    Annual Participant Statements

156.    Third, as part of their efforts to conceal their ERISA violations and to defraud ESOP participants into believing their CQ stock was fine, the Defendants misrepresented to participants that the value of the Casino Queen stock held in their individual ESOP accounts was growing.

157.    The Board Defendants, as members of the Administrative Committee or acting for the Company as the Plan Administrator, prepared and disseminated to ESOP participants annual account balance statement misrepresenting to them that their CQ stock was increasing in value every year between 2013 and 2017, sometimes by as much as 50% in one year.

31

2668185 v1

158.    Table 2 shows the value per share of CQ stock that was disclosed to participants in account statements provided to them from 2014 until 2019.

| Table 2 | | | |
|---|---|---|---|
| **Date of Disclosure** | **Valuation Date** | **Stock Value Per Share** | **Increase or Decrease in Value** |
| Not Disclosed | Transaction Date | Not Disclosed | --- |
| June 30, 2014 | 12/31/2013 | $ 56.59 | --- |
| Oct 9, 2015 | 12/31/2014 | $ 61.83 | 9% |
| [date unknown] | 12/31/2015 | $ 66.38 | 7% |
| [date unknown] | 12/31/2016 | $ 99.43 | 50% |
| June 27, 2018 | 12/312017 | $ 109.11 | 10% |
| Oct. 15, 2019 | 12/31/2018 | $ 5.75 | -95% |
| Source: Account statements sent to ESOP participants six months after year end. | | | |

159.    As shown above, even though the Company had not been in compliance with its debt covenants since 2017 (a fact concealed from participants and the DOL until 2019), Defendants reported to Plaintiffs and all ESOP participants on 12/31/2017 that their CQ stock had grown in value by 10%.

160.    In October 2019, the participants in the Casino Queen ESOP received their account balance statements which were current as of December 31, 2018. These statements disclosed that the value of CQ stock held in the participants' individual accounts had fallen from $109.11 per share as of 12/31/2017 to $5.75 per share as of 12/31/2018 – losing 95% of its value in one year.

32

161.    These October 2019 statements were accompanied by a letter from Terry Hanger, the new President of Casino Queen. The letter stated that "[t]he value of our ESOP has declined significantly from 2017," and attributed the decline to "the fact that our annual profit fell by nearly 60% between 2016 and 2018 and has continued to slide significantly into 2019."

162.    Company management stated that the 95% drop in the value of CQ stock occurred because business levels decreased over the years; however, employees who were working at the Casino, including in managerial positions, observed that the business levels at Casino Queen had not decreased dramatically from 2016 to 2018.

163.    Plaintiffs have never known, and still do not know, how many shares the ESOP purchased or how much the ESOP paid per share for Casino Queen stock in the Transaction.

164.    Because Plaintiffs and the other ESOP participants were not privy to the methodology the Company used to make its annual valuation of Company stock, and because Plaintiffs and other ESOP participants had no knowledge of the initial share price paid for the acquisition of Company stock, it was impossible for them to independently evaluate the accuracy of the reported share value and its annual growth.

165.    Plaintiffs exercised reasonable due diligence by reviewing their annual account balances and attending employee meetings concerning the ESOP. Both of these sources of information – which were the only sources readily available to Plaintiffs – indicated that participants' ESOP accounts of were growing rapidly. Thus, because Defendants actively concealed material facts from all ESOP participants, Plaintiffs did not discover that the ESOP overpaid for CQ stock until October 2019.

166.    The vast majority of the facts alleged herein were discovered by counsel for Plaintiffs through counsel's recent investigation and discussions with employees of Casino Queen.

167.    An employee characterized the illusion of wealth creation through employee-ownership ESOP as something that felt like "a set-up and the set-up worked perfectly."

168.    Because Defendants were aware: (i) of the financial difficulties of Casino Queen; (ii) that the Selling Shareholders were unable to sell the Company to a third party buyer after years of trying; (iii) that the ESOP paid an inflated price for CQ stock in the 2012 Transaction; and (iv) that the Asset Sale used to refinance the Transaction was not in the best interest of the ESOP, the statements and disclosures made to ESOP participants from 2012 until the October of 2019 concealed the many ERISA violations alleged herein.

169.    Defendants took acts to conceal their breaches of fiduciary duty by concealing and misrepresenting material facts. Indeed, because of their actions to conceal their ERISA violations, Defendants were able to "avoid detection" and hide those violations from participants, despite the diligent efforts by Plaintiffs to review their account statements and obtain available information concerning their ESOP accounts.

170.    Accordingly, the statute of limitations for all claims alleged herein, which relate to the facts and ERISA violations that Defendants concealed from participants and the DOL, runs from October 2019, which is the earliest that Plaintiffs discovered or could have discovered those ERISA violations.

## V.    CLASS ALLEGATIONS

171.    Plaintiffs bring these claims as a class action pursuant to Rule 23(a) and (b) of the Federal Rules of Civil Procedure, on behalf of the following class:[4]

---

[4] Plaintiffs reserve the right to revise their class definition, and to propose other or additional classes in subsequent pleadings or his motion for class certification, after discovery in this action.

2668185 v1

All participants in the Casino Queen ESOP who vested under the terms of the Plan, and those participants' beneficiaries, excluding Defendants and their immediate family members; any fiduciary of the ESOP; the officers and directors of CQ Holding Company, Inc. or of any other entity in which a Defendant has a controlling interest; and legal representatives, successors, and assigns of any such excluded persons.

172.    **Numerosity.** The members of the Class are so numerous that joinder of all members is impracticable. According to the 2018 Form 5500 filed with the Department of Labor, which is the most recent available Form 5500, as of December 31, 2018, there were 620 participants in the ESOP.

173.    **Commonality.** The issues of liability are common to all members of the Class and are capable of common answers as those issues primarily focus on Defendants' acts (or failure to act). Questions of law and fact common to the Class as a whole include, but are not limited to, the following:

(a)    Whether Defendants caused the Plan to engage in prohibited transactions under ERISA;

(b)    Whether the Board Defendants and/or Administrative Committee had the power to direct the Co-Trustees in connection with the ESOP's purchase of CQ Stock in the 2012 Transaction;

(c)    Whether the Board Defendants and/or Administrative Committee directed the Co-Trustees in connection with the ESOP's purchase of CQ Stock in the 2012 Transaction

(d)    Whether the Board Defendants breached their fiduciary duties by failing to adequately monitor the Co-Trustees or any other fiduciary who approved the 2012 Transaction;

(e)    Whether the Co-Trustees, as directed trustees, breached their fiduciary duties to ESOP participants by following the direction to complete the ESOP's purchase of CQ Stock for more than fair market value;

(f)    Whether refinancing the ESOP's debt through the Asset Sale was in the participants' best interest and constituted prohibited transactions;

(g)    Whether Defendants took acts to conceal their unlawful conduct and the true purchase price and value of the Company;

35

(h)     The amount of losses suffered by the ESOP as a result of Defendants' unlawful conduct;

(i)     The amount of profits that accrued to the Selling Board Members as a result of the unlawful conduct described herein; and

(j)     The proper form of equitable and injunctive relief, and other remedial relief.

174.    **Typicality.** Plaintiffs' claims are typical of those of the Class because (among other things): (a) they were employed by CQ and was a participant in the ESOP; (b) to the extent that Plaintiffs seek relief on behalf of the Plan pursuant to § 502(a)(2) of ERISA, their claims are not only typical of, but the same as, a claim under § 502(a)(2) brought by any other Class Member; (c) to the extent that Plaintiffs seek equitable relief, that relief would affect all Class Members equally; and (d) all of the Class members were injured and continue to be injured in the same manner based on the unlawful conduct alleged herein.

175.    **Adequacy.** Plaintiffs will fairly and adequately represent and protect the interests of the Class and are committed to the vigorous representation of the Class. Plaintiffs' retained counsel, Cohen Milstein Sellers and Toll PLLC ("Cohen Milstein") and Nichols Kaster, PLLP ("Nichols Kaster"), are experienced in class action and ERISA litigation, and Plaintiffs have no interests antagonistic to or in conflict with the interests of the Class.

176.    **Rule 23(b)(1)(A).** Class certification is appropriate pursuant to Fed. R. Civ. P. 23(b)(1)(A). Fiduciaries of ERISA-covered plans have a legal obligation to act consistently with respect to all similarly situated participants and to act in the best interests of the ESOP and its participants. This action challenges whether Defendants acted consistently with their fiduciary duties or otherwise violated ERISA as to the Casino Queen ESOP as a whole. As a result, prosecution of separate actions by individual members would create the risk of inconsistent or

36

varying adjudications that would establish incompatible standards of conduct for Defendants relating to the ESOP.

177.   **Rule 23(b)(1)(B).** Class certification is also appropriate pursuant to Fed. R. Civ. P. 23(b)(1)(B).   Administration of an ERISA-covered plan requires that all similarly situated participants be treated the same. Resolving whether Defendants breached their fiduciary obligations to the ESOP and engaged in prohibited transactions with respect to the Plan would, as a practical matter, be dispositive of the interests of the other participants in the ESOP even if they and would substantially impair or impede their ability to protect their interests if they are not made parties to this litigation by being included in the Class.  Further, the relief granted by the Court, including any equitable relief, injunctive relief, or accounting of profits, may be dispositive of the interests of other class members.

178.   **Rule 23(b)(2).** Additionally and alternatively, class certification is appropriate pursuant to Fed. R. Civ. P. 23(b)(2) because Defendants have acted or refused to act on grounds generally applicable to the Class, making appropriate declaratory and injunctive relief with respect to Plaintiffs and the Class as a whole. This action challenges whether Defendants acted consistently with their fiduciary duties or otherwise violated ERISA as to the ESOP as a whole. The members of the Class are entitled to declaratory and injunctive relief to remedy Defendants' fiduciary violations. As ERISA is based on trust law, any monetary relief consists of equitable monetary relief and is either provided directly by the declaratory or injunctive relief or flows as a necessary consequence of that relief.

179.   **Rule 23(b)(3).** Additionally and alternatively, class certification is appropriate pursuant to Fed. R. Civ. P. 23(b)(3) because questions of law and fact common to all Class members predominate over any questions affecting individual members of the Class, and because

a class action is superior to other available methods for the fair and efficient adjudication of this action. Common questions related to liability will necessarily predominate over any individual questions because Defendants' duties and obligations were uniform to all participants and therefore all members of the Class. Plaintiffs and all Class members have been harmed by the unlawful conduct alleged herein. As relief and any recovery will be on behalf of the Plan, common questions as to remedies will likewise predominate over any individual issues.

180.    A class action is a superior method to other available methods for the fair and efficient adjudication of this action. As the claims are brought on behalf of the ESOP, resolution of the issues in this litigation will be efficiently resolved in a single proceeding rather than multiple proceedings. The losses suffered by individual Class members are small compared to the expense and burden of individual prosecution of this action. In addition, class certification is superior because it will obviate the need for unduly duplicative litigation which might result in inconsistent judgments about Defendants' duties with regard to the ESOP.

181.    In addition, the following factors also favor certification of this case as a class action:

- No other litigation concerning this controversy has been filed by any other members of the Class; and

- The names and addresses of the Class members are available from the ESOP, and notice will be provided to all Class members to the extent required by Rule 23.

## VI.    CAUSES OF ACTION

**Count I**
**Prohibited Transactions in Violation of ERISA § 406(a), 29 U.S.C. §§ 1106(a)**
**(Against All Defendants in Connection With the 2012 Transaction)**

182.    Plaintiffs incorporate the preceding paragraphs as though set forth herein.

183.    ERISA § 406(a)(1), 29 U.S.C. § 1106(a)(1), requires that a plan fiduciary "shall not cause the plan to engage in a transaction, if he knows or should know that such transaction constitutes a direct or indirect (A) sale or exchange, or leasing of any property between the plan and a party in interest," or a "(D) transfer to, or use by or for the benefit of, a party in interest, of any assets of the plan."

184.    ERISA § 406(a)(1)(B), 29 U.S.C. § 1106(a)(1)(B), requires that a plan fiduciary shall not cause the plan to engage in a transaction, if he knows or should know that such transaction constitutes the direct or indirect loan of money between the plan and a party in interest.

185.    ERISA § 3(14), 29 U.S.C. § 1002(14) defines a "party in interest" to include, *inter alia*:

- "any fiduciary … of such employee benefit plan";
- "an employer any of whose employees are covered by such plan [the ESOP]"; or
- "an employee, officer or director … or a 10 percent or more shareholder" of an employer whose employees are covered by the ESOP.
- "a relative (as defined in paragraph (15)) of any individual described in subparagraph (A), (B), (C), or (E)[.]"

29 U.S.C. § 1002(14)(A), (C), (H), and (F).

186.    As alleged above, each of the Defendants were fiduciaries of the Casino Queen ESOP before and at the time of the 2012 Transaction.

187.    Because each of the Selling Shareholders was a member of the Board of Directors of the Company, a 10% or more shareholder, and/or a family member of Board member or 10% shareholder, each of them was a party in interest to the ESOP within the meaning of ERISA § 3(14), 29 U.S.C. § 1002(14).

188.    The ESOP's purchase of all outstanding CQ stock from the Selling Shareholders, each of whom was a party in interest to the ESOP, constituted an exchange of property between

the ESOP and the Selling Shareholders in violation of ERISA § 406(a)(1)(A), 29 U.S.C. § 1106(a)(1)(A), as well as a transfer of the ESOP assets to the Selling Shareholders in violation of ERISA § 406(a)(1)(D), 29 U.S.C. § 1106(a)(1)(D).

189.   The ESOP's Transaction loans from the Selling Shareholders also constituted prohibited transactions in violation of ERISA § 406(a)(1)(B), 29 U.S.C. § 1106(a)(1)(B).

190.   Further, each individual payment to the Selling Shareholders by the ESOP in connection with the Transaction loans constituted another exchange of property between the ESOP and the Selling Shareholders in violation of ERISA § 406(a)(1)(A), 29 U.S.C. § 1106(a)(1)(A), as well as a transfer of the ESOP assets to the Selling Shareholders in violation of ERISA § 406(a)(1)(D), 29 U.S.C. § 1106(a)(1)(D).

191.   The Board Defendants, acting in their capacity as the Administrative Committee who directed the Co-Trustees in the Transaction, improperly caused the prohibited transactions set forth herein.  By virtue of the foregoing, the Board Defendants and the Administrative Committee Defendants violated ERISA §§ 406(a)(1)(A), (B) and (D), 29 U.S.C. §§ 1106(a)(1)(A), (B) and (D).

192.   Further, Defendants Watson and Barrows, acting in their capacity as directed trustees, completed the ESOP's purchase of CQ stock for greater than fair market value at the direction of the other Board Defendants despite their knowledge that the 2012 Transaction violated ERISA's prohibited transaction rules.

193.   These prohibited transactions caused losses to the Plan and enriched the Selling Board Members.

40

194.    The Defendants are liable for appropriate relief under ERISA § 409, 29 U.S.C. § 1109, and ERISA §§ 502(a)(2) and (3), 29 U.S.C. §§ 1132(a)(2) and (3), for these prohibited transactions.

**Count II**
**Self-Dealing in Violation of ERISA § 406(b), 29 U.S.C. §§ 1106(b)**
**(Against Selling Board Members in Connection with the 2012 Transaction)**

195.    Plaintiffs incorporate the preceding paragraphs as though set forth herein.

196.    As alleged above, the Selling Board Members were fiduciaries of the Casino Queen ESOP before, during and after the 2012 Transaction.

197.    ERISA § 406(b)(1), 29 U.S.C. § 1106(b)(1), prohibits a fiduciary from "deal[ing] with the assets of the plan in his own interest or for his own account[.]" 29 U.S.C. § 1106(b)(1).

198.    The Selling Board Members orchestrated and caused the sale of CQ stock to the ESOP in the 2012 Transaction to enrich themselves and dealt with ESOP assets in their own interest within the meaning of ERISA § 406(b)(1), 29 U.S.C. § 1106(b)(1).

199.    These prohibited transactions caused losses to the Plan and enriched the Selling Board Members.

200.    The Selling Board Members are liable for appropriate relief under ERISA § 409, 29 U.S.C. § 1109, and ERISA §§ 502(a)(2) and (3), 29 U.S.C. §§ 1132(a)(2) and (3), for these prohibited transactions.

**Count III**
**Breach of Fiduciary Duties Under ERISA §§ 404(a)(1)(A) and (B),**
**29 U.S.C. §§ 1104(a)(1)(A) and (B)**
**(Against All Defendants in Connection With the 2012 Transaction)**

201.    Plaintiffs incorporate the preceding paragraphs as though set forth herein.

41

2668185 v1

202.    From before the 2012 Transaction until after it was completed, all Defendants were members of the Board and Administrative Committee. As such, pursuant to ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), they were ESOP fiduciaries responsible for the 2012 Transaction because they: (1) exercised discretionary authority or control respecting management of the ESOP; (2) exercised authority or control over the ESOP's assets; and/or (3) had discretionary authority or discretionary responsibility in the administration of the ESOP.

203.    As fiduciaries responsible for the 2012 Transaction, all Defendants were required to act "for the exclusive purpose of providing benefits to participants and the beneficiaries of the plan." *See* ERISA § 404(a)(1)(A), 29 U.S.C. § 1104(a)(1)(A).

204.    As fiduciaries responsible for the 2012 Transaction, all Defendants were required to act with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent person acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims. *See* ERISA § 404(a)(1)(B), 29 U.S.C. § 1104(a)(1)(B).

205.    In the context of a sale of the sponsoring company/employer to an ESOP, the duties of loyalty under ERISA § 404(a)(1)(A) and prudence under ERISA § 404(a)(1)(B) require a fiduciary to undertake an appropriate investigation to ensure that the ESOP and its participants pay no more than adequate consideration for the Company's assets.

206.    Pursuant to ERISA § 3(18), adequate consideration for an asset for which there is no generally recognized market means the fair market value of the asset determined in good faith by the trustee or named fiduciary pursuant to the terms of the plan and in accordance with Department of Labor regulations.

207.    As fiduciaries responsible for the 2012 Transaction, all Defendants were required to engage in appropriate due diligence and an independent investigation of the fair market value of the CQ stock sold to the ESOP.

208.    As alleged above, a prudent and loyal fiduciary would have determined that the amount the ESOP paid for CQ stock, approximately $170 million, was greater than the fair market value of the Company at the time of the Transaction.

209.    A prudent and loyal fiduciary would have recognized that the $170 million purchase price was based on unrealistic financial projections and that the prior unsuccessful attempts to sell the Company indicated it was not worth $170 million.

210.    A prudent and loyal fiduciary would have concluded that the 100% leveraged structure necessary to complete the 2012 the Transaction was imprudent and not in the best interest of the ESOP participants.

211.    By failing to act prudently and loyally in connection with the 2012 Transaction, and by failing to restore the losses caused thereby, all Defendants breached their fiduciary duties under ERISA § 404(a)(1)(A) and (B), 29 U.S.C. § 1104(a)(1)(A) and (B), and caused losses to the ESOP and the individual retirement accounts of the participants in the ESOP.

212.    All Defendants are liable for appropriate relief under ERISA § 409, 29 U.S.C. § 1109, and ERISA §§ 502(a)(2) and (3), 29 U.S.C. §§ 1132(a)(2) and (3), for these violations of ERISA §§ 404(a)(1)(A) and (B), 29 U.S.C. §§ 1104(a)(1)(A) and (B).

**Count IV**
**Breach of Fiduciary Duties and Prohibited Transactions**
**Under ERISA §§ 404(a)(1) and 406(a)(1)(A), 29 U.S.C. §§ 1104(a)(1) and 1106(a)**
**(Against Co-Trustees Watson and Barrows in Connection with Events after the**
**2012 Transaction Including the Asset Sale)**

213.    Plaintiffs incorporate the preceding paragraphs as though set forth herein.

43

214.    As discretionary Co-Trustees following the 2012 Transaction, Defendants Watson and Barrows were required to act at all times prudently and loyally in accordance with ERISA § 404(a)(1)(A) and (B), 29 U.S.C. § 1104(a)(1)(A) and (B).

215.    Among other things, as prudent and loyal fiduciaries to the ESOP following the 2012 Transaction, the Co-Trustees should have corrected mistakes in the 2012 Transaction and related reporting to participants and the DOL about the Transaction; sought to remedy any overpayment by the ESOP for Company stock; and sought to restore the losses caused thereby.

216.    In addition, the Co-Trustees should have closely scrutinized the Asset Sale and conducted appropriate due diligence regarding the Asset Sale, which would have revealed that it was not prudent or in the best interest of Plan participants.

217.    The Co-Trustees failed to do any of these things. Instead, they concealed the Company's true financial condition and value (or lack thereof), and subsequently approved the Asset Sale which was not in the best interests of ESOP participants.

218.    As a result, the Co-Trustees breached their fiduciary duties under ERISA § 404(a)(1)(A) and (B), 29 U.S.C. § 1104(a)(1)(A) and (B), and caused losses to the ESOP and the individual retirement accounts of the participants in the ESOP.

219.    Additionally, through their votes – on behalf of the ESOP – to approve the refinancing of the 2012 Transaction debt as part of the Asset Sale, which resulted in the transfers of ESOP assets to the Selling Shareholders, the Co-Trustees caused prohibited transactions in violation of ERISA § 406(a)(1)(D), 29 U.S.C. § 1106(a)(1)(D). These prohibited transactions caused losses to the ESOP and the individual retirement accounts of the participants in the ESOP.

220.    The Co-Trustees are liable for appropriate relief under ERISA § 409, 29 U.S.C. § 1109, and ERISA §§ 502(a)(2) and (3), 29 U.S.C. §§ 1132(a)(2) and (3), for these violations of

44

ERISA §§ 404(a)(1)(A) and (B), 29 U.S.C. §§ 1104(a)(1)(A) and (B), and ERISA § 406(a)(1)(D), 29 U.S.C. § 1106(a)(1)(D).

### Count V
### Failure to Monitor Appointed Fiduciaries
### Under ERISA §§ 404(a)(1)(A) and (B), 29 U.S.C. §§ 1104(a)(1)(A) and (B)
### (Against Board Defendants in Connection With the 2012 Transaction & Asset Sale)

221.     Plaintiffs incorporate the preceding paragraphs as though set forth herein.

222.     The Board Defendants had a duty to monitor any appointed fiduciary to ensure that such appointee is acting in accordance with ERISA and in compliance with the terms of the Plan. *See* 29 C.F.R. § 2509.75-8 (FR-17). If the appointed fiduciary has violated or continues to violate ERISA, the monitoring fiduciary must remove the appointed fiduciary and attempt to restore any losses to the plan caused by the ERISA violations.

223.     The Board Defendants had the power to appoint and did appoint all fiduciaries acting on behalf of the ESOP during the 2012 Transaction, including the Co-Trustees and the Administrative Committee members. The Board Defendants also had the power to remove any fiduciary acting on behalf of the ESOP during the 2012 Transaction if such fiduciary was not properly carrying out their duties.

224.     The Board Defendants breached their duty to monitor the ESOP fiduciaries that they appointed. Among other things, the Board Defendants:

1) appointed the Co-Trustees and Administrative Committee merely to rubber stamp the 2012 Transaction (and the subsequent Asset Sale);

2) failed to monitor and evaluate the performance of the ESOP fiduciaries they appointed, or have a system in place for doing so;

3) failed to ensure that the fiduciaries they appointed to act for the ESOP in connection with the 2012 Transaction had complete, accurate and realistic financial information concerning the financial viability of the Company, including information concerning the Company's financial projections for cash flow and earnings upon which the valuation report was based;

45

4)  stood idly by while participants suffered substantial losses as a result of the ERISA violations caused by the fiduciaries they appointed;

5)  failed to implement a system to resolve conflicts of interest;

6)  failed to remove appointed fiduciaries whose performance was inadequate; and

7)  failed to ensure that these fiduciaries took appropriate remedial action to redress their violations of ERISA.

225.   The foregoing monitoring failures by the Board Defendants caused losses to the ESOP and the individual retirement accounts of the participants in the ESOP.

226.   The Board Defendants are liable for appropriate relief under ERISA § 409, 29 U.S.C. § 1109, and ERISA §§ 502(a)(2) and (3), 29 U.S.C. §§ 1132(a)(2) and (3), for these monitoring failures.

**Alternatively, Count VI**
**Co-Fiduciary Liability Under ERISA § 405(a)(1), 29 U.S.C. §§ 1105(a)(1)**
**(Against Board Defendants for 2012 Transaction & Asset Sale)**

227.   Plaintiffs incorporate the preceding paragraphs as though set forth herein.

228.   ERISA § 405(a)(1), 29 U.S.C. § 1105(a)(1) provides that a fiduciary "with respect to a plan shall be liable for a breach of fiduciary responsibility of another fiduciary with respect to the same plan … if he participates knowingly in, or knowingly undertakes to conceal, an act or omission of such other fiduciary[.]"

229.   ERISA § 405(a)(2), 29 U.S.C. § 1105(a)(2) provides that a fiduciary "with respect to a plan shall be liable for a breach of fiduciary responsibility of another fiduciary with respect to the same plan … if he has enabled such other fiduciary to commit a breach[.]"

230.   ERISA § 405(a)(3), 29 U.S.C. § 1105(a)(3) provides that a fiduciary "with respect to a plan shall be liable for a breach of fiduciary responsibility of another fiduciary with respect to

the same plan … if he has knowledge of a breach by such other fiduciary, unless he makes reasonable efforts under the circumstances to remedy the breach."

231.   The Board Defendants were involved in and directed the preparation of the financial projections underlying the stock appraisal relied upon to justify the price of $170 million that the ESOP paid for CQ stock.

232.   The Board Defendants also had responsibility for directing and monitoring Company executives and management, who assisted in preparing the financial projections underlying the valuation relied upon to approve the price that the ESOP paid for the Company.

233.   In addition, the Selling Board Members had unique knowledge about the Company's finances and the true value of the Company because they had unsuccessfully attempted to sell Casino Queen to other third-party buyers and engaged in significant pricing negotiations and due diligence requested by those potential buyers.

234.   Based on their responsibilities and their knowledge of the Company's finances, the Board Defendants knew that the financial projections underlying the stock appraisal were unrealistic and inflated, and knew that the 2012 Transaction was not in the best interest of the ESOP participants, and nonetheless knowingly participated in the Transaction and/or directed the Transaction.

235.   The Board Defendants also knew that the Asset Sale was not prudent nor in the best interest of the ESOP participants, and nonetheless knowingly participated in the sale and/or approved the sale, in violation of ERISA § 405(a)(1), 29 U.S.C. § 1105(a)(1).

236.   Despite their knowledge of that the 2012 Transaction and the Asset Sale constituted breaches of fiduciary duty by other fiduciaries, the Board Defendants made no reasonable efforts to remedy those violations contrary to ERISA § 405(a)(3), 29 U.S.C. § 1105(a)(3). To the contrary,

the Board Defendants concealed such fiduciary violations and failed to ensure that ESOP participants received proper disclosures.

237.    The Board Defendants, by failing to properly monitor the fiduciaries they appointed in connection with the 2012 Transaction and the Asset Sale, enabled those fiduciaries to commit breaches of fiduciary duties.

238.    Through the actions and omissions alleged in this Count, the Board Defendants caused losses to the ESOP and the individual retirement accounts of the participants in the ESOP.

239.    By virtue of the foregoing, if the Board Defendants are not found to have direct fiduciary responsibility for the prohibited transactions and fiduciary breaches committed in connection with the 2012 Transaction and the Asset Sale, then they nonetheless are jointly and severally liable as co-fiduciaries under ERISA §§ 405(a)(1), (2) and (3) 29 U.S.C. §§ 1105(a)(1), (2) and (3), for violations of other fiduciaries in connection with the 2012 Transaction and the Asset Sale.

## VII.    <u>PRAYER FOR RELIEF</u>

Plaintiffs, on behalf of the Plan and the Class, pray that judgment be entered against Defendants on each Count and respectfully requests that the Court award the following relief:

    a.  Declare that Defendants have breached their fiduciary duties to the Casino Queen ESOP and caused prohibited transactions in the manner described herein;

    b.  Order Defendants to restore all losses to the ESOP, or pay such amount or surcharge to the ESOP as is necessary to make it whole for any losses to the ESOP, which resulted from said breaches and prohibited transactions;

    c.  Order the Selling Board Members to provide all accountings necessary to determine the amount of profits they must restore to the ESOP pursuant to 29 U.S.C. §§ 1109(a) and 1132(a)(2) and (3), and further order that they make such a restoration of profits;

    d.  To the extent necessary, issue an injunction or order creating a constructive trust into which all ill-gotten gains, fees, and/or profits paid to any of the Selling Board

Members in violation of ERISA shall be placed for the sole benefit of the ESOP and its participants and beneficiaries;

e. Appoint an independent fiduciary to manage the assets of the ESOP;

f. Order that Defendants provide other appropriate equitable relief to the ESOP;

g. Certify the Class, appoint Plaintiffs as class representatives, and appoint Cohen Milstein and Nichols Kaster as Class Counsel;

h. Award attorneys' fees and costs pursuant to ERISA § 502(g), 29 U.S.C. § 1132(g), and/or order payment of fees and expenses to Plaintiffs' counsel on the basis of the common benefit or common fund doctrine out of any money recovered for the Class;

i. Award pre-judgment interest and post-judgment interest; and

j. Award such other and further relief that the Court determines is appropriate pursuant to ERISA § 502(a)(2) and/or § 502(a)(3), 29 U.S.C. § 1132(a)(2) and/or 1132(a)(3), or pursuant to Rule 54(c) of the Federal Rules of Civil Procedure, or that is equitable and just.

Dated: April 27, 2020

**COHEN MILSTEIN SELLERS & TOLL PLLC**

*/s/Mary Bortscheller*
Mary J. Bortscheller, Illinois Bar: 6304457
Michelle C. Yau, *pro hac vice* forthcoming
Sarah D. Holz, *pro hac vice* forthcoming
1100 New York Ave. NW ● Fifth Floor
Washington, DC 20005
(202) 408-4600
mbortscheller@cohenmilstein.com
myau@cohenmilstein.com
sholz@cohenmilstein.com

49

**NICHOLS KASTER, PLLP**
Kai H. Richter, *pro hac vice* forthcoming
Paul Lukas, *pro hac vice* forthcoming
Grace Chanin, *pro hac vice* forthcoming
4600 IDS Center, 80 S 8th Street
Minneapolis, MN 55402
Telephone: 612-256-3200
krichter@nka.com
lukas@nka.com
gchanin@nka.com

*Attorneys for Plaintiffs*

50