# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF ILLINOIS

Tom Hensiek, Jason Gill, and Lillian Wrobel, on behalf of themselves individually, and on behalf of similarly situated participants and beneficiaries of the Casino Queen Employee Stock Ownership Plan,

       Plaintiffs,

    v.

Board of Directors of CQ Holding Company, Inc. (a/k/a CQH Board of Directors), the Administrative Committee of the Casino Queen Employee Stock Ownership Plan, the Co-Trustees of the Casino Queen Employee Stock Ownership Plan, Charles Bidwill III, Timothy J. Rand, James G. Koman, Jeffrey Watson, Robert Barrows, Mary C. Bidwill, Brian R. Bidwill, Patricia M. Bidwill, Shauna Bidwill Valenzuela, The Bidwill Succession Trust, its Trustee, and any beneficiaries of said Trust, Bidwill Kasino Trust, its Trustee, and any beneficiaries of said Trust, The Karen L. Hamilton Irrevocable Trust, its Trustee, and any beneficiaries of said Trust, The William J. Koman, Jr. Irrevocable Trust, its Trustee, and any beneficiaries of said Trust, The William J. Koman, Sr. Living Trust, its Trustee, and any beneficiaries of said Trust, The Elizabeth S. Koman Irrevocable Trust, its Trustee, and any beneficiaries of said Trust, The Janis A. Koman Irrevocable Trust, its Trustee, and any beneficiaries of said Trust, and The James G. Koman Irrevocable Trust, its Trustee, and any beneficiaries of said Trust,

       Defendants.

James G. Koman,

       Contingent Crossclaim Plaintiff,

    v.

Case No. 3:20-cv-0377-DWD

**DEFENDANT JAMES G. KOMAN ANSWER TO PLAINTIFFS' FIRST AMENDED COMPLAINT, AFFIRMATIVE DEFENSES, AND CONTINGENT CROSSCLAIMS**

Timothy J. Rand, Charles Bidwill, III, Jeffrey Watson, Robert Barrows, the Board of Directors of CQ Holding Company, Inc., and the Administrative Committee of the Casino Queen Employee Stock Ownership Plan,

Contingent Crossclaim Defendants.

## <u>TABLE OF CONTENTS</u>

ANSWER………………………………………………………………………………..1

AFFIRMATIVE DEFENSES………………………………………………………………82

CONTINGENT CROSSCLAIMS…………………………………………………….…83

**DEFENDANT JAMES G. KOMAN'S ANSWER TO
PLAINTIFFS' FIRST AMENDED COMPLAINT**

Defendant James G. Koman, by and through his undersigned counsel, answers the First Amended Complaint filed by Plaintiffs Tom Hensiek, Jason Gill, and Lillian Wrobel (Dkt. 144) as follows:

## I.      INTRODUCTION

1.      This is a civil enforcement action brought pursuant to Sections 502(a)(2) and 502(a)(3) of the Employee Retirement Income Security Act of 1974, as amended ("ERISA"), 29 U.S.C. § 1132(a)(2) and (a)(3), by Plaintiffs Tom Hensiek, Jason Gill, and Lillian Wrobel, on behalf of themselves individually and other participants and beneficiaries in the Casino Queen Employee Stock Ownership Plan ("Casino Queen ESOP," "the ESOP," or "the Plan").

**ANSWER:**     Mr. Koman admits that Plaintiffs have filed the suit described in this paragraph under ERISA. Mr. Koman denies the remaining allegations in this paragraph.

2.      The Casino Queen ESOP is an ERISA-protected retirement plan where the individual retirement accounts of current and former employees are invested entirely in the stock of CQ Holding Company, Inc. ("the Company" or "CQH").  *See* 29 C.F.R. § 2550.407d-6 (definition of "employee stock ownership plan"). CQH in turn owns Casino Queen, Inc. ("CQI"), an Illinois corporation founded by five family groups: (1) the Koman family, (2) the Bidwill family, (3) Timothy Rand, (4) the Kenny family, and (5) the Gaughan/Toti group. Leading up to the transactions at issue in this case, each of these five family groups owned an equal portion of CQI and controlled one of the five seats on the CQI Board of Directors.  The members of these five family groups that owned CQI are collectively referred to herein as the "Selling Shareholders." "Casino Queen" and "the Casino," as used herein, refer to both CQH and CQI.

**ANSWER:**     Sentence 1 states a legal conclusion to which no response is required. To the extent a response is required, Mr. Koman admits that the Casino Queen ESOP is an ESOP as

defined by ERISA but denies the remaining allegations in sentence 1.  Mr. Koman admits that Casino Queen, Inc. ("CQI") is wholly owned by CQ Holding Company, Inc. ("CQH") and that individuals and entities associated with these groups have at times owned shares of CQI, but denies the remainder of the allegations in sentence 2.  The remainder of sentence 3 contains a legal conclusion to which no response is required.  To the extent a response is required, Mr. Koman denies the remaining allegations in sentence 3. Sentence 4 contains no allegations requiring a response. To the extent a response is required, Mr. Koman denies the allegations in sentence 4.

3.     As participants in the Casino Queen ESOP, Plaintiffs were told initially that the ESOP was a great opportunity that would lead to the creation of wealth for Casino employees. However, this alluring promise was revealed to be a mere illusion in 2019 when the value of CQH stock—the sole asset held in the participants' ESOP accounts—was disclosed to be worth vastly less than what the ESOP's fiduciaries led Plaintiffs to believe it was worth.  This drop in the value of the CQH stock followed years in which the ESOP's fiduciaries concealed both that the ESOP had significantly overpaid for the CQH stock in 2012, and that they engaged in other ERISA violations, including selling all of the Casino's real property out from under the ESOP.

**ANSWER:**     Mr. Koman denies the allegations in this paragraph.

4.     ERISA imposes exacting requirements on retirement plan fiduciaries because such plans all too often "are abused by those responsible for their management who manipulate them for their own purposes or make poor investments with them."  *Mass. Mutual Life Ins. Co. v. Russell*, 473 U.S. 134, 140 n.8 (1985) (quoting 3 Leg. Hist. 4811; 120 Cong. Rec. 29957 (1974)). Under ERISA, fiduciaries must abide by strict fiduciary standards, including the duties of loyalty and prudence, ERISA § 404(a)(1)(A) and (B), 29 U.S.C. § 1104(a)(1)(A) and (B), and prohibited transaction rules, ERISA § 406(a) and (b), 29 U.S.C. § 1106(a) and (b), which categorically bar specific types of transactions that Congress found likely to injure the plan.  *Harris Tr. and Sav. Bank v. Salomon Smith Barney, Inc.*, 530 U.S. 238, 241-43 (2000).  As discussed herein, Defendants did not come close to meeting their ERISA obligations.

2

**ANSWER:**   This paragraph states legal conclusions to which no response is required. To the extent a response is required, Mr. Koman denies the allegations in this paragraph.

5.     CQI opened the Casino Queen Hotel & Casino, a riverboat gambling house, in 1993.  In 2007, CQI moved the business on land to a location in East St. Louis, Illinois.  Beginning in or around 2006, the Selling Shareholders tried unsuccessfully for several years to sell CQI to third party buyers.

**ANSWER:**   Mr. Koman admits the allegations in sentences 1 and 2. Mr. Koman admits that CQI was owned by a group of investors who considered sales to third parties, but denies the remaining allegations in sentence 3.

6.     Because the Selling Shareholders were unable to find a buyer willing to pay what the Selling Shareholders wanted for CQI, they created their own buyer by establishing the ESOP to buy it.  The Selling Shareholders, through their family-controlled Board seats, then caused the ESOP to purchase Casino Queen for at least $170 million through a complex, integrated transaction that involved the creation of a holding company (CQH), numerous stock transfers, and the assumption of high-cost debt to cover the entire purchase price, including a $25 million loan from the Selling Shareholders themselves.[1]  This entire transaction is hereinafter referred to as the "2012 Transaction" or the "ESOP Transaction."  The 2012 Transaction was designed to and did conceal from the ESOP participants and the Department of Labor ("DOL") that the Selling Shareholders were overpaid for their stock, that Casino Queen had assumed a dangerously high debt load to complete the transaction, and that the debt came with draconian interest rates as high as 17.5%.

---

[1] As explained in detail below, Plaintiffs do not know the exact purchase price of the ESOP.  The Company submitted documentation of the 2012 Transaction to the Securities and Exchange Commission stating that the sale price was $175 million, while reporting to the Department of Labor that the sale price was only $4 million.  Media reports at the time of sale indicated that the Company was sold for $170 million.

**ANSWER:**   Mr. Koman denies the allegations in sentences 1 and 2.  Mr. Koman admits that the ESOP entered into a leveraged stock purchase transaction on December 26, 2012, in which it acquired shares of CQH (the "ESOP Transaction"), but denies the remaining of the allegations in sentence 3. Mr. Koman denies the allegations in sentence 4.  Footnote 1 of this paragraph contains no allegations requiring a response.  To the extent a response is required, Mr. Koman denies the allegations in footnote 1.

7.     With the formation of CQH, the Selling Shareholders installed Defendants

James G. Koman ("Koman"), Charles Bidwill III ("Bidwill") and Timothy J. Rand ("Rand")—all

former CQI Board Members—on the newly formed CQH Board of Directors, which allowed them

to retain control of Casino Queen after the 2012 Transaction.  The CQH Board then handpicked

two of their own, Jeffrey Watson ("Watson"), Casino Queen's General Manager, and Robert Bar-

rows ("Barrows"), Casino Queen's Chief Financial Officer, to be the "Co-Trustees" of the ESOP

charged with approving the 2012 Transaction.  In that role, the Co-Trustees were explicitly in-

structed to take direction from an "Administrative Committee" that the CQH Board set up for the

ESOP,  which (not coincidentally) consisted of CQH Board Members and officers of the Company.

The CQH Board retained the power to dismiss the Co-Trustees (who continued serving on the CQH

Board despite being charged with approving the 2012 Transaction) and Administrative Committee

members, and thus controlled their decision-making.

**ANSWER:**   Mr. Koman admits that CQI authorized CQI's officers to incorporate a hold-
ing company, CQH, in 2012; that CQI's officers incorporated CQH on October 2, 2012; and that
CQI's officers appointed Messrs. Watson and Barrows as the sole members of CQH's board of
directors. (Declaration of Andrew D. Salek-Raham ("Decl.") Ex. A-D). Mr. Koman further admits
that Messrs. Watson and Barrows were the sole members of CQH's board of directors at the time
the CQH board of directors appointed Messrs. Watson and Barrows the sole officers of CQH and
the co-trustees of the ESOP. (Decl. Ex. E-I). Mr. Koman further admits that, pursuant to the terms
of the Plan Document and Trust Agreement, GreatBanc Trust Company ("GreatBanc") was en-
gaged as an independent fiduciary with the sole fiduciary authority to direct Messrs. Watson and
Barrows, as the ESOP's co-trustees, to cause the ESOP to enter into the ESOP Transaction. (Decl.
Ex. G, J-L). Mr. Koman further admits that GreatBanc directed the Co-Trustees to, among other
things, cause the ESOP to enter into the ESOP Transaction and, after the ESOP had acquired shares
of CQH, to appoint Messrs. Koman, Bidwill, and Rand to the CQH board of directors on December
26, 2012. (Decl. Ex. M-N). Mr. Koman further admits that, following their appointment to the

4

CQH board of directors, Messrs. Koman, Bidwill, and Rand were classified as "Note Holder Directors," a category of CQH director not authorized to take any actions except the limited actions related to certain corporate transactions that were enumerated in CQH's amended certificate of incorporation. (*See* Decl. Ex. N-O). Mr. Koman admits that he, Mr. Bidwill, and Mr. Rand resigned as members of the CQI board of directors on December 26, 2012. (*See* Decl. Ex. P). Mr. Koman further admits that Mr. Watson was, at times, the General Manager of CQI, and that Mr. Barrows was, at times, the Chief Financial Officer of CQI. Mr. Koman denies the remaining allegations in this paragraph.

8.    Because the CQH Board Members retained power over the Co-Trustees, and also over the Administrative Committee on which the CQH Board Members served, each of them was an ERISA fiduciary to the ESOP.  The CQH Board Members also had fiduciary authority with respect to the 2012 Transaction pursuant to the terms of a written document (the "Plan Document") that governed the ESOP, as alleged in detail below.  This fiduciary status required that the CQH Board Members act prudently and loyally towards the ESOP and its participants, and avoid ERISA prohibited transactions.

**ANSWER:**    This paragraph states legal conclusions to which no response is required. To the extent a response is required, Mr. Koman denies the allegations in this paragraph.

9.    Koman, Bidwill, and Rand (and their families) were direct beneficiaries of the 2012 Transaction.  Accordingly, they were deeply conflicted in the 2012 ESOP Transaction. Nevertheless, with the assistance of the Co-Trustees and Administrative Committee, they indulged their significant conflicts and violated ERISA through two major transactions—the 2012 ESOP Transaction and a 2013 sale of Casino Queen's real property—the details and effects of which were largely concealed from the ESOP participants and the public.

**ANSWER:**    Mr. Koman admits that certain trusts associated with certain members of the Koman family sold shares of CQH in connection with the ESOP Transaction.  Mr. Koman denies the remainder of the allegations in sentence 1.  Sentences 2 and 3 state legal conclusions to which no response is required. To the extent a response is required, Mr. Koman denies the allegations in sentences 2 and 3.

10.    First, through their control over the ESOP's Co-Trustees and Administrative

Committee, Koman, Bidwill, and Rand (acting in their fiduciary capacity and backed by their family members who were also Selling Shareholders) facilitated and directed the Co-Trustees to approve the 2012 Transaction wherein the ESOP overpaid the Selling Shareholders for the CQH stock. The inflated price paid for the CQH stock was based, in part, on financial projections for Casino Queen's future profitability, which the CQH Board knew or should have known were unreliable, unrealistic, and/or inaccurate. The inflated price also failed to correctly account for information provided to the valuation company by and/or as a result of Koman, Bidwill, and Rand that was materially misleading and incomplete. Further, the valuation failed to apply appropriate reductions for the company's debt position, retention of Selling Shareholder control, and Stock Appreciation Rights issued to the Co-Trustees, among other things. The CQH Board also should have negotiated better interest rates for the benefit of the ESOP.

**ANSWER:** Mr. Koman admits that GreatBanc had, and exercised, sole discretion to direct the ESOP's co-trustees to cause the ESOP to enter into the ESOP Transaction, but denies the remaining allegations in this paragraph. (*See* Decl. Ex. G, J-K, M).

11. The CQH Board (acting as the Administrative Committee) and the Co-Trustees they directed were bound to conduct a prudent and loyal investigation to ensure that the 2012 Transaction was in the best interest of the ESOP participants and to abide by ERISA's strict prohibited transaction rules. Although the Co-Trustees served as directed trustees in connection with the 2012 Transaction (who were directed by the CQH Board acting as the Administrative Committee), the Co-Trustees were precluded from approving the 2012 Transaction if they had reason to believe that the Transaction was not in conformance with ERSIA's strict fiduciary provisions and prohibited transaction rules. Despite these duties, the Co-Trustees approved and effectuated the 2012 Transaction at an inflated stock price based, in part, on financial projections for Casino Queen's future profitability, which the CQH Board knew or should have known were unreliable,

unrealistic, and/or inaccurate. The inflated price also failed to correctly account for information provided to the valuation company by and/or as a result of the CQH Board that was materially misleading and incomplete. Further, the valuation failed to apply appropriate reductions for the company's debt position, retention of Selling Shareholder control, and Stock Appreciation Rights issued to the Co-Trustees, among other things. The Co-Trustees also acted imprudently, and not in the best interest of the ESOP participants, when they approved the $170 million debt the ESOP took on to complete the purchase of CQH stock at crippling interest rates of up to 17.5%, concealed from participants and the DOL through Casino Queen's corporate structure. In both respects, the Co-Trustees imprudently went ahead with the 2012 Transaction at the direction of the Administrative Committee (i.e., the CQH Board), which was acting at the behest of the Selling Shareholders.

**ANSWER:** Mr. Koman admits that GreatBanc had, and exercised, sole discretion to direct the ESOP's co-trustees to cause the ESOP to enter into the ESOP Transaction, but denies the remaining allegations in this paragraph. (*See* Decl. Ex. G, J-K, M).

12. The Co-Trustees—Watson and Barrows—were compensated for their roles in obtaining the excessively high valuation used in the 2012 Transaction, approving the 2012 Transaction, continuing to prop up Casino Queen's valuation after the 2012 Transaction, and helping the Selling Shareholders extract the remainder of their money from Casino Queen through a Stock Appreciation Rights Plan. The Stock Appreciation Rights Plan was instituted concurrently with the formation of the ESOP and awarded Watson and Barrows CQH stock on terms that caused them to place their own interests and the interests of the Selling Shareholders above those of the Plan's participants and beneficiaries. Watson and Barrows ultimately cashed out the CQH stock they received through this scheme for millions of dollars.

**ANSWER:** Mr. Koman admits that GreatBanc, as the sole independent fiduciary with discretion to vote the ESOP's shares, directed the ESOP's co-trustees to vote the ESOP's shares to approve a stock appreciation rights plan for certain members of company management, including Messrs. Watson and Barrows, on December 26, 2012, but denies the remaining allegations in sentence 1. (Decl. Ex.

M, Q). Mr. Koman denies the allegations in sentence 2. Mr. Koman lacks knowledge or information sufficient to admit or deny the allegations in sentence 3 and therefore denies them.

13.    As a result of the 2012 Transaction, Casino Queen employees were forced to

invest their employer-sponsored retirement savings in CQH stock at a price and terms approved

by the Co-Trustees without employee input. Indeed, Casino Queen employees did not learn that the

ESOP had purchased Casino Queen until *after* the 2012 Transaction was completed and the pur-

chase price of $170 million was agreed to by the Selling Shareholders and the Co-Trustees. After

the ESOP Transaction, at the direction of the Co-Trustees and the Administrative Committee (i.e.,

the CQH Board), Casino Queen's management told employees that the ESOP was a great oppor-

tunity to become "owners" of Casino Queen and boasted that employees would be able to buy

second homes due to their ESOP participation.

**ANSWER:**    Mr. Koman denies the allegations in sentence 1. Mr. Koman lacks knowledge or information sufficient to admit or deny the allegations in sentence 2, and therefore denies them. Mr. Koman admits that, following the ESOP's acquisition of CQH shares on December 26, 2012 and until January 23, 2014, he served as a Note Holder Director on the CQH board of directors, meaning he was not authorized to take any actions except the limited actions related to certain corporate transactions enumerated in CQH's amended certificate of incorporation, but denies the remaining allegations in sentence 3. (*See* Decl. Ex. M-O).

14.    Together, the CQH Board Members and Co-Trustees violated their ERISA

fiduciary duties to act prudently and in the best interest of the ESOP participants, and engaged in

ERISA-prohibited transactions, through the 2012 Transaction.

**ANSWER:**    This paragraph states a legal conclusion to which no response is required. To the extent a response is required, Mr. Koman denies the allegations in this paragraph.

15.    After the 2012 Transaction, the CQH Board Members and Co-Trustees (who,

after the 2012 Transaction, served as discretionary trustees, rather than directed trustees) facilitated

and caused the sale of virtually all of Casino Queen's real property to pay off the debt owed to the

Selling Shareholders. The proceeds of this sale (referred to hereinafter as the "2013 Asset Sale"

or the "Asset Sale") provided an accelerated payment on the 2012 Transaction loan held by the Selling Shareholders. This real property sale was an extraordinarily bad deal for the Company and the ESOP, but it benefitted the Selling Shareholders, represented by Koman, Bidwill, and Rand on the CQH Board.

**ANSWER:** Mr. Koman admits that CQI entered into a transaction in which CQI would sell certain real property to a third party, lease the same from a third party, and obtain a $43 million credit facility from a third party with a five year term and 7% interest (the "Real Property Sale"). Mr. Koman further admits that, subsequent to the Real Property Sale, CQI and CQH paid off certain existing debt. Mr. Koman further admits that the co-trustees had sole discretion to vote shares of CQH held by the ESOP in connection with the Real Property Sale. Mr. Koman further admits that, following the ESOP's acquisition of CQH shares on December 26, 2012 and until January 23, 2014, he served as a Note Holder Director on the CQH board of directors, meaning he was not authorized to, and did not, participate in any CQH board action to approve the Real Property Sale. (*See* Decl. Ex. M-O, Y-Z). Mr. Koman denies the remaining allegations in this paragraph.

16.    The sale of the Company's property and the refinancing of the 2012 Transaction debt required a majority vote of the CQH Board and of the Company shareholders.  At all times following the 2012 Transaction, the majority of the ESOP's shares were voted by the Co-Trustees, so the sale and refinancing were controlled by Co-Trustees appointed by the CQH Board.  Thus, through this Asset Sale, the Co-Trustees and CQH Board again violated their ERISA duties of prudence and loyalty and engaged in prohibited transactions.

**ANSWER:** Sentence 1 states legal conclusions to which no response is required. To the extent a response is required, Mr. Koman denies the allegations in sentence 1.  Sentence 2 states a legal conclusion to which no response is required.  To the extent a response is required, Mr. Koman admits that the ESOP's co-trustees had discretion to, and did, vote CQH shares in connection with the Real Property Sale. Mr. Koman further admits that, as a Note Holder Director on the CQH board of directors at the time of the Real Property Sale, he was not entitled to, and did not, vote to approve the Real Property Sale. Mr. Koman further admits that the only CQH board members with the authority to vote to approve the Real Property Sale were Messrs. Watson and Barrows, who voted to approve the transaction. (*See* Decl. Ex. M-O, Y-Z). Sentence 3 states a legal conclusion to which no response is required.  To the extent a response is required, Mr. Koman denies the allegations in sentence 3.

17.    After the 2012 Transaction, the Co-Trustees, and the CQH Board acting as the

Administrative Committee, in coordination with the Selling Shareholders who were members of the Koman, Bidwill, and Rand families, concealed these ERISA violations for years.  Specifically, they concealed that the ESOP had paid significantly greater than fair market value for Casino Queen by telling the employee participants that the CQH stock was worth more than $170 million and misleading employees to believe their ESOP retirement accounts were growing and would continue to grow at amazing rates.

> **ANSWER:**    Mr. Koman denies the allegations in this paragraph.

18.    They further maintained the ruse by issuing ESOP account statements and filing documents with the government showing the CQH stock growing at incredible rates.  For example, the Co-Trustees, Administrative Committee and CQH Board Members disclosed in governmental filings that the CQH stock increased 35% in value in just four days from the date the ESOP Transaction closed (Dec. 26, 2012) to year end 2012, despite the fact that the CQH had assumed a debt load of $170 million with massive interest rates.  The next year the Co-Trustees and the CQH Board Members acting as the Administrative Committee reported to ESOP participants and to the DOL that the CQH stock they sold to the ESOP had grown 524% in value, even though the Co- Trustees and CQH Board had arranged for the sale of all of Casino Queen's real property, which Casino Queen would then need to lease back for millions of dollars a year.

> **ANSWER:**    Mr. Koman denies the allegations in sentence 1.  Mr. Koman admits that sentences 2 and 3 purport to paraphrase, summarize, and/or quote the ESOP's Form 5500s, but relies on those documents to speak for themselves.  Mr. Koman denies the allegations in sentences 2 and 3 to the extent they are inconsistent with the terms of the Plan's Form 5500s.

19.    The Defendants' conduct and the nature of these sham transactions  allowed Defendants to avoid detection of their ERISA violations until 2019, when Plaintiffs and other ESOP participants learned the unfortunate truth: that the value of CQH stock, the only investment

in their ESOP accounts, was worth approximately 95% less than was reported to employees for years and was worth just 1.6% of what the ESOP originally paid for it.

> **ANSWER:**   Mr. Koman denies the allegations in this paragraph.

20.    In summary, despite ERISA's mandate that plan fiduciaries administer the Casino Queen ESOP solely in the interests of the participants and beneficiaries, the CQH Board Members, Administrative Committee, and Co-Trustees orchestrated a highly leveraged and imprudent purchase designed to benefit corporate insiders and then concealed this fact from ESOP participants and beneficiaries until 2019.

> **ANSWER:**   Mr. Koman denies the allegations in this paragraph.

21.    Defendants' ERISA violations caused tens of millions of dollars in losses to the ESOP participants, who overpaid for the CQH stock and will not receive the deferred compensation they had earned. Many ESOP participants chose to stay at Casino Queen and turned down jobs at nearby casinos that paid significantly more because of management's false promises of large payouts to participants when they reached retirement.  The ESOP, and the money that management promised it would generate, were also used as a selling point to recruit and retain employees despite Casino Queen's below-market wages.

> **ANSWER:**   Mr. Koman denies the allegations in sentence 1.   Mr. Koman lacks knowledge or information sufficient to admit or deny the allegations in sentences 2 and 3, and therefore denies them.

22.    Plaintiffs bring this lawsuit on behalf of themselves and other ESOP participants to obtain redress for Defendants' fiduciary breaches and prohibited transactions, including restoration of the losses that they suffered, disgorgement of the profits that Defendants wrongfully obtained, and other equitable and remedial relief as provided by ERISA and applicable law.

**ANSWER:**     Mr. Koman admits that Plaintiffs purport to bring claims on behalf of themselves, other ESOP participants, and the Plan seeking certain relief, but denies the remaining allegations in this paragraph.

## II.     JURISDICTION AND VENUE

23.     **Subject Matter Jurisdiction**. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331.  This Court also has subject matter jurisdiction pursuant to ERISA § 502(a) and (e)(1), 29 U.S.C. § 1132(a) and (e)(1).

**ANSWER:**     This paragraph states a legal conclusion to which no response is required. To the extent a response is required, Mr. Koman denies the allegations in this paragraph.

24.     **Personal Jurisdiction**. This Court has personal jurisdiction over Defendants because they transact business in, and have significant contacts with, this District, and because ERISA § 502(e)(2), 29 U.S.C. § 1132(e)(2), provides for nationwide service of process.

**ANSWER:**     This paragraph states a legal conclusion to which no response is required. To the extent a response is required, Mr. Koman denies the allegations in this paragraph.

25.     **Venue**. Venue is proper in this District pursuant to ERISA § 502(e)(2), 29 U.S.C. § 1132(e)(2). Among other things:

(a)     The ESOP is administered in this District;

(b)     The fiduciary breaches at issue took place in this District;

(c)     Casino Queen, which was the subject of the 2012 Transaction, is located in East St. Louis, Illinois;

(d)     Defendant Jeffrey Watson resides in this District because, on information and belief, he resides in Belleville, Illinois, which is in St. Clair County;

(e)     Defendant Robert Barrows resides in this District because, on information and belief, he lives in Edwardsville, Illinois, which is in Madison County;

(f)     Plaintiff Tom Hensiek resides in this District, as he lives in Troy, Illinois, which is in Madison County;

(g)     Plaintiff Jason Gill resides in this District, as he lives in Nashville, Illinois, which is in Washington County; and

(h)      Plaintiff Lillian Wrobel resides in this District, as she lives in Granite City, Illinois, which is in Madison County.

**ANSWER:**    Mr. Koman admits that Casino Queen, Inc. is located in East St. Louis, Illinois, but lacks knowledge or information sufficient to admit or deny the remaining allegations in this paragraph, and therefore denies them.

## III.    PARTIES

**A.**    **Plaintiffs**

**(1)**    **Tom Hensiek**

26.    Plaintiff Tom Hensiek is a former employee of Casino Queen and was a participant in the Casino Queen ESOP during the relevant period.

**ANSWER:**    Mr. Koman lacks knowledge or information sufficient to admit or deny the allegations in this paragraph., and therefore denies them.

27.    Mr. Hensiek began working at Casino Queen in 1999 and left his position as a Manager in April 2018. At the time Mr. Hensiek left Casino Queen, he was fully vested in the shares of CQH stock held in his ESOP account.

**ANSWER:**    Mr. Koman lacks knowledge or information sufficient to admit or deny the allegations in this paragraph, and therefore denies them.

28.    Mr. Hensiek was a Casino Queen employee when the Company was sold to the ESOP. Mr. Hensiek had no knowledge of—and was provided no information regarding—any substance of deliberations of the fiduciaries who represented the ESOP in the 2012 Transaction.

**ANSWER:**    Mr. Koman lacks knowledge or information sufficient to admit or deny the allegations in this paragraph, and therefore denies them.

29.    Plaintiff Hensiek left his job at Casino Queen in April 2018, with the understanding that he would receive his first payment from his ESOP account at the end of 2019.

**ANSWER:**    Mr. Koman lacks knowledge or information sufficient to admit or deny the allegations in this paragraph, and therefore denies them.

13

30.     However, in October 2019, Plaintiff Hensiek was surprised to learn that his ESOP account had lost about 95% of its value, and that his ESOP account was being closed.

**ANSWER:**     Mr. Koman lacks knowledge or information sufficient to admit or deny the allegations in this paragraph, and therefore denies them.

31.     Plaintiff Hensiek had planned to use the first distribution from his ESOP to supplement his income in 2019.  Plaintiff Hensiek also intended to rely on his ESOP account as a source of income in retirement.

**ANSWER:**     Mr. Koman lacks knowledge or information sufficient to admit or deny the allegations in this paragraph, and therefore denies them.

**(2)     Jason Gill**

32.     Plaintiff Jason Gill is a former employee of Casino Queen and was a participant in the Casino Queen ESOP during the relevant time period.

**ANSWER:**     Mr. Koman lacks knowledge or information sufficient to admit or deny the allegations in this paragraph, and therefore denies them.

33.     Mr. Gill began working at Casino Queen in 2013 and left his position as a Dealer in July 2018.  At the time Mr. Gill left Casino Queen, he was fully vested in the shares of CQH stock held in his ESOP account.

**ANSWER:**     Mr. Koman lacks knowledge or information sufficient to admit or deny the allegations in this paragraph, and therefore denies them.

34.     Plaintiff Gill left his job at Casino Queen in July 2018, with the understanding that he would receive the first payment from his ESOP account at the end of 2019.

**ANSWER:**     Mr. Koman lacks knowledge or information sufficient to admit or deny the allegations in this paragraph, and therefore denies them.

35.     However, near the end of 2019, Plaintiff Gill learned that his ESOP account had lost about 95% of its value, and that his ESOP account was being closed.

**ANSWER:**   Mr. Koman lacks knowledge or information sufficient to admit or deny the allegations in this paragraph, and therefore denies them.

**(3)    Lillian Wrobel**

36.    Plaintiff Lillian Wrobel is a current employee of Casino Queen and is currently a participant in the Casino Queen ESOP and has been during the entire relevant time period.

**ANSWER:**   Mr. Koman lacks knowledge or information sufficient to admit or deny the allegations in this paragraph, and therefore denies them.

37.    Ms. Wrobel began working at Casino Queen in 2007.  She is fully vested in the shares of CQH stock held in her ESOP account.

**ANSWER:**   Mr. Koman lacks knowledge or information sufficient to admit or deny the allegations in this paragraph, and therefore denies them.

38.    Plaintiff Wrobel was planning to retire at age 65 using, in part, the value of the CQH stock that she believed she had in her ESOP account.

**ANSWER:**   Mr. Koman lacks knowledge or information sufficient to admit or deny the allegations in this paragraph, and therefore denies them.

39.    However, near the end of 2019, Plaintiff Wrobel learned that her ESOP account had lost about 95% of its value and has continued to work past her 65th birthday.

**ANSWER:**   Mr. Koman lacks knowledge or information sufficient to admit or deny the allegations in this paragraph, and therefore denies them.

**(B)    Defendants**

**(1)    The CQH Board Defendants**

40.    CQH was created in 2012 as part of the 2012 Transaction.

**ANSWER:**   Mr. Koman admits that CQH was incorporated in 2012, but denies the remaining allegation in this paragraph.

41.    Defendants Koman, Bidwill, Rand, Watson and Barrows were members of the CQH Board of Directors during and immediately after the 2012 Transaction.

**ANSWER:**    Mr. Koman admits that, following the ESOP's acquisition of CQH shares on December 26, 2012 and until January 23, 2014, he served as a Note Holder Director on the CQH board of directors, meaning he was not authorized to take any actions except the limited actions related to certain corporate transactions enumerated in CQH's amended certificate of incorporation, but denies the remaining allegations in this paragraph. (*See* Decl. Ex. M-O).

42.    The CQH Board of Directors, and the individual members thereof, are collectively referred to as the "CQH Board Defendants."

**ANSWER:**    This paragraph contains no factual allegations to which a response is required. To the extent a response is required, Mr. Koman denies the allegations in this paragraph.

43.    As alleged in detail below, each of the CQH Board Defendants was and is a fiduciary to the ESOP within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), because each of them: (1) exercised discretionary authority or control respecting management of the ESOP; (2) exercised authority or control over the ESOP's assets; and/or (3) have discretionary authority or discretionary responsibility in the administration of the ESOP.

**ANSWER:**    This paragraph states legal conclusions to which no response is required. To the extent a response is required, Mr. Koman denies the allegations in this paragraph.

44.    The CQH Board of Directors at all relevant times had the sole authority to appoint and remove the ESOP Co-Trustees and therefore were fiduciaries of the ESOP under ERISA. Through their power and discretion to hire and fire the ESOP Co-Trustees, the CQH Board of Directors had power and control over the ESOP and a fiduciary duty to monitor the ESOP Trustees they appointed.

**ANSWER:**    This paragraph states legal conclusions to which no response is required. To the extent a response is required, Mr. Koman denies the allegations in this paragraph.

45.    At the time the ESOP was created, the CQH Board Defendants appointed two of their own members—Watson and Barrows—as Co-Trustees of the Casino Queen ESOP.  The CQH Board maintained Watson and Barrows as the Co-Trustees of the ESOP from the time of the ESOP's inception until at least 2018.

16

**ANSWER:**   Mr. Koman further admits that Messrs. Watson and Barrows were the sole members of CQH's board of directors at the time the CQH board of directors appointed Messrs. Watson and Barrows the sole officers of CQH and the co-trustees of the ESOP, but denies the remaining allegations in sentence 1. (Decl. Ex. E-I). Mr. Koman admits that Watson and Barrows served as trustees of the ESOP for some time after the ESOP Transaction, but lacks knowledge or information sufficient to admit or deny the remaining allegations in sentence 2 and therefore denies them.

46.     The CQH Board also had authority and discretion to appoint members of the Administrative Committee.  The Plan Document provides that the CQH Board determines the members of the Administrative Committee, and further provides that CQH Board Members and Company officers may serve on the Administrative Committee.  Through their power and discretion to appoint and remove the Administrative Committee members, the CQH Board had power and control over the ESOP and a fiduciary duty to monitor the Administrative Committee members they appointed.

**ANSWER:**   Sentence 1 states a legal conclusion to which no response is required.  To the extent a response is required, Mr. Koman denies the allegations in sentence 1.  Mr. Koman admits that sentence 2 purports to summarize, paraphrase, and/or quote the Plan Document, but relies on the document to speak for itself.  Mr. Koman denies the allegations in sentence 2 to the extent they are inconsistent with terms of the Plan Document.  Sentence 3 states a legal conclusion to which no response is required.  To the extent a response is required, Mr. Koman denies the allegations in sentence 3.

47.     Alternatively, if no Administrative Committee members were actually appointed by the CQH Board, the Plan Document further provides that the CQH Board (acting for CQH at the time) had all the powers, responsibilities, and duties of the Administrative Committee. Specifically, the Plan Document states that "in the event the [CQH] Board fails to designate an Administrative Committee under this Article, the Sponsor [acting through its Board] shall be deemed the 'plan administrator' of the Plan and shall have all the powers, responsibilities and duties of the Administrative Committee as set forth herein."  Thus, CQH (acting through its Board members) retained all powers of the Administrative Committee until its members were appointed.

**ANSWER:**    Mr. Koman admits the sentences 1 and 2 purport to summarize, paraphrase, and/or quote the Plan Document, but relies on the document to speak for itself.  Mr. Koman denies the allegations in sentences 1 and 2 to the extent they are inconsistent with the terms of the Plan Document.  Sentence 3 states a legal conclusion to which no response is required.  To the extent a response is required, Mr. Koman admits that, following the ESOP's acquisition of CQH shares on December 26, 2012 and until January 23, 2014, he served as a Note Holder Director on the CQH board of directors, meaning he was not authorized to take any actions except the limited actions related to certain corporate transactions enumerated in CQH's amended certificate of incorporation, but denies the remaining allegations in sentence 3. (*See* Decl. Ex. M-O).

48.    Accordingly, each of the CQH Board Defendants had the powers and responsibilities provided to the Administrative Committee in the ESOP Plan Document until the Administrative Committee was appointed, which did not occur until after the 2012 ESOP Transaction.  These powers and responsibilities included the power to direct the Co-Trustees whenever they were acting as "directed trustees" as set forth in the ESOP Plan Document and in accordance with the provisions of ERISA § 403(a)(1), 29 U.S.C. § 1103(a)(1); the power and responsibility to manage the ESOP's assets; the power and responsibility to prepare and distribute account statements and relevant information about the ESOP to participants in compliance with ERISA; the power and responsibility to prepare, attest to and file accurate and reliable annual reports for the ESOP with the DOL; and responsibility for all aspects of the administration of the Plan.

**ANSWER:**    This paragraph states legal conclusions to which no response is required. To the extent a response is required, Mr. Koman admits that, following the ESOP's acquisition of CQH shares on December 26, 2012 and until January 23, 2014, he served as a Note Holder Director on the CQH board of directors, meaning he was not authorized to take any actions except the limited actions related to certain corporate transactions enumerated in CQH's amended certificate of incorporation, but denies the remaining allegations in this paragraph. (*See* Decl. Ex. M-O).

49.    At all relevant times, the CQH Board Defendants effectively controlled the ESOP through Defendants Watson and Barrows, who were both Co-Trustees and CQH Board Members themselves.  This included but was not limited to the CQH Board Defendants' power to direct the Co-Trustees concerning the 2012 Transaction, the 2013 Asset Sale, and the general management of the ESOP's assets and operations.

**ANSWER:**   Mr. Koman denies the allegations in this paragraph.

50.   Based on the recent investigation of counsel, the CQH Board Defendants instructed the Co-Trustees concerning their actions in connection with the 2012 Transaction and directed them about how to manage the ESOP's assets.  The CQH Board Defendants include the following individuals.

**ANSWER:**   Mr. Koman denies the allegations in sentence 1.  Sentence 2 contains no factual allegations to which a response is required.  To the extent a response is required, Mr. Koman denies the allegations in sentence 2.

### a)   Charles Bidwill, III

51.   Defendant Charles Bidwill, III, a sports and gambling investor, was a founder, member of the CQI Board, and former President of CQI.  Bidwill also was a CQH Board Member during the relevant period.  While a CQH Board Member, Bidwill and his family members sold their shares of CQH stock to the ESOP for tens of millions of dollars.

**ANSWER:**   Mr. Koman admits that Charles Bidwill III was a founding investor in CQI, a director and officer of CQI, and a Note Holder Director on the CQH Board following the ESOP Transaction and until January 23, 2014, but denies the remaining allegations in this paragraph.

### b)   Timothy J. Rand

52.   Defendant Timothy J. Rand, an entrepreneur and business owner, was a founder, member of the CQI Board, and former Vice President of CQI. Rand was also a member of the CQH Board during the relevant period.  While a CQH Board Member, Rand sold his shares of CQH stock to the ESOP for tens of millions of dollars.

**ANSWER:**   Mr. Koman admits that Mr. Rand was a founding investor in CQI, a director and officer of CQI, and a Note Holder Director on the CQH Board following the ESOP Transaction and until January 23, 2014, but denies the remaining allegations in this paragraph.

### c) James G. Koman

53.    Defendant James ("Jim") G. Koman is the CEO of an investment firm focused on commercial real estate development.  He was a member of the CQI Board and a former President of CQI. He was also a member of the CQH Board during the relevant period. Koman's father was one of the founding Casino Queen investors.  While a CQH Board Member, Koman and his family sold their shares of CQH stock to the ESOP for tens of millions of dollars.

**ANSWER:**    Mr. Koman admits that he is the CEO of a commercial real estate investment firm and was, at times, a director and officer of CQI and a Note Holder Director on the CQH board, but denies the remaining allegations in sentences 1 through 3. Mr. Koman admits the allegations in sentence 4. Mr. Koman denies the allegations in sentence 5.

### d) Jeffrey Watson

54.    Defendant Jeffrey Watson was a member of the CQH Board during the relevant period. Watson served as the President of CQH from the time of the 2012 Transaction until on or around January 20, 2019.  He also served as General Manager of the Casino from 2012 to 2018, and General Counsel to the Casino from 2000 to 2018. On information and belief, Watson lives in Belleville, Illinois.

**ANSWER:**    Mr. Koman admits that Mr. Watson was, at times, an ESOP Director on the CQH board, but denies the remaining allegations in sentence 1. Mr. Koman admits that Mr. Watson was the President of CQH in 2012 and, for a time, post-2012, but lacks knowledge or information sufficient to admit or deny the remaining allegations in sentence 2, and therefore denies them.  Mr. Koman admits that Mr. Watson was, at times, the General Manager of the Casino but lacks knowledge or information sufficient to admit or deny the remaining allegations in sentence 3, and therefore denies them.  Mr. Koman lacks knowledge or information sufficient to admit or deny the allegations in sentence 4, and therefore denies them.

55.    Defendant Watson also served as a Co-Trustee of the ESOP, alongside Defendant Barrows, during and after the 2012 Transaction until at least sometime in 2018.  As Co-Trustee, Watson was a directed trustee for the 2012 Transaction, but as a CQH Board Member he retained and exercised fiduciary power over the Transaction.  In addition, after the 2012 Transaction, as

Co-Trustee, Watson was a fiduciary to the ESOP under ERISA § 3(21)(A)(i), 29 U.S.C. §

1002(21)(A)(i) because the ESOP Plan Document gives the Trustee authority to hold and manage

all assets of the Trust Fund as a discretionary trustee.

**ANSWER:**   Mr. Koman admits that Mr. Watson served as a trustee of the ESOP until at least January 23, 2014, but lacks knowledge or information sufficient to admit or deny the remaining allegations in sentence 1, and therefore denies them.  Sentences 2 and 3 contain legal conclusions to which no response is required. To the extent a response is required, Mr. Koman denies the allegations in sentences 2 and 3.

56.    As part of the 2012 Transaction, Defendant Watson was given a Stock Appreciation

Rights incentive program that would grant him CQH shares and that would fully vest after Casino

Queen reduced all of the debt assumed in the 2012 Transaction to a single term loan.  Those Stock

Appreciation Rights became partially vested at the end of 2012 and fully vested after the 2013

Asset Sale, allowing Watson to cash out his shares for millions of dollars.

**ANSWER:**   Mr. Koman admits that this paragraph purports to summarize, paraphrase, and/or quote the terms of the stock appreciation rights agreement, but relies on the document to speak for itself.  Mr. Koman denies the allegations in this paragraph to the extent they are inconsistent with the terms of the stock appreciation rights agreement.

**e)    Robert Barrows**

57.    Defendant Robert ("Bob") Barrows was a member of the CQH Board during the

relevant period. Further, Barrows served as the Chief Financial Officer of Casino Queen from 1993

until approximately 2017, and served as Vice President, Secretary, and Treasurer of CQH from the

time of the 2012 Transaction until at least 2018.  On information and belief, Barrows lives in

Edwardsville, Illinois.

**ANSWER:**   Mr. Koman admits that Mr. Barrows was, at times, an ESOP Director on the CQH Board, but denies the remaining allegations in sentence 1.  Mr. Koman admits that Mr. Barrows was, at times, the Chief Financial Officer at CQI and, at times, the Vice President and Secretary of CQH, but denies the remaining allegations in sentence 2. Mr. Koman lacks knowledge or information sufficient to admit or deny the allegations in sentence 3, and therefore denies them.

21

58.     Defendant Barrows also served as a Co-Trustee of the ESOP, alongside Defendant Watson, after the 2012 Transaction until approximately 2018.  As Co-Trustee, Barrows was a directed trustee for the 2012 Transaction, but he nonetheless retained and exercised fiduciary power over the Transaction as a Board member.  In addition, after the 2012 Transaction, as Co-Trustee, Barrows was a fiduciary to the ESOP under ERISA § 3(21)(A)(i), 29 U.S.C § 1002(21)(A)(i) because the ESOP Plan document gives the Trustee authority to hold and manage all assets of the Trust Fund as a discretionary trustee.

**ANSWER:**     Mr. Koman admits that Mr. Barrows served as a trustee of the ESOP until at least January 23, 2014, but lacks knowledge or information sufficient to admit or deny the remaining allegations in sentence 1, and therefore denies them.  Sentences 2 and 3 contain legal conclusions to which no response is required. To the extent a response is required, Mr. Koman denies the allegations in sentences 2 and 3.

59.     As part of the 2012 Transaction, Defendant Barrows was given a Stock Appreciation Rights incentive program that would grant him CQH shares and that would fully vest after Casino Queen reduced all of the debt assumed in the 2012 Transaction to a single term loan. Those Stock Appreciation Rights partially vested at the end of 2012 and became fully vested after the 2013 Asset Sale, allowing Watson to cash out his shares for millions of dollars.

**ANSWER:**     Mr. Koman admits that this paragraph purports to summarize, paraphrase, and/or quote the terms of the stock appreciation rights agreement, but relies on the document to speak for itself.  Mr. Koman denies the allegations in this paragraph to the extent they are inconsistent with the terms of the stock appreciation rights agreement.

**(2)     The Co-Trustees**

60.     The Co-Trustees during all relevant times were Jeffrey Watson and Robert Barrows.

**ANSWER**:     Mr. Koman admits that Messrs. Watson and Barrows served as co-trustees of the ESOP until at least January 23, 2014, but lacks knowledge or information sufficient to admit or deny the remaining allegation in this paragraph, and therefore denies them.

61.     The Co-Trustees were directed trustees in connection with the 2012 ESOP Trans-action.  Although the responsibilities of a directed trustee are limited in scope, a trustee must exercise their duties prudently and solely in the interest of the plan participants and beneficiaries.

**ANSWER:**     Mr. Koman admits the allegations in sentence 1.  Sentence 2 contains a legal conclusion to which no response is required. To the extent that a response is required, Mr. Koman denies the allegations in sentence 2.

62.     ERISA prohibits a directed trustee or directed fiduciary from carrying out an action if s/he has reason to believe that such action violated ERISA.  Thus, if the directed trustee knew that a fiduciary was failing to discharge its obligations in accordance with ERISA's requirements, they could not simply follow directions from the breaching fiduciary.  Rather s/he must take steps or make efforts to remedy a breach (or to prevent an imminent breach).

**ANSWER:** This paragraph states legal conclusions to which no response is required.  To the extent a response is required, Mr. Koman denies the allegations in this paragraph.

63.     In addition, if a directed trustee has knowledge of a fiduciary breach, the directed trustee may be liable as a co-fiduciary unless the directed trustee takes reasonable steps to remedy the breach, including reporting the breach to other fiduciaries of the plan or to the DOL.

**ANSWER:**     This paragraph states a legal conclusion to which no response is required. To the extent a response is required, Mr. Koman denies the allegation in this paragraph.

**(3)     The Party-in-Interest Defendants**

64.     Discovery recently produced by Defendants has revealed the identities of previously unknown Selling Shareholders of Casino Queen.  As explained by the parties themselves in Bidwill v. Casino Queen, Inc., No. 06-CH-9409 (Ill. Cir. Ct. of Cook Cnty.):

> Casino Queen is owned by five groups of shareholders (23 individual shareholders in total). One group is composed of members of the Bidwill family of Chicago, Illinois, including Charles W. Bidwill, III, the named Plaintiff in this matter (hereinafter referred to as the "Bidwill Group"). The other groups are: (1) members of the Kenny family of Chicago, Illinois (hereinafter referred to as the "Kenny

Group"); (2) members of the Koman family of St. Louis, Missouri (hereinafter referred to as the "Koman Group"); (3) Michael Gaughan and his colleague, Frank Toti, of Las Vegas, Nevada (hereinafter referred to as the "Gaughan/Toti Group"); and (4) Timothy Rand of Chicago, Illinois (hereinafter referred to as the "Rand Group"). Each group owns 20% of Casino Queen's issued and outstanding shares. See Defendants' Verified Memorandum in Opposition to Plaintiff's Emergency Motion for Temporary Restraining Order and Preliminary Injunction.

**ANSWER:**   Mr. Koman admits that this paragraph purports to paraphrase summarize, and/or quote certain filings in Illinois state court, but relies on those documents to speak for themselves.  Mr. Koman denies the allegations in this paragraph to the extent they are inconsistent with the filings.

65.   Some of these Selling Shareholders are "parties in interest" under ERISA § 3(14), 29 U.S.C. § 1002(14) because they were either a CQH Board Member, a 10% or more shareholder, a family member of a CQH Board Member or 10% shareholder, a trust in which 50% or more of the beneficial interest is owned directly or indirectly by such persons, or otherwise met the definition of party in interest.  These parties in interest, alongside their individual ownership percentages, are listed below.  To the extent not included in Plaintiffs' original Complaint, these parties in interest are hereby named as Defendants in this action and are referred to as the "Party-in-Interest Defendants."

| Party-in-Interest Defendant | Ownership % sold to ESOP |
|---|---|
| Timothy J. Rand | 20.000% |
| William J. Koman, Sr. Living Trust, its Trustee, and any beneficiaries of said Trust | 10.200% |
| Charles W. Bidwill III | 8.000% |
| James G. Koman Irrevocable Trust, its Trustee, and any beneficiaries of said Trust | 4.280% |
| William J. Koman Irrevocable Trust, its Trustee, and any beneficiaries of said Trust | 2.880% |
| Bidwill Succession Trust, its Trustee, and any beneficiaries of said Trust | 2.000% |
| Bidwill Kasino Trust, its Trustee, and any beneficiaries of said Trust | 2.000% |
| Mary C. Bidwill | 2.000% |
| Brian R. Bidwill | 2.000% |
| Patricia M. Bidwill | 2.000% |
| Shauna Bidwill-Valenzuela | 2.000% |

| | |
|---|---|
| Karen L. Hamilton Irrevocable Trust, its Trustee, and any beneficiaries of said Trust | 0.880% |
| Janis A. Koman Irrevocable Trust, its Trustee, and any beneficiaries of said Trust | 0.880% |
| Elizabeth S. Koman Irrevocable Trust, its Trustee, and any beneficiaries of said Trust | 0.880% |
| James G. Koman[3] | |

**ANSWER:**   Sentence 1 states a legal conclusion to which no response is required.  To the extent a response is required, Mr. Koman denies the allegations in sentence 1.  Sentences 2 and 3 contain no factual allegations to which a response is required. To the extent a response is required, Mr. Koman denies the allegations in sentence 2 and 3.  Mr. Koman denies the allegations contained in the chart and footnote 3.

66.    Each of the Party-in-Interest Defendants had actual or constructive knowledge of the circumstances that rendered the 2012 ESOP Transaction unlawful, including but not limited to knowledge (a) that CQI had received at least 6 prior offers to purchase the Company on worse terms than those paid in the ESOP Transaction, (b) that the valuation supporting the 2012 ESOP Transaction was the product of improper, incomplete, unconsidered, and misleading information, and (c) that the interest rates on the loan the Selling Shareholders made to the ESOP through the shell Corporation CQH were unreasonably high.  In addition, the Party-in-Interest Defendants, all of whom are or are related to CQH Board Members Koman, Bidwill, or Rand, had knowledge of and participated in the ongoing efforts to actively conceal the details and effects of the 2012 Transaction from the ESOP participants, as articulated in Part IV.E, below.  Indeed, the Party-in-Interest Defendants continued to direct and control Casino Queen after the 2012 Transaction just as they had before the 2012 Transaction—through their family-controlled Board seat occupied by their chosen representative.

**ANSWER:**   Mr. Koman denies the allegations in this paragraph.

---

[3] On information and belief, Koman sold CQH shares he owned through one or more of the Koman family trusts that are Parties-in-Interest in this case.

**(4)**   **Administrative Committee**

67.   The Administrative Committee was and is a named fiduciary of the ESOP under Article IX of the Plan Document and ERISA § 402(a), 29 U.S.C. § 1102(a).

**ANSWER:**   Mr. Koman admits that this paragraph purports to paraphrase, summarize, and/or quote the terms of the Plan Document, but relies on that document to speak for itself.  Mr. Koman denies the allegations in this paragraph to the extent they are inconsistent with the terms of the Plan Document.

68.   The Administrative Committee also was and is a fiduciary to the ESOP within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), because it: (1) exercised discretionary authority and control respecting management of the ESOP; (2) exercised authority and control over the ESOP's assets; and/or (3) exercised discretionary authority or discretionary responsibility in the administration of the ESOP.  The Administrative Committee had the power to direct the Co-Trustees in connection with the 2012 ESOP Transaction and other matters as set forth in the Plan Document.  The Administrative Committee also had general responsibility under the Plan Document for the administration of the trust and the management of trust assets.

**ANSWER:**   Sentence 1 states a legal conclusion to which no response is required.  To the extent a response is required, Mr. Koman denies the allegations in sentence 1.  Mr. Koman admits that sentences 2 and 3 purport to paraphrase, summarize, and/or quote the terms of the Plan Document, but relies on that document to speak for itself.  Mr. Koman denies the allegations in sentences 2 and 3 to the extent they are inconsistent with the terms of the Plan Document.

69.   As alleged above, the Administrative Committee was appointed by the CQH Board, and for any periods when the CQH Board had not appointed the individual members of the Administrative Committee, the members of the CQH Board had the power over and responsibility for all aspects of the administration of the Plan.  These powers and responsibilities included all of the powers and responsibilities identified in Section 9.05 of the Plan Document as powers of the Administrative Committee, such as the power and duty to direct the Co-Trustees as directed trustees

in connection with the 2012 ESOP Transaction and the power and duty to prepare and distribute information to participants concerning the Plan.  The CQH Board did not appoint anyone to the Administrative Committee until July of 2015, the CQH Board Defendants acted as the Administrative Committee until after the 2012 ESOP Transaction and the 2013 Asset Sale.

**ANSWER:**    Mr. Koman admits that sentences 1 and 2 purport to paraphrase, summarize, and/or quote the terms of the Plan Document, but relies on that document to speak for itself.  Mr. Koman denies the allegations in sentences 1 and 2 to the extent that they are inconsistent with the terms of the Plan Document.  Mr. Koman lacks knowledge or information sufficient to admit or deny the allegations in sentence 3, and therefore denies them.

## IV.    FACTS

### A.    Casino Queen

70.    CQI, formerly known as Arch Paddle Boat Company, opened the Casino Queen Hotel and Casino in 1993.  At all relevant times, CQI was a private corporation and its stock has not traded on any public market or exchange.

**ANSWER:**    Mr. Koman admits the allegations in this paragraph.

71.    The Casino brought over a thousand jobs to East St. Louis, and at least for a time, it was one of the largest employers in a city which had struggled for decades with high rates of unemployment and crime.

**ANSWER:**    Mr. Koman admits that Casino Queen, Inc. employed a number of individuals in East St. Louis, but lacks knowledge or information sufficient to admit or deny the remaining allegations in this paragraph, and therefore denies them.

72.    Casino Queen was among the first casinos in the East St. Louis area when it opened in 1993.  However, over the next several years, numerous other casinos opened nearby, increasing competition with Casino Queen and leading to declining revenues from 2007 to the present.

**ANSWER:**    Mr. Koman admits the allegations in sentence 1.  Mr. Koman admits that other casinos opened in the East St. Louis area, but denies the remaining allegations in sentence 2.

73.     Prior to the 2012 ESOP Transaction, CQI was owned by a group of private investors, the Selling Shareholders, comprised of five family groups, each owning 20% of CQI: (1) the Koman family, (2) the Bidwill family, (3) Timothy Rand, (4) the Kenny family, and (5) the Gaughan/Toti group. Each family group controlled one CQI Board seat.  Each family's board member acted in coordination with and for the benefit of the family group he represented. James Koman was the CQI Board Member representing his family's interest; Charles Bidwill III was the CQI Board Member representing his family's interest; Timothy Rand was the CQI Board Member representing his own interest; Patrick or Phillip Kenny, at different times, were CQI Board Members representing their family's interest; and Michael Gaughan or Michael Kravolec, at different times, were CQI Board Members representing the Gaughan/Toti group's interest.

**ANSWER:**     Mr. Koman admits that CQI is wholly owned by CQH and that individuals and trusts associated with these groups have at times owned shares of CQI and CQH, but denies the remaining allegations in sentence 1.  Mr. Koman admits that the CQI Board prior to the ESOP Transaction consisted of himself, Mr. Bidwill, Mr. Rand, Mr. Kralovec, and Mr. Philip Kenny, but lacks knowledge or information sufficient to admit or deny the remaining allegations in sentences 2 and 3, and therefore denies them.

74.     Beginning in or around 2005, the Selling Shareholders attempted and failed to sell Casino Queen to various third-party investors.

**ANSWER:**     Mr. Koman admits that, at various times, CQI was owned by a group of investors who considered selling certain interests and/or assets to third party buyers, but denies the remaining allegations in this paragraph.

75.     In 2006, the Selling Shareholders entered a contract to sell CQI to Columbia Sussex for $200 million.  That deal was unsuccessful and fell through in 2007.

**ANSWER:**     Mr. Koman admits that, at various times, CQI was owned by a group of investors who considered selling certain interests and/or assets to third party buyers, including to Columbia Sussex for $200 million, but denies the remaining allegations in this paragraph.

76.     Thereafter, the Selling Shareholders "pitched" selling Casino Queen to numerous prospective buyers who considered purchasing the Casino and evaluated its business, including

Delaware North, which operates casinos and gaming entities.  However, the Selling Shareholders were never able to complete the sale of CQI to a third-party buyer.

**ANSWER:**     Mr. Koman admits that, at various times, CQI was owned by a group of investors who considered selling certain interests and/or assets to third party buyers, one of which was Delaware North.  Mr. Koman denies the remaining allegations in this paragraph.

77.     After years of trying and failing to sell Casino Queen to outside buyers, the Selling Shareholders decided to create an ESOP to buy it in a leveraged transaction.  Through their family-controlled Board seats, the Selling Shareholders orchestrated the sale of Casino Queen at an in-flated price to the ESOP in 2012 through a complex, integrated transaction designed to obscure the unfavorable terms and credit risks associated with the ESOP's purchase of Casino Queen from the Selling Shareholders.

**ANSWER:**     Mr. Koman denies the allegations in this paragraph.

78.     Prior to the creation of the ESOP, Casino Queen employees were eligible to partic-ipate in a non-ESOP retirement plan which offered a menu of funds such as equity funds, target date funds, fixed income funds, and principal preservation funds from which they could choose to invest their own contributions and contributions made by the Company on their behalf. Shortly after the 2012 ESOP Transaction, the Company stopped making employer contributions to that other retirement plan.  Instead, the Company contributed solely to the ESOP which holds only CQH, a stock that lacks a public market.

**ANSWER:**     Mr. Koman lacks knowledge or information sufficient to admit or deny the allegations in this paragraph, and therefore denies them.

79.     In October of 2012, the Selling Shareholders created CQH, a holding company for CQI, in order to facilitate the sale to the ESOP and placed three former CQI Board Members on the newly formed CQH Board.  The Selling Shareholders then exchanged their CQI stock for CQH stock.

**ANSWER:**   Mr. Koman admits that CQI authorized CQI's officers to incorporate a holding company, CQH, in 2012; that CQI's officers incorporated CQH on October 2, 2012; and that CQI's officers appointed Messrs. Watson and Barrows as the sole members of CQH's board of directors, but denies the remaining allegations in sentence 1. (Decl. Ex. A-D).  Mr. Koman admits that, on December 26, 2012, certain CQI shareholders exchanged shares of CQI for shares of CQH.

80.    Prior to the 2012 Transaction, CQI had outstanding debt of approximately $35 million.

**ANSWER:**   Mr. Koman lacks knowledge or information sufficient to admit or deny the allegations in this paragraph, and therefore denies them.

81.    On December 26, 2012, the CQH Board Defendants acting for CQH (as the Plan sponsor), in coordination with the Selling Shareholders, established the ESOP to purchase 100% of the then-outstanding CQH stock from the Selling Shareholders.  In order to purchase the stock, the ESOP borrowed $130 million in secured debt from Wells Fargo, $15 million from a third party, and $25 million from the Selling Shareholders through CQH and CQI.

**ANSWER:**   Mr. Koman admits that on December 26, 2012, the CQH board, whose sole members were Messrs. Watson and Barrows, approved a resolution establishing the ESOP, and that GreatBanc directed the ESOP's co-trustees to cause the ESOP enter into the ESOP Transactions, but denies the remaining allegations in this paragraph. (*See* Decl. Ex. M).

82.    A Stock Appreciation Rights Plan was adopted in connection with the 2012 ESOP Transaction to guarantee that Watson and Barrows would approve the ESOP's purchase of Casino Queen and pursue as high a valuation as possible, as well as use their positions after the creation of the ESOP to continue propping up company valuations and ensure that the ESOP repaid the $25 million it had borrowed from the Selling Shareholders as soon as possible.  Watson and Barrow's Stock Appreciation Rights were fully vested once that debt was paid off.  That debt was paid off, and the Stock Appreciation Rights fully vested the following year as a result of the 2013 Asset Sale.

**ANSWER:**   Mr. Koman admits that GreatBanc, as the sole independent fiduciary with discretion to vote the ESOP's shares, directed the ESOP's co-trustees to vote the ESOP's shares to approve

a stock appreciation rights plan for certain members of company management, including Messrs. Watson and Barrows, on December 26, 2012, but denies the remaining allegations in sentence 1. (Decl. Ex. M, Q, R). Mr. Koman admits that sentence 2 purports to paraphrase, summarize, and/or quote the terms of the stock appreciation rights agreement, but relies on that document to speak for itself. Mr. Koman denies the allegations in sentence 2 to the extent they are inconsistent with the terms of the stock appreciation rights agreement.  Mr. Koman lacks knowledge or information sufficient to admit or deny allegations in sentence 3, and therefore denies them.

83.     During an Illinois Gaming Commission meeting a few days before the 2012 Transaction, Defendant Watson told the gaming board about how excited his employees were about the ESOP, though they had not been told about the ESOP at that time.  Employee-participants were not told about the 2012 Transaction until after it was completed on December 26, 2012.

**ANSWER:**    Mr. Koman lacks knowledge or information sufficient to admit or deny the allegations in this paragraph, and therefore denies them.

84.     After the 2012 Transaction was completed, Defendant Watson held a mandatory employee meeting to announce to that the ESOP had been created and had purchased the Company from the Selling Shareholders.

**ANSWER:**    Mr. Koman lacks knowledge or information sufficient to admit or deny the allegations in this paragraph, and therefore denies them.

**B.    The Casino Queen ESOP**

85.     At all relevant times, the ESOP was an "employee pension benefit plan" governed by ERISA and was intended to constitute an "employee stock ownership plan" or "ESOP" within the meaning of ERISA § 407(d)(6), 29 U.S.C. § 1107(d)(6).

**ANSWER:**    This paragraph states legal conclusions to which no response is required. To the extent a response is required, Mr. Koman denies the allegations in this paragraph.

86.     The Plan covers eligible employees of Casino Queen Hotel & Casino in East St. Louis, Illinois, and Casino Queen Marquette in Iowa. During the Class Period, the ESOP has had between 512 and 631 participants.

31

**ANSWER:**     Mr. Koman lacks knowledge or information sufficient to admit or deny the allegations in this paragraph, and therefore denies them.

87.     ERISA requires that every retirement plan, including the Casino Queen ESOP, "be established and maintained pursuant to a written instrument.  Such instrument shall provide for one or more named fiduciaries who jointly or severally shall have authority to control and manage the operation and administration of the plan." *See* ERISA § 402(a)(l), 29 U.S.C. § 1102(a)(1).

**ANSWER:**     Sentence 1 contains legal conclusions to which no response is required. To the extent a response is required, Mr. Koman denies the allegations in sentence 1. Mr. Koman admits that sentence 2 purports to paraphrase, quote, and/or cite to a provision of ERISA, but relies on the statute to speak for itself.  Mr. Koman denies the remaining allegations contained in sentence 2 to the extent they are inconsistent with the statutory text.

88.     ERISA § 402(a)(2), 29 U.S.C. § 1102(a)(2) clarifies that "For purposes of this subchapter, the term "named fiduciary" means a fiduciary who is named in the plan instrument, or who, pursuant to a procedure specified in the plan, is identified as a fiduciary (A) by a person who is an employer or employee organization with respect to the plan or (B) by such an employer and such an employee organization acting jointly."

**ANSWER:**     Mr. Koman admits that this paragraph purports to paraphrase, quote, and/or cite to a provision of ERISA, but relies on the statute to speak for itself.  Mr. Koman denies the remaining allegations contained in this paragraph to the extent they are inconsistent with the statutory text.

89.     Here, the written instrument is entitled the Casino Queen Employee Stock Ownership Plan (the "Plan Document" or the "ESOP Plan Document").  ERISA also requires that every retirement plan, including the Casino Queen ESOP, have one or more "trustees [who] shall have exclusive authority and discretion to manage and control the assets of the plan, except to the extent that—(1) the plan expressly provides that the trustee or trustees are subject to the direction of a named fiduciary who is not a trustee, in which case the trustees shall be subject to proper directions

of such fiduciary which are made in accordance with the terms of the plan and which are not

contrary to this chapter [of ERISA.]" ERISA § 403(a)(l), 29 U.S.C. § 1103(a)(1).

**ANSWER:**    Mr. Koman admits the allegations in sentence 1.  Mr. Koman admits that
sentence 2 purports to paraphrase, quote, and/or cite to a provision of ERISA, but relies on the
statute to speak for itself.  Mr. Koman denies the remaining allegations contained in sentence 2 to
the extent they are inconsistent with the statutory text.

90.    Based on the Plan Document, the Administrative Committee and its members, the

Co-Trustees of the ESOP, and the CQH Board Defendants were all "named fiduciaries" within the

meaning of ERISA § 402(a)(2), 29 U.S.C. § 1102(a)(2).

**ANSWER:**    This paragraph contains legal conclusions to which no response is required.
To the extent a response is required, Mr. Koman denies the allegations in this paragraph.

### C.    The 2012 Transaction

91.    The CQH Board Defendants, including Koman, Bidwill, and Rand, backed by their

respective families, orchestrated and caused the sale of CQH stock to the ESOP in the 2012 Trans-

action to enrich themselves at the expense of the retirement security of the Casino Queen ESOP

participants.

**ANSWER:**    Mr. Koman denies the allegations in this paragraph.

92.    Specifically, the CQH Board Defendants (acting directly and/or through the Ad-

ministrative Committee and Co-Trustees) caused the ESOP to pay the Selling Shareholders sig-

nificantly more than fair market value for the CQH stock purchased from them. This allowed the

Selling Shareholders – many of whom were Board members or their family members – to obtain

ill-gotten gains and profits through the 2012 Transaction.

**ANSWER:**    Mr. Koman admits that GreatBanc had, and exercised, sole discretion to
direct the ESOP's co-trustees to cause the ESOP to enter into the ESOP Transaction, but denies
the remaining allegations in this paragraph. (*See* Decl. Ex. G, J-K, M).

93.     The CQH Board Defendants appointed two of themselves (Watson and Barrows) to be Co-Trustees to the ESOP at all relevant times, including during the ESOP's purchase of CQH stock from the Selling Shareholders.

**ANSWER:**     Mr. Koman admits that Messrs. Watson and Barrows were the sole members of CQH's board of directors at the time the CQH board of directors appointed Messrs. Watson and Barrows the co-trustees of the ESOP. (Decl. Ex. E-I). Mr. Koman admits that GreatBanc had, and exercised, sole discretion to direct the ESOP's co-trustees to cause the ESOP to enter into the ESOP Transaction, but denies the remaining allegations in this paragraph. (*See* Decl. Ex. G, J-K, M).

94.     The CQH Board Defendants' power to hire and fire the ESOP Co-Trustees created a conflict because the Co-Trustees were incentivized to act in the best interests of the CQH Board and the Selling Shareholders rather than the employees who participated in the ESOP.

**ANSWER:**     Mr. Koman admits that, following their appointment to the CQH board of directors, Messrs. Koman, Bidwill, and Rand were classified as "Note Holder Directors," a category of CQH director not authorized to appoint or remove the ESOP's trustees, but denies the remaining allegations in this paragraph. (*See* Decl. Ex. N-O).

95.     Indeed, based on the recent investigation of counsel, the CQH Board Defendants, up until the Transaction was completed, directed the Co-Trustees in the 2012 Transaction (either directly or through the Administrative Committee) and thereby exercised fiduciary control over the Transaction.

**ANSWER:**     Mr. Koman admits that GreatBanc had, and exercised, sole discretion to direct the ESOP's co-trustees to cause the ESOP to enter into the ESOP Transaction, but denies the remaining allegations in this paragraph. (*See* Decl. Ex. G, J-K, M).

96.     The ESOP Plan Document confirms this, as it provides that the "Trustee shall be a directed trustee with respect to the initial purchase of Stock by the Trust and related transactions occurring contemporaneously therewith in accordance with the provisions of ERISA Section 403(a)(l). When acting as a directed trustee, the Trustee shall follow all proper directions received

from the **Sponsor**, an investment manager or any other **named fiduciary** which are made in ac-

cordance with the terms and provisions of the Plan and this Trust Agreement and which are not

contrary to ERISA." (emphasis added).

    **ANSWER:**   Mr. Koman admits that this paragraph purports to paraphrase, summarize, and/or quote the terms of the Plan Document, but relies on that document to speak for itself. Mr. Koman denies the allegations in this paragraph to the extent they are inconsistent with the terms of the Plan Document. Mr. Koman further admits that GreatBanc had, and exercised, sole discretion to direct the ESOP's co-trustees to cause the ESOP to enter into the ESOP Transaction, but denies the remaining allegations in this paragraph. (*See* Decl. Ex. G, J-K, M).

    97.    The CQH Board Defendants were responsible for the actions of both the Company

(as "Sponsor") prior to the 2012 Transaction and the Administrative Committee (as "named fidu-

ciary"), and had the power to direct the directed trustees in connection with the 2012 Transaction.

As such, the CQH Board Defendants had fiduciary responsibility for the 2012 Transaction under

ERISA. Likewise, the Administrative Committee on which they served had such fiduciary re-

sponsibility.

    **ANSWER:**   Mr. Koman admits that GreatBanc had, and exercised, sole discretion to direct the ESOP's co-trustees to cause the ESOP to enter into the ESOP Transaction, but denies the remaining allegations in sentence 1. (*See* Decl. Ex. G, J-K, M). Sentences 2 and 3 state legal conclusions to which no response is required. To the extent a response is required, Mr. Koman denies the allegations in sentences 2 and 3.

    98.    Because the CQH Board Defendants and Administrative Committee directed the

Co-Trustees "with respect to the initial purchase of" CQH stock, and because of their power over

the ESOP Co-Trustees, the CQH Board Defendants and Administrative Committee caused the

ESOP to purchase the CQH stock for at least $170 million, which was greater than fair market

value.

    **ANSWER:**   Mr. Koman denies the allegations in this paragraph.

    99.    Contrary to Defendants' claim in their motion to dismiss briefing (ECF No. 49),

the 2012 ESOP Transaction was not a "two-step" transaction. Rather, it was a complex, integrated

35

transaction, the entirety of which occurred following the Company's Board of Directors' agreement to pursue an ESOP transaction.

**ANSWER:**   Mr. Koman admits that the ESOP Transaction involved multiple steps and that the ESOP's acquisition occurred after the CQH Board established the ESOP.  Mr. Koman denies the remaining allegations in this paragraph.

100.    As alleged above, Defendants Watson and Barrows, in addition to serving as CQH Board Members and Co-Trustees, simultaneously held high-level management positions at Casino Queen during the relevant period.

**ANSWER:**   Mr. Koman admits that, at various times, Messrs. Watson and Barrows were members of CQI management, members of CQI's and CQH's Board, and co-trustees of the ESOP, but denies the remaining allegations in this paragraph.

101.    The 2012 Transaction was announced to employees only after it was completed; at that time, employees were told that the Casino had been sold to the ESOP for $170 million, but that the Casino was actually worth $174 million.  Employees were not told how many shares the ESOP was purchasing for $170 million and thus, the employees did not know the per share price the ESOP paid for CQH stock.

**ANSWER:**   Mr. Koman lacks knowledge or information sufficient to admit or deny the allegations in this paragraph, and therefore denies them.

102.    To this day, Plaintiffs do not know the share price of the stock purchased in the 2012 Transaction.

**ANSWER:**   Mr. Koman lacks knowledge or information sufficient to admit or deny the allegations in this paragraph, and therefore denies them.

103.    Further, it was only after Plaintiffs filed this action in 2020 that they were first provided with and given access to a copy of the valuation report underlying the 2012 Transaction price paid by the ESOP.

**ANSWER:**   Mr. Koman lacks knowledge or information sufficient to admit or deny the allegations in this paragraph, and therefore denies them.

36

104.     At the same mandatory employee meeting, ESOP participants were told that, because they had become owners of the Company, they would have enough money to purchase vacation homes.

**ANSWER:**     Mr. Koman lacks knowledge or information sufficient to admit or deny the allegations in this paragraph, and therefore denies them.

105.     Employees were also told that, as the new owners of the Company, they would get to vote on any transaction entered into by Casino Queen that was greater than three million dollars. This did not happen.

**ANSWER:**     Mr. Koman lacks knowledge or information sufficient to admit or deny the allegations in this paragraph, and therefore denies them.

106.     As described in further detail below, in 2013 the Company sold its real property for $140 million.  The Company also later acquired a small casino in Iowa (the subsequently renamed Casino Queen Marquette) for $40 million.  The employees were not permitted to vote on either of those transactions.

**ANSWER:**     Mr. Koman admits that the Company entered into the Real Property Sale, but denies the remaining allegations in sentence 1.  Mr. Koman lacks knowledge or information sufficient to admit or deny the allegations in sentences 2 and 3, and therefore denies them.

107.     On December 27, 2012, the Company reported publicly that "[t]he ESOP will effectively create an enhanced retirement benefits plan tied to the performance of the Property and provide liquidity for employees when they retire or leave the Company.  The private nature of the ESOP permits management to focus on strategies for the long-term benefit of the Company and creation of wealth for its employees."  However, the 2012 Transaction did not enhance employees' retirement benefits or provide them with a long-term benefit. The chief beneficiaries of the 2012 Transaction were the Selling Shareholders.

37

**ANSWER:**   Mr. Koman admits that sentence 1 purports to paraphrase, summarize, and/or quote a published article, but relies on that document to speak for itself.  Mr. Koman denies the allegations in sentence 1 to the extent they are inconsistent with the article.  Mr. Koman denies the remaining allegations in this paragraph.

108.   Defendants knew that the Company was not worth the $170 million the ESOP paid for it because the Selling Shareholders had tried for years to sell the Company and were not able to find a third-party buyer to pay $170 million.

**ANSWER:**   Mr. Koman denies the allegations in this paragraph.

109.   Defendants also knew or should have known that the valuation report used to justify a $170 million purchase price was based on unreliable and unrealistic financial projections of the Company's future earnings and cash flows.  They also knew or should have known that Casino Queen's revenues had dropped significantly for years due to Casino Queen's market share decreasing and that the Company had struggled since 2007 as the number of competitors grew.

**ANSWER:**   Mr. Koman denies the allegations in this paragraph.

110.   Casino Queen's long-term financial prospects were also diminished by an Illinois smoking ban and St. Louis's removal of its $500 loss limit rule, which removed an edge Illinois casinos had previously enjoyed over competitors across the river.  And in 2010, Missouri began allowing casinos to operate 24 hours a day, while Illinois required casinos to close for two hours per day.  As a result, casino-goers who wanted to gamble uninterrupted began to cross the river to visit Missouri casinos instead of visiting Casino Queen.

**ANSWER:**   Mr. Koman lacks knowledge or information sufficient to admit or deny the allegations in this paragraph, and therefore denies them.

111.   Further, Casino Queen was more limited in its ability to attract customers compared to its competitor casinos that were part of gaming giants.

**ANSWER:**   Mr. Koman lacks knowledge or information sufficient to admit or deny the allegations in this paragraph, and therefore denies them.

112.    Despite knowledge that all of the above problems facing Casino Queen indicated that it was not worth the $170 million the ESOP paid for the Company, the CQH Board Defendants and Administrative Committee instructed the Co-Trustees to arrange and complete the 2012 Transaction.[4]

**ANSWER:**    Mr. Koman denies the allegations in this paragraph and the allegations contained in footnote 4.

113.    Because the CQH Board Defendants and Administrative Committee had the power to direct the Co-Trustees during the 2012 Transaction, they should have directed the Co-Trustees to not complete the 2012 Transaction, which they knew or should have known was not prudent or in the best interest of the ESOP participants.    Further, the Co-Trustees independently knew or should have known that it was not prudent or in the best interest of participants to proceed with the 2012 Transaction, and therefore should not have authorized the 2012 Transaction regardless of the direction that they received.

**ANSWER:**    Sentence 1 contains legal conclusions to which no response is required. To the extent a response is required, Mr. Koman admits that GreatBanc had, and exercised, sole discretion to direct the ESOP's co-trustees to cause the ESOP to enter into the ESOP Transaction, but denies the remaining allegations in sentence 1. (*See* Decl. Ex. G, J-K, M). Mr. Koman lacks knowledge or information sufficient to admit or deny the allegations in this paragraph, and therefore denies the allegations in sentence 2.

114.    The CQH Board Defendants, Administrative Committee, and Co-Trustees also knew or should have known that it was imprudent and not in the participants' best interest to have the ESOP borrow all of the money necessary to complete the 2012 Transaction.

**ANSWER:**    This paragraph contains legal conclusions to which no response is required. To the extent a response is required, Mr. Koman denies the allegations in this paragraph.

---

[4] Even if the CQH Board Defendants did not directly instruct the Co-Trustees to consummate the 2012 Transaction, they effectively exercised power over the Co-Trustees' decision-making through the Administrative Committee, and also because the CQH Board had hiring and firing power over the Co-Trustees, who were themselves CQH Board Members.

115.     According to governmental filings, the Company guaranteed all of the debt the ESOP took out to complete the 2012 Transaction.  Because it was the guarantor, the Company had to classify the ESOP's debt on its balance sheet, which deeply burdened the small Company with debt and cannibalized the common equity owned by the ESOP.

**ANSWER:**     Mr. Koman lacks knowledge or information sufficient to admit or deny the allegations in sentence 1, and therefore denies them.  Mr. Koman denies the allegations in sentence 2.

116.     Further, as guarantor, the Company was and continues to be obligated to make cash contributions to the ESOP sufficient to cover the loan payments due in a given year, which resulted in a significant cash drain on the Company.  These required cash contributions, which service the ESOP's debt, significantly impaired the Company's cash flows and earnings after the 2012 Transaction.

**ANSWER:**     Mr. Koman admits that CQH makes contributions to the ESOP that service the ESOP's debt, but denies the remaining allegations in this paragraph.

117.     The real beneficiaries of the 2012 Transaction and ESOP loan were not the ESOP participants, but rather the Selling Shareholders.  In filings that Plaintiffs' counsel recently obtained from the U.S. Securities and Exchange Commission, it was disclosed that Defendants Bidwill, Rand and Koman pocketed $46.3 million in cash immediately through the 2012 Transaction and were owed millions more by the ESOP as they financed a large portion of the ESOP's $170 million Transaction debt.  The other Selling Shareholders were similarly unjustly enriched.

**ANSWER:**     Mr. Koman denies the allegations in sentence 1.  Mr. Koman admits that sentence 2 purports to paraphrase, summarize, and/or quote a Form D filing with the SEC, but relies on that filing to speak for itself.  Mr. Koman denies the remaining allegations contained in sentence 2 to the extent they are inconsistent with the terms of that filing.  (*See* Decl. Ex. S). Mr. Koman denies the allegation in sentence 3.

118.     The CQH Board Defendants – at least three of whom had a manifest conflict as the sellers of CQH stock to the ESOP – caused the imprudent and disloyal 2012 Transaction where the ESOP overpaid for CQH stock and overleveraged itself and the Company the ESOP purchased.

**ANSWER:**     Mr. Koman admits that Messrs. Watson and Barrows were the sole members of CQH's board of directors at the time of the ESOP's acquisition of CQH stock. (Decl. Ex. E-I). Mr. Koman further admits that, after the ESOP's acquisition of CQH stock, GreatBanc directed the ESOP's co-trustees to appoint Mr. Koman a Note Holder Director on the CQH board. (*See* Decl. Ex. M-O). Mr. Koman denies the remaining allegations in this paragraph.

119.     The CQH Board Defendants also failed to monitor the Co-Trustees during the 2012 Transaction to ensure that the ESOP did not pay greater than fair market value for the Company.

**ANSWER:**     This paragraph contains a legal conclusion to which no response is required. To the extent a response is required, Mr. Koman denies the allegations in this paragraph.

120.     The Co-Trustees who approved the 2012 Transaction at the behest of the CQH Board and the Administrative Committee did so based on inaccurate and unrealistic information concerning the financial viability of the Company, including the Company's financial projections for future cash flow, which were used to justify the $170 million purchase price.

**ANSWER:**     Mr. Koman denies the allegations in this paragraph, and further denies that the ESOP Transaction was improper.

121.     The CQH Board Defendants failed to ensure that the Co-Trustees who approved the 2012 Transaction received all information necessary for them to fulfill their fiduciary duties, including facts related to their many unsuccessful attempts to sell Casino Queen to a third-party buyer.

**ANSWER:**     Mr. Koman denies the allegations in this paragraph, and further denies that the ESOP Transaction was improper.

122.     The Co-Trustees knew or should have known that the cash flow problems created by the $170 million Transaction debt taken on by both the ESOP and the Company as guarantor were not prudent and in the best interest of the ESOP participants.

41

**ANSWER:** Mr. Koman denies the allegations in this paragraph, and further denies that the ESOP Transaction was improper.

123. Ultimately, the 2012 Transaction was designed and executed to benefit the Selling Shareholders, in particular Koman, Bidwill and Rand, and their families, all of whom profited handsomely from it. The CQH Board Defendants' ERISA violations significantly harmed the participants in the ESOP, which all along was a house of cards that toppled after Defendants could no longer conceal their scheme.

**ANSWER:** Mr. Koman denies the allegations in this paragraph.

124. Further, as described in detail below, Defendants concealed relevant information from the ESOP participants and the DOL in publicly available filings for the ESOP from the 2012 Transaction until October 2019.

**ANSWER:** Mr. Koman denies the allegations in this paragraph.

**D. Following the 2012 Transaction, the CQH Board Members and Co-Trustees Violated ERISA by Approving a Deal that was Imprudent and Disloyal**

125. Pursuant to the Plan Document, the Co-Trustees have the power to vote unallocated shares of CQH stock, which has been the majority of CQH shares since the 2012 Transaction. The Co-Trustees, therefore, at all relevant times were able to vote an absolute majority of all outstanding shares.

**ANSWER:** Mr. Koman admits that this paragraph purports to paraphrase, summarize, and/or quote the terms of the Plan Document, but relies on that document to speak for itself. Mr. Koman denies the allegations in this paragraph to the extent they are inconsistent with the terms of the Plan Document.

126. Among other things, the Co-Trustees, who were themselves CQH Board Members, had the power to "vote" to continue to re-elect themselves and the other members to the CQH Board. The relationship between the CQH Board Defendants and the Co-Trustees therefore was deeply conflicted and self-perpetuating.

42

**ANSWER:**    Mr. Koman admits that this paragraph purports to paraphrase, summarize, and/or quote the terms of the Plan Document, but relies on that document to speak for itself.  Mr. Koman denies the allegations in this paragraph to the extent they are inconsistent with the terms of the Plan Document.

127.    In 2013, the Co-Trustees, selected by the CQH Board Members, voted to approve a transaction which sold substantially all of the Company's real property to Gaming and Leisure Properties ("GLPI") and refinanced all the ESOP's debt owed to the Selling Shareholders, which were loans guaranteed by the Company.

**ANSWER:**    Mr. Koman admits that, following their appointment to the CQH board of directors, Messrs. Koman, Bidwill, and Rand were classified as "Note Holder Directors," a category of CQH director not authorized to appoint or remove the ESOP's trustees or vote on the 2013 Real Property Sale. (*See* Decl. Ex. N-O). Mr. Koman further admits that the ESOP's trustees voted CQH shares in connection with the Real Property Sale, and that, subsequent to the Real Property Sale, CQI and CQH paid off certain existing debt, but denies the remaining allegations in this paragraph.

128.    As part of this Asset Sale, the Co-Trustees (appointed by the CQH Board), caused all of the debt related to the 2012 Transaction to be refinanced.  Through this refinancing, the Selling Shareholders were able to cash out their remaining profits from the 2012 Transaction.  However, the refinancing was based on unfavorable financial terms for the ESOP and the Company.[5]

**ANSWER:**    Mr. Koman admits that, following their appointment to the CQH board of directors, Messrs. Koman, Bidwill, and Rand were classified as "Note Holder Directors," a category of CQH director not authorized to appoint or remove the ESOP's trustees or vote on the 2013 Real Property Sale. (*See* Decl. Ex. N-O). Mr. Koman further admits that in 2013 the ESOP's trustees voted CQH shares in connection with the Real Property Sale and that, subsequent to the Real Property Sale, CQI and CQH paid off certain existing debt, but denies the remaining allegations in this paragraph and footnote 5.

---

[5] The Company took on a new $43 million loan from GLPI which had a five-year maturity and an interest rate of 7%.

129.     For example, the Asset Sale required the Company to transfer ownership over all of the Company's primary assets – its land, hotel, casino, and an RV park – to GLPI for $140 million.

**ANSWER:**     Mr. Koman admits that this paragraph purports to paraphrase, summarize, and/or quote the operative legal documents in connection with the Real Property Sale, but relies on those documents to speak for themselves. Mr. Koman denies the allegations in this paragraph to the extent they are inconsistent with those documents.

130.     But the Company agreed to lease the sold property back from GLPI for approximately $14 million per year, over a 15-year term.  Thus, over the full term of the lease, the Company agreed to pay $210 million in rent for property it sold for only $140 million.

**ANSWER:**     Mr. Koman admits that this paragraph purports to paraphrase, summarize, and/or quote the operative legal documents in connection with the Real Property Sale, but relies on those documents to speak for themselves. Mr. Koman denies the allegations in this paragraph to the extent they are inconsistent with those documents.

131.     In contrast to the $14 million annual rent bill, the real property sold to GLPI had a tax-assessed total value of about $12.1 million dollars.

**ANSWER:**     Mr. Koman lacks knowledge or information sufficient to admit or deny the allegations in this paragraph, and therefore denies them.

132.     As part of the lease agreement, the Company also agreed to pay all property expenses, including property taxes, insurance, and maintenance of the property, and utilities, in addition to rent, in an arrangement known as a "triple net lease."

**ANSWER:**     Mr. Koman admits that this paragraph purports to paraphrase, summarize, and/or quote the operative legal documents in connection with the Real Property Sale, but relies on those documents to speak for themselves. Mr. Koman denies the allegations in this paragraph to the extent they are inconsistent with those documents.

133.     The Company has paid $14 million annually in rent, plus all property expenses from 2013 to the present, for real property independently valued at just $12.1 million. GLPI continues to list Casino Queen as a tenant on its website.

**ANSWER:**    Mr. Koman lacks knowledge or information sufficient to admit or deny the allegations in this paragraph, and therefore denies them.

134.    GLPI agreed to provide Casino Queen with a new $43 million term loan, which allowed Koman, Bidwill, Rand, and the other Selling Shareholders to monetize the remainder of their Seller gains from the 2012 Transaction because it provided the Company (and hence the ESOP) with cash to pay off all of the ESOP's outstanding loans owed to the Selling Shareholders.

**ANSWER:**    Mr. Koman admits that this paragraph purports to paraphrase, summarize, and/or quote the operative legal documents in connection with the Real Property Sale, but relies on those documents to speak for themselves. Mr. Koman denies the allegations in this paragraph to the extent they are inconsistent with those documents.

135.    In other words, because the Asset Sale refinanced the Company and ESOP's then-existing loans (some of which were owed to the Selling Shareholders), the refinancing of corporate and ESOP debt to GLPI as the new lender allowed the Selling Shareholders to cash out their remaining profits from the 2012 Transaction.

**ANSWER:**    Mr. Koman admits that, subsequent to the Real Property Sale, CQI and CQH paid off existing debt, but denies the remaining allegations in this paragraph.

136.    In a statement regarding the Asset Sale, Defendant Watson said that "[t]his transaction offers us the opportunity to reorganize our capital structure, with a long-term solution that provides stability for our employee-owners.  Further, by unlocking the value in our real estate assets, we are able to focus on efficiently operating our business in a less restrictive, asset-lite environment."

**ANSWER:**    Mr. Koman lacks knowledge or information sufficient to admit or deny the allegations in this paragraph, and therefore denies them.

137.    The Company needed this "long-term solution" precisely because the ESOP purchased the Company for greater than fair market value and the Company was forced to guarantee the ESOP's $170 million Transaction debt.  At the time of the 2012 Transaction, the ESOP had no

assets and no credit. Following the Transaction, the ESOP subsequently had no way to service the debt long term, necessitating the Asset Sale – which sold off the primary assets of the Company the ESOP had purchased less than a year earlier.

**ANSWER:**   Mr. Koman denies the allegations in sentence 1.  Mr. Koman admits that the ESOP, like all ESOPs, had no assets when first created, but denies the remaining allegations in sentences 2 and 3.

138.   Pursuant to the Plan Document, major decisions of the Company require a share-holder vote; such decisions include refinancing of the Company's debt or the sale of a substantial proportion of the Company's assets.  Thus, in order to complete the Asset Sale, Co-Trustees Watson and Barrows had to approve the Asset Sale and the restructuring of the Company's debt because they had the power to vote the majority of all outstanding CQH stock as of 2013.

**ANSWER:**   Mr. Koman admits that sentence 1 purports to paraphrase, summarize, and/or quote the terms of the Plan Document, but relies on that document to speak for itself.  Mr. Koman denies the allegations in sentence 1 to the extent they are inconsistent with the terms of the Plan Document.  Mr. Koman admits that the ESOP trustees voted CQH shares in connection with the Real Property Sale, but denies the remaining allegations in sentence 2.

139.   The CQH Board Defendants knowingly participated in the Asset Sale and the refinancing of the Company's Transaction debt.  In so doing, Koman, Bidwill, and Rand were conflicted because they and their family members (the Party-in-Interest Defendants) stood to gain from the accelerated payoff of the ESOP loans owed to them.

**ANSWER:**   Sentence 1 states a legal conclusion to which no response is required.  To the extent a response is required, Mr. Koman denies the allegation in sentence 1.  Mr. Koman denies the allegations in sentence 2.

140.   The disloyal and imprudent actions of the CQH Board Members, including Watson and Barrows, in connection with the Asset Sale used to refinance the Company's ESOP Transaction debt, caused the value of the CQH stock held in participants' ESOP accounts to be further impaired.

**ANSWER:**   Mr. Koman denies the allegations in this paragraph.

141.   According to a 2012 news article recently discovered by counsel, the Koman, Bidwill, and Rand families planned to retain control over Casino Queen by installing Koman, Bidwill, and Rand on the CQH Board until the loans they made to the ESOP were paid in full, which was estimated to be three to five years.

**ANSWER:**   Mr. Koman lacks knowledge or information sufficient to admit or deny the allegations in this paragraph, and therefore denies them.

142.   Based on the news articles and governmental filings recently discovered by counsel, Koman, Bidwill, and Rand, backed and directed by their family members, expedited their payout on the debt the ESOP owed them from the 2012 Transaction by arranging the Asset Sale and related debt refinancing, through Watson and Barrows, who voted to approve them.

**ANSWER:**   Mr. Koman admits that the trustees voted CQH shares in connection with the Real Property Sale, but denies the remaining allegations in sentence 2.

143.   Watson and Barrows were incentivized to approve the Asset Sale and expedite the repayment of the loan from the Selling Shareholders through the Stock Appreciation Rights Plan. Their Stock Appreciation Rights fully vested when the loan to the Selling Shareholders was paid off with the completion of the Asset Sale.  Watson and Barrows were able to cash out millions of dollars of CQH stock received through the Stock Appreciation Rights Plan.

**ANSWER:**   Mr. Koman admits that GreatBanc, as the sole independent fiduciary with discretion to vote the ESOP's shares, directed the ESOP's co-trustees to vote the ESOP's shares to approve a stock appreciation rights plan for certain members of company management, including Messrs. Watson and Barrows, on December 26, 2012, but denies the remaining allegations in sentence 1. (*See* Decl. Ex. M, Q, R). Mr. Koman admits that sentence 2 purports to paraphrase, summarize, and/or quote the terms of the stock appreciation rights agreement, but relies on that document to speak for itself. Mr. Koman denies the allegations in sentence 2 to the extent they are inconsistent with the terms of the stock appreciation rights agreement.  Mr. Koman lacks knowledge or information sufficient to admit or deny the allegations in sentence 3, and therefore denies them.

144.    The Asset Sale that was used to refinance the ESOP Transaction debt left Casino Queen as a shell of a company that did not own any real property assets and which did not have sufficient cash flow to service its remaining debts.

**ANSWER:**    Mr. Koman denies the allegations in this paragraph.

145.    But by 2014, this was no longer the concern of Defendants Bidwill, Rand, and Koman, or their family members, as they succeeded in having the portion of the ESOP Transaction loans owed to them fully repaid.

**ANSWER:**    Mr. Koman admits that he and Messrs. Bidwill and Rand resigned from the CQH Board on January 23, 2014, but denies the remaining allegations in this paragraph. (*See* Decl. Ex. T-V).

146.    Shortly after they were paid in full for the Company that the ESOP was forced to purchase (indeed, at an inflated price), Defendants Bidwill, Rand, and Koman relinquished their CQH Board memberships.

**ANSWER:**    Mr. Koman admits that he and Messrs. Bidwill and Rand resigned from the CQH Board on January 23, 2014, but denies the remaining allegations in this paragraph. (*See* Decl. Ex. T-V).

**E.    ESOP Fiduciaries Concealed the Violations of ERISA By Inaccurately Reporting the Price the ESOP Paid for the Company and Misrepresenting the Stock Value as Increasing from 2012-2019**

147.    Plaintiffs were unaware of the material facts relating to the fiduciary breaches and prohibited transactions set forth herein until at least October 2019 because Defendants engaged in a pattern of fraud and/or concealment of material facts concerning the 2012 Transaction and the Asset Sale. Despite their exercise of reasonable due diligence, Plaintiffs did not know nor could they have known of Defendants' violations of ERISA, because Defendants made several misstatements of material of fact concerning the 2012 Transaction and the Asset Sale to conceal evidence of their wrongdoing.

48

**ANSWER:**   Mr. Koman denies the allegations in this paragraph.

>    **(1)   Statements to Employee Participants During Mandatory Employee Meetings About the ESOP**

148.   First, Plaintiffs attended mandatory employee meetings about the ESOP, wherein the Co-Trustees, at the direction of the CQH Board and the Administrative Committee repeatedly told employees/participants that the ESOP would provide significant retirement savings and even create wealth for participants.  For example, at one meeting employees were told by Company management that they would be able to purchase second homes with the money they would earn as employee-owners of Casino Queen.

**ANSWER:**   Mr. Koman lacks knowledge or information sufficient to admit or deny the allegations in this paragraph, and therefore denies them.

149.   Employees also were told that they could look forward to making the equivalent of nearly their entire salary through the ESOP.

**ANSWER:**   Mr. Koman lacks knowledge or information sufficient to admit or deny the allegations in this paragraph, and therefore denies them.

150.   Even as late as mid-2018, when Plaintiff Gill left Casino Queen for what he believed were better employment opportunities elsewhere, Company management told Gill that he was making a big mistake by moving to another casino, because Casino Queen's ESOP was a unique opportunity that would provide "the best retirement you'll ever have."

**ANSWER:**   Mr. Koman lacks knowledge or information sufficient to admit or deny the allegations in this paragraph, and therefore denies them.

151.   Immediately after the ESOP Transaction, while they were still CQH Board Members, Koman, Bidwill, and Rand directed the Co-Trustees and other Company management to provide this inaccurate information regarding the ESOP to ESOP participants. Koman, Bidwill, and Rand in turn operated at the behest of the Party-in-Interest Defendants—their family members and

former Selling Shareholders that still had money tied up in Casino Queen and had a significant interest in keeping the ESOP participants in the dark.

**ANSWER:**   Mr. Koman denies the allegations in this paragraph.

### (2)   Annual Form 5500s Filed with the Department of Labor

152.   Second, Defendants concealed that the ESOP overpaid for CQH stock and took on imprudent levels of debt by misreporting the purchase price the ESOP paid and the amount of debt acquired to complete the Transaction in the ESOP's required annual filings with the DOL.

**ANSWER:**   Mr. Koman denies the allegations in this paragraph.

153.   CQH, as the sponsor of the ESOP, was required to file financial reports disclosing information regarding the ESOP's financial condition, including its assets, liabilities, and income on an annual basis.

**ANSWER:**   Mr. Koman admits that ERISA-covered plans file Forms 5500 annually with the U.S. Department of Labor, but lacks knowledge or information sufficient to admit or deny the remaining allegations in this paragraph and therefore denies them.

154.   The CQH Board Defendants, as members of the Administrative Committee or acting for the Company as the Plan Administrator, prepared and caused to be filed with the DOL the ESOP's Form 5500s.  Each of these governmental filings is signed by a Casino Queen executive who swears to the truth, completeness, and correctness of the report under penalties of perjury. Immediately after the ESOP Transaction, while they were still CQH Board Members, Koman, Bidwill, and Rand (in coordination with and for the benefit of themselves and their family members, the Party-in-Interest Defendants) were fully aware of and participated in the inclusion of inaccurate and incomplete information in the Company's Form 5500s.  Watson and Barrows were also involved in this practice from the inception of the ESOP and continued the practice after Koman, Bidwill, and Rand resigned from the CQH Board.

**ANSWER:**   Mr. Koman admits that, following their appointment to the CQH board, Messrs. Koman, Bidwill, and Rand were classified as "Note Holder Directors," a category of CQH director not authorized to take any actions related to the ESOP's Form 5500 filings, and that Messrs. Koman, Bidwill, and Rand resigned from the CQH Board on January 23, 2014, but denies the remaining allegations in sentence 1. (*See* Decl. Ex. N-O, T-V). Mr. Koman admits that sentence 2 purports to paraphrase, summarize, and/or quote the Plan's Form 5500s, but relies on those documents to speak for themselves. Mr. Koman denies the allegations in sentence 2 to the extent they are inconsistent with the Plan's Form 5500s. Mr. Koman denies the allegations in sentence 3. Mr. Koman lacks knowledge or information sufficient to admit or deny the allegations in sentence 4, and therefore denies them.

155.   The Form 5500s filed for plan years 2012, 2013 and 2014 were signed by Defendant Barrows, and the Form 5500s filed after that were signed by William Vandersand.

**ANSWER:**   Mr. Koman admits that this paragraph purports to paraphrase, summarize, and/or quote the Plan's Form 5500s for years 2012, 2013, and 2014, but relies on those documents to speak for themselves. Mr. Koman denies the allegations in this paragraph to the extent they are inconsistent with the Plan's Form 5500s for years 2012, 2013, and 2014.

156.   The ESOP repeatedly misrepresented the price it paid for CQH stock in each Form 5500 filed during the relevant time (2012-2019), though the misrepresentations were not consistent.

**ANSWER:**   Mr. Koman lacks knowledge or information sufficient to admit or deny the allegations in this paragraph, and therefore denies them. Mr. Koman further expressly denies the existence of any alleged fraud or concealment.

157.   The ESOP's 2012 Form 5500 is only 11 pages long and does not include any accounting statement or notes describing the 2012 Transaction.

**ANSWER:**   Mr. Koman admits that this paragraph purports to paraphrase, quote, and/or cite to the Plan's 2012 Form 5500, but relies on that document to speak for itself. Mr. Koman denies the remaining allegations contained in this paragraph to the extent they are inconsistent with the terms of the Plan's 2012 Form 5500. (*See* Decl. Ex. W).

158.   The Form 5500s for 2012, as well as 2013, 2014, 2015 and 2016, stated that the ESOP's cost of purchase for the CQH stock was only $4 million, and that the ESOP took out $4 million of debt for the purchase.

**ANSWER:**     Mr. Koman admits that this paragraph purports to paraphrase, quote, and/or cite to the Plan's 2012, 2013, 2014, 2015 and 2016 Form 5500s, but relies on those documents to speak for themselves. Mr. Koman denies the remaining allegations contained in this paragraph to the extent they are inconsistent with the terms of the 2012, 2013, 2014, 2015 and 2016 Form 5500s.

159.     However, the 2017 Form 5500 stated that the ESOP's cost of purchase for the CQH stock was less – $3,898,388 – and that the ESOP took out $3,898,388 in debt for the purchase.

**ANSWER:**     Mr. Koman admits that this paragraph purports to paraphrase, quote, and/or cite to the Plan's 2017 Form 5500, but relies on that document to speak for itself.  Mr. Koman denies the remaining allegations contained in this paragraph to the extent they are inconsistent with the terms of the Plan's 2017 Form 5500.

160.     The 2018 Form 5500 stated that the ESOP's cost of purchase for the CQH stock was even less – $3,885,302 – and that the ESOP took out $3,885,302 in debt for the purchase.

**ANSWER:**     Mr. Koman admits that this paragraph purports to paraphrase, quote, and/or cite to the Plan's 2018 Form 5500, but relies on that document to speak for itself.  Mr. Koman denies the remaining allegations contained in this paragraph to the extent they are inconsistent with the terms of the Plan's 2018 Form 5500.

161.     In contrast, the Form D, which Defendant Watson filed in January 2013 with the U.S. Securities and Exchange Commission on behalf of CQH, stated that the purchase price of the CQH stock was $175 million. However, the Form D did not disclose how much of the purchase price was borrowed.

**ANSWER:**     Mr. Koman admits that this paragraph purports to paraphrase, quote, and/or cite to the Form D filed with the SEC, but relies on that document to speak for itself.  Mr. Koman denies the remaining allegations contained in this paragraph to the extent they are inconsistent with the terms of the Form D. (*See* Decl. Ex. S).

162.     None of the ESOP's governmental filings state the per share price paid by the ESOP for CQH stock in the 2012 Transaction.

| Table 1 | | | | |
|---|---|---|---|---|
| **Date of Disclosure** | **Cost of CQH stock as reported** | **Value of CQH stock as reported** | **Valuation Date** | **Yr over Yr Gain or Loss** |

| 10/14/2013 | $4,000,000 | $5,400,000 | 12/31/2012 | 35% |
| 10/15/2014 | $4,000,000 | $28,294,972 | 12/31/2013 | 424% |
| 10/15/2015 | $4,000,000 | $30,914,969 | 12/31/2014 | 9% |
| 10/14/2016 | $4,000,000 | $33,189,967 | 12/31/2015 | 7% |
| 9/20/2017 | $4,000,000 | $48,962,106 | 12/31/2016 | 48% |
| 10/10/2018 | $3,898,388 | $53,169,149 | 12/31/2017 | 9% |
| Oct. 15, 2019 | $3,885,302 | $2,792,561 | 12/31/2018 | -95% |
| Source: Casino Queen ESOP Form 5500s filed between 2013 and 2019. | | | | |

**ANSWER:**   Mr. Koman admits that this paragraph purports to paraphrase, quote, and/or cite to the ESOP's governmental filings, but relies on those documents to speak for themselves. Mr. Koman denies the remaining allegations contained in this paragraph to the extent they are inconsistent with the terms of the ESOP's governmental filings. Mr. Koman admits that Table 1 purports to paraphrase, quote, and/or cite to the Plan's Form 5500s, but relies on those documents to speak for themselves. Mr. Koman denies the remaining allegations contained in Table 1 to the extent they are inconsistent with the terms of the Plan's Form 5500s.

163.   Immediately following the 2012 Transaction, the ESOP reported having approximately $5,400,000 in assets, just weeks after the ESOP purchased the CQH stock for a reported $4 million. This indicates a 35% increase in the value of CQH stock.

**ANSWER:**   Mr. Koman admits that this paragraph purports to paraphrase, quote, and/or cite to the Plan's 2012 Form 5500, but relies on that document to speak for itself. Mr. Koman denies the remaining allegations contained in this paragraph to the extent they are inconsistent with the Plan's 2012 Form 5500 filing. (*See* Decl. Ex. W).

164.   The reported CQH stock value continued to rise every year thereafter until plummeting in 2018, as shown in Table 1.

**ANSWER:**   Mr. Koman admits that this paragraph purports to paraphrase, quote, and/or cite to the Plan's Form 5500s, but relies on those documents to speak for themselves. Mr. Koman denies the remaining allegations contained in this paragraph to the extent they are inconsistent with the terms of the Plan's Form 5500s.

165.    The reported increases were sometimes astronomical, such as in 2013 when the stock value was reported to have increased by 424% in a single year.

**ANSWER:**    Mr. Koman admits that this paragraph purports to paraphrase, quote, and/or cite to the Plan's Form 5500s, but relies on those documents to speak for themselves. Mr. Koman denies the remaining allegations contained in this paragraph to the extent they are inconsistent with the terms of the Plan's Form 5500s.

166.    The reported growth in value in the period prior to 2018 did not reflect reality, as the ESOP fiduciaries never reported to the DOL the true sale price of the CQH stock at the time of the 2012 Transaction, nor the approximately $170 million in debt that the ESOP acquired to purchase that stock.

**ANSWER:**    Mr. Koman denies the allegations in this paragraph.

167.    The information provided in the Form 5500s was intended to conceal, and did conceal, that the ESOP overpaid for CQH stock in the 2012 Transaction.

**ANSWER:**    Mr. Koman denies the allegations in this paragraph.

168.    It was not until October 15, 2019, when the Company filed its 2018 Form 5500 with the DOL—after all the CQH Board Defendants involved in the 2012 Transaction had left their positions as Board Members and Trustees—that the ESOP fiduciaries disclosed the true value of CQH stock.

**ANSWER:**    Mr. Koman denies the allegations in this paragraph.

169.    In the DOL filing dated October 15, 2019, the ESOP disclosed for the first time that there was "substantial doubt [about CQ Holding Company's] ability, and therefore the [ESOP's] ability, to continue as a going concern beyond one year from issuance of these financial statements. The [ESOP] may be unable to realize its assets and discharge its liabilities in the normal course of business."

**ANSWER:**    Mr. Koman admits that this paragraph purports to paraphrase, quote, and/or cite to an unnamed filing with the U.S. Department of Labor dated October 15, 2019, but relies on

54

that document to speak for itself. Mr. Koman denies the remaining allegations contained in this paragraph to the extent they are inconsistent with the terms of the unnamed U.S. Department of Labor filing dated October 15, 2019.

170.    The ESOP also disclosed for the first time in its Form 5500 for Plan year 2018 (filed in October of 2019) that the Company "has not been in compliance with certain debt covenants since December 31, 2017."

**ANSWER:**    Mr. Koman admits that this paragraph purports to paraphrase, quote, and/or cite to the Plan's 2018 Form 5500, but relies on that document to speak for itself.  Mr. Koman denies the remaining allegations contained in this paragraph to the extent they are inconsistent with the terms of the Plan's 2018 Form 5500.

### (3) Annual Participation Statements

171.    Third, as part of their efforts to conceal their ERISA violations and to defraud ESOP participants into believing their CQH stock was fine, the Defendants misrepresented to participants that the value of the Casino Queen stock held in their individual ESOP accounts was growing.

**ANSWER:**    Mr. Koman denies the allegations in this paragraph.

172.    The CQH Board Defendants, as members of the Administrative Committee or acting for the Company as the Plan Administrator, prepared and disseminated to ESOP participants annual account balance statements misrepresenting to them that their CQH stock was increasing in value every year between 2013 and 2017, sometimes by as much as 50% in one year.

**ANSWER:**    Mr. Koman admits that, following their appointment to the CQH board, Messrs. Koman, Bidwill, and Rand were classified as "Note Holder Directors," a category of CQH director not authorized to take any actions related to the ESOP's annual participant statements, but lacks knowledge or information sufficient to admit or deny the remaining allegations in this paragraph, and therefore denies them. (*See* Decl. Ex. N-O).

173.    In the immediate aftermath of the 2012 Transaction, while they were still CQH Board Members, Koman, Bidwill, and Rand, backed and directed by their family members (the Party-in-Interest Defendants), caused these inaccurate annual account balance statements to be prepared and disseminated to the ESOP participants for the purpose of concealing the details and

effect of the 2012 ESOP Transaction and 2013 Asset Sale. Watson and Barrows were also intimately involved in this deception and continued providing fraudulent account statements to ESOP participants after Koman, Bidwill, and Rand extracted the remainder of the Selling Shareholders' money from Casino Queen and resigned from the CQH Board.

**ANSWER:**    Mr. Koman admits that, following their appointment to the CQH board, Messrs. Koman, Bidwill, and Rand were classified as "Note Holder Directors," a category of CQH director not authorized to take any actions related to the ESOP's annual participant statements, but lacks knowledge or information sufficient to admit or deny the remaining allegations in this paragraph, and therefore denies them. (*See* Decl. Ex. N-O).

174.    Table 2 shows the value per share of CQH stock that was disclosed to participants in account statements provided to them from 2014 until 2019.

| Table 2 | | | |
|---|---|---|---|
| **Date of Disclosure** | **Valuation Date** | **Stock Value Per Share** | **Increase or Decrease in Value** |
| Not Disclosed | Transaction Date | Not Disclosed | --- |
| June 30, 2014 | 12/31/2013 | $ 56.59 | --- |
| Oct 9, 2015 | 12/31/2014 | $ 61.83 | 9% |
| [date unknown] | 12/31/2015 | $ 66.38 | 7% |
| [date unknown] | 12/31/2016 | $ 99.43 | 50% |
| June 27, 2018 | 12/312017 | $ 109.11 | 10% |
| Oct. 15, 2019 | 12/31/2018 | $ 5.75 | -95% |
| Source: Account statements sent to ESOP participants six months after year end. | | | |

**ANSWER:**  Mr. Koman admits that on June 30, 2014, participants received their first ESOP account statements, which were for the period ending December 31, 2013, and that these account statements were based on a determination of the value of CQH's shares contained in a valuation report that the ESOP's appraiser, Enterprise Services, Inc., issued on March 15, 2014.

56

(*See* Decl. Ex. X). Mr. Koman lacks knowledge or information sufficient to admit or deny the remaining allegations in this paragraph and therefore denies them.

175.    As shown above, even though the Company had not been in compliance with its debt covenants since 2017 (a fact concealed from participants and the DOL until 2019), Defendants reported to Plaintiffs and all ESOP participants on December 31, 2017 that their CQH stock had grown in value by 10%.

**ANSWER:**    Mr. Koman lacks knowledge or information sufficient to admit or deny the allegations in this paragraph and therefore denies them.

176.    In October 2019, the participants in the Casino Queen ESOP received their account balance statements which were current as of December 31, 2018. These statements disclosed that the value of CQH stock held in the participants' individual accounts had fallen from $109.11 per share as of December 31, 2017 to $5.75 per share as of December 31, 2018 – losing 95% of its value in one year.

**ANSWER:**    Mr. Koman lacks knowledge or information sufficient to admit or deny the allegations in this paragraph and therefore denies them.

177.    These October 2019 statements were accompanied by a letter from Terry Hanger, the new President of Casino Queen. The letter stated that "[t]he value of our ESOP has declined significantly from 2017" and attributed the decline to "the fact that our annual profit fell by nearly 60% between 2016 and 2018 and has continued to slide significantly into 2019."

**ANSWER:**    Mr. Koman lacks knowledge or information sufficient to admit or deny the allegations in this paragraph and therefore denies them.

178.    Company management stated that the 95% drop in the value of CQH stock occurred because business levels decreased over the years; however, employees who were working at the Casino, including in managerial positions, observed that the business levels at Casino Queen had not decreased dramatically from 2016 to 2018.

**ANSWER:**    Mr. Koman lacks knowledge or information sufficient to admit or deny the allegations in this paragraph and therefore denies them.

179.    Plaintiffs have never known, and still do not know, how many shares the ESOP purchased or how much the ESOP paid per share for CQH stock in the 2012 Transaction.

**ANSWER:**    Mr. Koman lacks knowledge or information sufficient to admit or deny the allegations in this paragraph and therefore denies them.

180.    Because Plaintiffs and the other ESOP participants were not privy to the methodology the Company used to make its annual valuation of CQH stock, and because Plaintiffs and other ESOP participants had no knowledge of the initial share price paid for the acquisition of CQH stock, it was impossible for them to independently evaluate the accuracy of the reported share value and its annual growth.

**ANSWER:**    Mr. Koman lacks knowledge or information sufficient to admit or deny the allegations in this paragraph and therefore denies them.

181.    Plaintiffs exercised reasonable due diligence by reviewing their annual account balances and attending mandatory employee meetings concerning the ESOP. Both of these sources of information – which were the only sources readily available to Plaintiffs – indicated that participants' ESOP accounts were growing rapidly. Thus, because Defendants actively concealed material facts from all ESOP participants, Plaintiffs did not discover that the ESOP overpaid for CQH stock until October 2019.

**ANSWER:**    Mr. Koman denies that reviewing their annual account balances and attending employee meetings concerning the ESOP were the only sources of information readily available to Plaintiffs, and also denies that Defendants concealed material facts from all ESOP participants.  Mr. Koman lacks knowledge or information sufficient to admit or deny the remaining allegations in this paragraph and therefore denies them.

182.    The vast majority of the facts alleged herein were discovered by counsel for Plaintiffs through counsel's recent investigation and discussions with employees of Casino Queen.

**ANSWER:**   Mr. Koman lacks knowledge or information sufficient to admit or deny the allegations in this paragraph and therefore denies them.

183.   An employee characterized the illusion of wealth creation through employee-ownership ESOP as something that felt like "a set-up, and the set-up worked perfectly."

**ANSWER:**   Mr. Koman lacks knowledge or information sufficient to admit or deny the allegations in this paragraph and therefore denies them.

184.   Because Defendants were aware: (i) of the financial difficulties of Casino Queen; (ii) that the Selling Shareholders were unable to sell the Company to a third party buyer after years of trying; (iii) that the ESOP paid an inflated price for CQH stock in the 2012 Transaction; and (iv) that the Asset Sale used to refinance the Transaction was not in the best interest of the ESOP, the statements and disclosures made to ESOP participants from 2012 until October of 2019 concealed the many ERISA violations alleged herein.

**ANSWER:**   Mr. Koman denies the allegations in this paragraph.

185.   Defendants took acts to conceal their breaches of fiduciary duty by concealing and misrepresenting material facts. Indeed, because of their actions to conceal their ERISA violations, Defendants were able to "avoid detection" and hide those violations from participants, despite the diligent efforts by Plaintiffs to review their account statements and obtain available information concerning their ESOP accounts.

**ANSWER:**   Mr. Koman denies the allegations in this paragraph.

186.   Accordingly, the statute of limitations for all claims alleged herein, which relate to the facts and ERISA violations that Defendants concealed from participants and the DOL, runs from October 2019, which is the earliest that Plaintiffs discovered or could have discovered those ERISA violations.

**ANSWER:**   This paragraph states a legal conclusion to which no response is required. To the extent a response is required, Mr. Koman denies the allegations in this paragraph.

## V.   CLASS ALLEGATIONS

187.   Plaintiffs bring these claims as a class action pursuant to Rule 23(a) and (b) of the

Federal Rules of Civil Procedure, on behalf of the following Class:[6]

> All participants in the Casino Queen ESOP who vested under the terms of the Plan,
> and those participants' beneficiaries, excluding Defendants and their immediate
> family members; any fiduciary of the ESOP; the officers and directors of CQ Hold-
> ing Company, Inc. or of any other entity in which a Defendant has a controlling
> interest; and legal representatives, successors, and assigns of any such excluded
> persons.

**ANSWER:**   Mr. Koman admits that Plaintiffs purport to bring this action as a class action
pursuant to Fed. R. Civ. P. 23(a) and (b).  Mr. Koman denies that class certifications is appropriate
or that the proposed class definition would be appropriate if a class were certified, and denies the
remaining allegations in this paragraph. Footnote 6 contains no factual allegations to which no re-
sponse is required.  To the extent a response is required, Mr. Koman denies the allegations in foot-
note 6.

188.   **Numerosity.** The members of the Class are so numerous that joinder of all mem-

bers is impracticable. According to the 2020 Form 5500 filed with the DOL, as of December 31,

2018, there were 445 participants in the ESOP.

**ANSWER:**   Sentence 1 states a legal conclusion to which no response is required. To the
extent a response is required, Mr. Koman denies the allegations in sentence 1.  Mr. Koman admits
that sentence 2 purports to paraphrase, quote, and/or cite to the Plan's 2020 Form 5500, but relies
on that document to speak for itself. Mr. Koman denies the remaining allegations contained in sen-
tence 2 to the extent they are inconsistent with the terms of the Plan's 2020 Form 5500.

189.   **Commonality.** The issues of liability are common to all members of the Class and

are capable of common answers as those issues primarily focus on Defendants' acts (or failure to

act). Questions of law and fact common to the Class as a whole include, but are not limited to, the

following:

> (a)   Whether Defendants caused the Plan to engage in prohibited transactions
>        under ERISA;

---

[6] Plaintiffs reserve the right to revise their class definition, and to propose other or additional clas-
ses in subsequent pleadings or their motion for class certification, after discovery in this action.

      (b)      Whether the CQH Board Defendants and/or Administrative Committee had the power to direct the Co-Trustees in connection with the ESOP's purchase of CQH stock in the 2012 Transaction;

      (c)      Whether the CQH Board Defendants and/or Administrative Committee directed the Co-Trustees in connection with the ESOP's purchase of CQH stock in the 2012 Transaction;

      (d)      Whether the CQH Board Defendants breached their fiduciary duties by failing to adequately monitor the Co-Trustees or any other fiduciary who approved the 2012 Transaction;

      (e)      Whether the Co-Trustees, as directed trustees, breached their fiduciary duties to ESOP participants by following the direction to complete the ESOP's purchase of CQH stock for more than fair market value;

      (f)      Whether refinancing the ESOP's debt through the Asset Sale was in the participants' best interest and constituted prohibited transactions;

      (g)      Whether Defendants took acts to conceal their unlawful conduct and the true purchase price and value of the Company;

      (h)      The amount of losses suffered by the ESOP as a result of Defendants' unlawful conduct;

      (i)      The amount of profits that accrued to the Party-in-Interest Defendants as a result of the unlawful conduct described herein; and

      (j)      The proper form of equitable and injunctive relief, and other remedial relief.

**<u>ANSWER:</u>**    This paragraph states a legal conclusion to which no response is required. To the extent a response is required, Mr. Koman denies the allegations in this paragraph.

190.    **Typicality.** Plaintiffs' claims are typical of those of the Class because (among other things): (a) they were employed by CQ and were/are participants in the ESOP; (b) to the extent that Plaintiffs seek relief on behalf of the Plan pursuant to ERISA § 502(a)(2), 29 U.S.C. § 1132(a)(2), their claims are not only typical of, but the same as, a claim under ERISA § 502(a)(2) brought by any other Class member; (c) to the extent that Plaintiffs seek equitable relief, that relief would affect all Class members equally; and (d) all of the Class members were injured and continue to be injured in the same manner based on the unlawful conduct alleged herein.

**ANSWER:**     This paragraph states a legal conclusion to which no response is required. To the extent a response is required, Mr. Koman denies the allegations in this paragraph.

191.    **Adequacy.** Plaintiffs will fairly and adequately represent and protect the interests of the Class and are committed to the vigorous representation of the Class. Plaintiffs' retained counsel, Cohen Milstein Sellers and Toll PLLC ("Cohen Milstein") and Stris & Maher LLP ("Stris & Maher"), are experienced in class action and ERISA litigation, and Plaintiffs have no interests antagonistic to or in conflict with the interests of the Class.

**ANSWER:**     Mr. Koman admits that Plaintiffs have retained counsel but denies the remaining allegations in this paragraph.

192.    **Rule 23(b)(1)(A).** Class certification is appropriate pursuant to Federal Rule of Civil Procedure 23(b)(1)(A). Fiduciaries of ERISA-covered plans have a legal obligation to act consistently with respect to all similarly situated participants and to act in the best interests of the ESOP and its participants. This action challenges whether Defendants acted consistently with their fiduciary duties or otherwise violated ERISA as to the Casino Queen ESOP as a whole. As a result, prosecution of separate actions by individual members would create the risk of inconsistent or varying adjudications that would establish incompatible standards of conduct for Defendants relating to the ESOP.

**ANSWER:**     Sentences 1, 2, and 4 state legal conclusions to which no response is required. To the extent a response is required, Mr. Koman denies the allegations in sentences 1, 2 and 4. Mr. Koman admits that the FAC purports to allege that Defendants breached ERISA's fiduciary duties but otherwise denies the allegations in sentence 3, including that Plaintiffs are entitled to any relief.

193.    **Rule 23(b)(1)(B).** Class certification is also appropriate pursuant to Federal Rule of Civil Procedure 23(b)(1)(B). Administration of an ERISA-covered plan requires that all similarly situated participants be treated the same. Resolving whether Defendants breached their fiduciary obligations to the ESOP and engaged in prohibited transactions with respect to the Plan

would, as a practical matter, be dispositive of the interests of the other participants in the ESOP and would substantially impair or impede their ability to protect their interests if they are not made parties to this litigation by being included in the Class. Further, the relief granted by the Court, including any equitable relief, injunctive relief, or accounting of profits, may be dispositive of the interests of other Class members.

**ANSWER:**    This paragraph states a legal conclusion to which no response is required. To the extent a response is required, Mr. Koman denies the allegations in this paragraph.

194.    **Rule 23(b)(2).** Additionally and alternatively, class certification is appropriate pursuant to Federal Rule of Civil Procedure 23(b)(2) because Defendants have acted or refused to act on grounds generally applicable to the Class, making appropriate declaratory and injunctive relief with respect to Plaintiffs and the Class as a whole. This action challenges whether Defendants acted consistently with their fiduciary duties or otherwise violated ERISA as to the ESOP as a whole. The members of the Class are entitled to declaratory and injunctive relief to remedy Defendants' fiduciary violations. As ERISA is based on trust law, any monetary relief consists of equitable monetary relief and is either provided directly by the declaratory or injunctive relief or flows as a necessary consequence of that relief.

**ANSWER:**    Sentences 1 and 4 state legal conclusions to which no response is required. To the extent a response is required, Mr. Koman denies the allegations in sentences 1 and 4.  Mr. Koman admits that the FAC purports to allege that Defendants breached their ERISA fiduciary duties but otherwise denies the allegations in sentence 2, including that Plaintiffs are entitled to any relief.  Mr. Koman denies the allegations in sentence 3.

195.    **Rule 23(b)(3).** Additionally and alternatively, class certification is appropriate pursuant to Federal Rule of Civil Procedure 23(b)(3) because questions of law and fact common to all Class members predominate over any questions affecting individual members of the Class, and because a class action is superior to other available methods for the fair and efficient adjudication

of this action. Common questions related to liability will necessarily predominate over any individual questions because Defendants' duties and obligations were uniform to all participants and therefore all members of the Class. Plaintiffs and all Class members have been harmed by the unlawful conduct alleged herein. As relief and any recovery will be on behalf of the Plan, common questions as to remedies will likewise predominate over any individual issues.

**ANSWER:**    Sentences 1, 2, and 4 state legal conclusions to which no response is required. To the extent a response is required, Mr. Koman denies the allegations in sentences 1, 2 and 4.  Mr. Koman denies the allegations in sentence 3.

196.    A class action is a superior method to other available methods for the fair and efficient adjudication of this action. As the claims are brought on behalf of the ESOP, resolution of the issues in this litigation will be efficiently resolved in a single proceeding rather than multiple proceedings. The losses suffered by individual Class members are small compared to the expense and burden of individual prosecution of this action. In addition, class certification is superior because it will obviate the need for unduly duplicative litigation which might result in inconsistent judgments about Defendants' duties with regard to the ESOP.

**ANSWER:**   This paragraph contains no factual allegations to which no response is required.  To the extent a response is required, Mr. Koman denies the allegations in this paragraph, including that purported individual Class members suffered any losses.

197.    In addition, the following factors also favor certification of this case as a class action:

- No other litigation concerning this controversy has been filed by any other members of the Class; and

- The names and addresses of the Class members are available from the ESOP, and notice will be provided to all Class members to the extent required by Rule 23.

**ANSWER:**    Mr. Koman lacks knowledge or information sufficient to admit or deny the allegations in this paragraph and therefore denies them, including that this action should be certified as a class action.

# VI.   CAUSES OF ACTION

## Count I
### Prohibited Transactions in Violation of ERISA § 406(a), 29 U.S.C. § 1106(a) (Against All Defendants in Connection With the 2012 Transaction)

198.   Plaintiffs incorporate the preceding paragraphs as though set forth herein.

**ANSWER:**   Mr. Koman incorporates his prior answers as though set forth herein.

199.   ERISA § 406(a)(1), 29 U.S.C. § 1106(a)(1), requires that a plan fiduciary "shall not cause the plan to engage in a transaction, if [s/he] knows or should know that such transaction constitutes a direct or indirect (A) sale or exchange, or leasing of any property between the plan and a party in interest," or a "(D) transfer to, or use by or for the benefit of, a party in interest, of any assets of the plan."

**ANSWER:**   Mr. Koman admits that this paragraph purports to paraphrase, quote, and/or cite to a provision of ERISA, but relies on the statute to speak for itself. Mr. Koman denies the remaining allegations contained in this paragraph to the extent they are inconsistent with the statutory text.

200.   ERISA § 406(a)(1)(B), 29 U.S.C. § 1106(a)(1)(B), requires that a plan fiduciary shall not cause the plan to engage in a transaction, if s/he knows or should know that such transaction constitutes the direct or indirect loan of money between the plan and a party in interest.

**ANSWER:**   Mr. Koman admits that this paragraph purports to paraphrase, quote, and/or cite to a provision of ERISA, but relies on the statute to speak for itself. Mr. Koman denies the remaining allegations contained in this paragraph to the extent they are inconsistent with the statutory text.

201.   ERISA § 3(14), 29 U.S.C. § 1002(14) defines a "party in interest" to include, *inter alia*:

- "any fiduciary . . . of such employee benefit plan";

- "an employer any of whose employees are covered by such plan [the ESOP]";

- "an employee, officer or director . . . or a 10 percent or more shareholder" of an employer whose employees are covered by the ESOP; or

65

- "a relative (as defined in paragraph (15)) of any individual described in subparagraph (A), (B), (C), or (E)[.]" ERISA § 3(14)(A), (C), (H), and (F), 29 U.S.C. § 1002(14)(A), (C), (H), and (F).

**ANSWER:**   Mr. Koman admits that this paragraph purports to paraphrase, quote, and/or cite to a provision of ERISA, but relies on the statute to speak for itself. Mr. Koman denies the remaining allegations contained in this paragraph to the extent they are inconsistent with the statutory text.

202.   The Supreme Court has held that anyone, including a non-fiduciary party-in-interest, who receives the benefit of conduct that violates ERISA may be subject to equitable remedies under ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3), if they have "actual or constructive knowledge of the circumstances that rendered the transaction unlawful." *Harris Tr. & Sav. Bank v. Salomon Smith Barney, Inc.*, 530 U.S. 238, 251 (2000).

**ANSWER:**   Mr. Koman admits that this paragraph purports to paraphrase, quote, and/or cite to the Supreme Court's opinion in *Harris Tr. & Sav. Bank v. Salomon Smith Barney, Inc.*, 530 U.S. 238, 251 (2000), but relies on the opinion to speak for itself.  Mr. Koman denies the remaining allegations contained in this paragraph to the extent they are inconsistent with the Supreme Court's opinion.

203.   As alleged above, the following parties were fiduciaries of the Casino Queen ESOP before and at the time of the 2012 Transaction: the CQH Board Defendants, the Administrative Committee, the Co-Trustees, Charles Bidwill III, Timothy J. Rand, James G. Koman, Jeffrey Watson, and Robert Barrows. These Defendants are referred to hereinafter as the "Fiduciary Defendants".

**ANSWER:**   Sentence 1 states a legal conclusion to which no response is required.  To the extent a response is required, Mr. Koman denies the allegations in sentence 1.  Sentence 2 contains no factual allegation to which a response is required.  To the extent a response is required, Mr. Koman denies the allegations in sentence 2.

204.   Because each of the Party-in-Interest Defendants was a member of the CQH Board of Directors, a 10% or more shareholder, a family member of a Board member or 10% shareholder, a trust in which 50% or more of the beneficial interest is owned directly or indirectly by such

persons, or otherwise a party in interest as defined in ERISA § 3(14), 29 U.S.C. § 1002(14), each

of them was a party in interest to the ESOP within the meaning of ERISA § 3(14), 29 U.S.C. §

1002(14).

**ANSWER:**    This paragraph states a legal conclusion to which no response is required. To
the extent a response is required, Mr. Koman denies the allegations in this paragraph.

205.    The ESOP's purchase of all outstanding CQH stock from the Party-in-Interest De-

fendants, each of whom was a party in interest to the ESOP, constituted an exchange of property

between the ESOP and the Party-in-Interest Defendants in violation of ERISA § 406(a)(1)(A), 29

U.S.C. § 1106(a)(1)(A), as well as a transfer of the ESOP assets to the Party-in-Interest Defendants

in violation of ERISA § 406(a)(1)(D), 29 U.S.C. § 1106(a)(1)(D).

**ANSWER:**    This paragraph states a legal conclusion to which no response is required. To
the extent a response is required, Mr. Koman denies the allegations in this paragraph.

206.    The ESOP's Transaction loans from the Party-in-Interest Defendants also consti-

tuted prohibited transactions in violation of ERISA § 406(a)(1)(B), 29 U.S.C. § 1106(a)(1)(B).

**ANSWER:**    This paragraph states a legal conclusion to which no response is required. To
the extent a response is required, Mr. Koman denies the allegations in this paragraph.

207.    Further, each individual payment to the Party-in-Interest Defendants by the ESOP

in connection with the 2012 Transaction loans constituted another exchange of property between

the ESOP and the Party-in-Interest Defendants in violation of ERISA § 406(a)(1)(A), 29 U.S.C. §

1106(a)(1)(A), as well as a transfer of the ESOP assets to the Party-in-Interest Defendants in vio-

lation of ERISA § 406(a)(1)(D), 29 U.S.C. § 1106(a)(1)(D).

**ANSWER:**    This paragraph states a legal conclusion to which no response is required. To
the extent a response is required, Mr. Koman denies the allegations in this paragraph.

208.    The CQH Board Defendants, acting in their capacity as the Administrative Com-

mittee who directed the Co-Trustees in the 2012 Transaction, improperly caused the prohibited

transactions set forth herein. By virtue of the foregoing, the CQH Board Defendants and the Administrative Committee Defendants violated ERISA § 406(a)(1)(A), (B) and (D), 29 U.S.C. § 1106(a)(1)(A), (B) and (D).

**ANSWER:**    Mr. Koman denies the allegations in sentence 1.  Sentence 2 states a legal conclusion to which no response is required. To the extent a response is required, Mr. Koman denies the allegations in sentence 2.

209.    Further, Defendants Watson and Barrows, acting in their capacity as directed trustees, completed the ESOP's purchase of CQH stock for greater than fair market value at the direction of the other CQH Board Defendants despite their knowledge that the 2012 Transaction violated ERISA's prohibited transaction rules.

**ANSWER:**    This paragraph states a legal conclusion to which no response is required. To the extent a response is required, Mr. Koman denies the allegations in this paragraph.

210.    These prohibited transactions caused losses to the Plan and enriched the Fiduciary Defendants and the Party-in-Interest Defendants.

**ANSWER:**    This paragraph states a legal conclusion to which no response is required. To the extent a response is required, Mr. Koman denies the allegations in this paragraph, and further denies that the Plan suffered losses or that the former shareholders were "enriched."

211.    The Fiduciary Defendants are liable for appropriate relief under ERISA § 409, 29 U.S.C. § 1109, and ERISA § 502(a)(2) and (3), 29 U.S.C. § 1132(a)(2) and (3), for these prohibited transactions.

**ANSWER:**    This paragraph states a legal conclusion to which no response is required. To the extent a response is required, Mr. Koman denies the allegations in this paragraph.

212.    The Party-in-Interest Defendants, including Koman, Bidwill and Rand, to the extent they were not acting as fiduciaries of the ESOP, are liable as non-fiduciary parties-in-interest

under *Harris Trust* and ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3), because each of them know-

ingly participated in prohibited transactions under ERISA.[7]

**ANSWER:**     This paragraph states a legal conclusion to which no response is required. To the extent a response is required, Mr. Koman denies the allegations in this paragraph. Mr. Koman denies the allegations in sentence 1 of footnote 7.  Sentence 2 contains no factual allegations to which a response is required.  To the extent a response is required, Mr. Koman denies the allegations in sentence 2 of footnote 7.

## Count II
### Self-Dealing in Violation of ERISA § 406(b), 29 U.S.C. § 1106(b)
### (Against James G. Koman, Charles Bidwill III and Timothy Rand in Connection with the 2012 Transaction)

213.     Plaintiffs incorporate the preceding paragraphs as though set forth herein.

**ANSWER:**     Mr. Koman incorporates his prior answers as though set forth herein.

214.     As alleged above, Koman, Bidwill, and Rand were fiduciaries of the Casino Queen

ESOP before, during and after the 2012 Transaction.

**ANSWER:**     This paragraph states a legal conclusion to which no response is required. To the extent a response is required, Mr. Koman denies the allegations in this paragraph.

215.     ERISA § 406(b)(1), 29 U.S.C. § 1106(b)(1), prohibits a fiduciary from "deal[ing]

with the assets of the plan in his [or her] own interest or for his [or her] own account[.]"

**ANSWER:**     Mr. Koman admits that this paragraph purports to paraphrase, quote, and/or cite to a provision of ERISA, but relies on the statute to speak for itself. Mr. Koman denies the remaining allegations contained in this paragraph to the extent they are inconsistent with the statutory text.

216.     Koman, Bidwill, and Rand orchestrated and caused the sale of CQH stock to the

ESOP in the 2012 Transaction to enrich themselves and dealt with ESOP assets in their own inter-

est within the meaning of ERISA § 406(b)(1), 29 U.S.C. § 1106(b)(1).

---

[7] Plaintiff have always asserted a non-fiduciary claim in this case, including against Koman, Bidwill and Rand. Nevertheless, Plaintiffs clarify their intention to pursue equitable remedies against non-fiduciary parties in interest out of an abundance of caution in response to the position taken by certain Defendants during discovery in this case that no such claim has been asserted.

**ANSWER:**     Mr. Koman denies the allegations in this paragraph.

217.     These prohibited transactions caused losses to the Plan and enriched Koman, Bidwill, and Rand.

**ANSWER:**     Mr. Koman denies the allegations in this paragraph.

218.     Koman, Bidwill, and Rand are liable for appropriate relief under ERISA § 409, 29 U.S.C. § 1109, and ERISA § 502(a)(2) and (3), 29 U.S.C. § 1132(a)(2) and (3), for these prohibited transactions.

**ANSWER:**     This paragraph states a legal conclusion to which no response is required. To the extent a response is required, Mr. Koman denies the allegations in this paragraph.

### Count III
### Breach of Fiduciary Duties Under ERISA § 404(a)(1)(A) and (B),
### 29 U.S.C. § 1104(a)(1)(A) and (B)
### (Against the Fiduciary Defendants in Connection With the 2012 Transaction)

219.     Plaintiffs incorporate the preceding paragraphs as though set forth herein.

**ANSWER:**     Mr. Koman incorporates his prior answers as though set forth herein.

220.     From before the 2012 Transaction until after it was completed, the Fiduciary Defendants were members of the CQH Board and the Administrative Committee, or were named Trustees of the ESOP. As such, pursuant to ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), they were ESOP fiduciaries responsible for the 2012 Transaction because they: (1) exercised discretionary authority or control respecting management of the ESOP; (2) exercised authority or control over the ESOP's assets; and/or (3) had discretionary authority or discretionary responsibility in the administration of the ESOP

**ANSWER:**     Mr. Koman denies the allegation in sentence 1.  Sentence 2 contains legal conclusions to which no response is required.  To the extent a response is required, Mr. Koman denies the allegations in sentence 2.

221.    As fiduciaries responsible for the 2012 Transaction, the Fiduciary Defendants were required to act "for the exclusive purpose of providing benefits to participants and the beneficiaries of the plan." ERISA § 404(a)(1)(A), 29 U.S.C. § 1104(a)(1)(A).

**ANSWER:**    This paragraph states a legal conclusion to which no response is required. To the extent a response is required, Mr. Koman denies the allegations in this paragraph.

222.    As fiduciaries responsible for the 2012 Transaction, the Fiduciary Defendants were required to act with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent person acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims. See ERISA § 404(a)(1)(B), 29 U.S.C. § 1104(a)(1)(B).

**ANSWER:**    This paragraph states a legal conclusion to which no response is required. To the extent a response is required, Mr. Koman denies the allegations in this paragraph.

223.    In the context of a sale of the sponsoring company/employer to an ESOP, the duties of loyalty under ERISA § 404(a)(1)(A), 29 U.S.C. § 1104(a)(1)(A), and prudence under ERISA § 404(a)(1)(B), 29 U.S.C. § 1104(a)(1)(B), require a fiduciary to undertake an appropriate investigation to ensure that the ESOP and its participants pay no more than adequate consideration for the Company's assets.

**ANSWER:**    Mr. Koman admits that this paragraph purports to paraphrase, quote, and/or cite to a provision of ERISA, but relies on the statute to speak for itself. Mr. Koman denies the remaining allegations contained in this paragraph to the extent they are inconsistent with the statutory text.

224.    Pursuant to ERISA § 3(18), 29 U.S.C. § 1002(18), adequate consideration for an asset for which there is no generally recognized market means the fair market value of the asset is determined in good faith by the trustee or named fiduciary pursuant to the terms of the plan and in accordance with DOL regulations.

**ANSWER:**    Mr. Koman admits that this paragraph purports to paraphrase, quote, and/or cite to a provision of ERISA, but relies on the statute to speak for itself. Mr. Koman denies the remaining allegations contained in this paragraph to the extent they are inconsistent with the statutory text.

225.    As fiduciaries responsible for the 2012 Transaction, the Fiduciary Defendants were required to engage in appropriate due diligence and an independent investigation of the fair market value of the CQH stock sold to the ESOP.

**ANSWER:**    Mr. Koman denies the allegations in this paragraph.

226.    As alleged above, a prudent and loyal fiduciary would have determined that the amount the ESOP paid for CQH stock, approximately $170 million, was greater than the fair market value of the Company at the time of the Transaction.

**ANSWER:**    This paragraph states a legal conclusion to which no response is required. To the extent a response is required, Mr. Koman denies the allegations in this paragraph.

227.    A prudent and loyal fiduciary would have recognized that the $170 million purchase price was based on unrealistic financial projections and that the prior unsuccessful attempts to sell the Company indicated it was not worth $170 million.

**ANSWER:**    This paragraph states a legal conclusion to which no response is required. To the extent a response is required, Mr. Koman denies the allegations in this paragraph.

228.    A prudent and loyal fiduciary would have concluded that the 100% leveraged structure necessary to complete the 2012 Transaction was imprudent and not in the best interest of the ESOP participants.

**ANSWER:**    This paragraph states a legal conclusion to which no response is required. To the extent a response is required, Mr. Koman denies the allegations in this paragraph.

229.    By failing to act prudently and loyally in connection with the 2012 Transaction, and by failing to restore the losses caused thereby, the Fiduciary Defendants breached their fiduciary duties under ERISA § 404(a)(1)(A) and (B), 29 U.S.C. § 1104(a)(1)(A) and (B), and caused losses to the ESOP and the individual retirement accounts of the participants in the ESOP.

**ANSWER:**    This paragraph states a legal conclusion to which no response is required. To the extent a response is required, Mr. Koman denies the allegations in this paragraph.

230.    The Fiduciary Defendants are liable for appropriate relief under ERISA § 409, 29 U.S.C. § 1109, and ERISA § 502(a)(2) and (3), 29 U.S.C. § 1132(a)(2) and (3), for these violations of ERISA § 404(a)(1)(A) and (B), 29 U.S.C. § 1104(a)(1)(A) and (B).

**ANSWER:**    This paragraph states a legal conclusion to which no response is required. To the extent a response is required, Mr. Koman denies the allegations in this paragraph.

**Count IV**
**Breach of Fiduciary Duties and Prohibited Transactions**
**Under ERISA § 404(a)(1) and 406(a)(1)(A), 29 U.S.C. § 1104(a)(1) and 1106(a) (Against the CQH Board Defendants and Co-Trustees Watson and Barrows in Connection with Events after the 2012 Transaction Including the Asset Sale)**

231.    Plaintiffs incorporate the preceding paragraphs as though set forth herein.

**ANSWER:**    Mr. Koman incorporates his prior answers as though set forth herein.

232.    As discretionary Co-Trustees during and following the 2012 Transaction, Defendants Watson and Barrows were required to act at all times prudently and loyally in accordance with ERISA § 404(a)(1)(A) and (B), 29 U.S.C. § 1104(a)(1)(A) and (B).

**ANSWER:**    This paragraph states a legal conclusion to which no response is required. To the extent a response is required, Mr. Koman denies the allegations in this paragraph.

233.    As fiduciaries of the ESOP during the 2012 Transaction, as alleged above, Koman, Bidwill, and Rand were required to act at all times prudently and loyally in accordance with ERISA § 404(a)(1)(A) and (B), 29 U.S.C. § 1104(a)(1)(A) and (B).

**ANSWER:**    This paragraph states a legal conclusion to which no response is required. To the extent a response is required, Mr. Koman denies the allegations in this paragraph.

234.    Among other things, as prudent and loyal fiduciaries to the ESOP following the 2012 Transaction, the Co-Trustees should have corrected mistakes in the 2012 Transaction and related reporting to participants and the DOL about the Transaction; sought to remedy any over-payment by the ESOP for CQH stock; and sought to restore the losses caused thereby.

**ANSWER:**    This paragraph states a legal conclusion to which no response is required. To the extent a response is required, Mr. Koman denies the allegations in this paragraph.

235.    In addition, the Co-Trustees should have closely scrutinized the Asset Sale and conducted appropriate due diligence regarding the Asset Sale, which would have revealed that it was not prudent or in the best interest of Plan participants.

**ANSWER:**    This paragraph states a legal conclusion to which no response is required. To the extent a response is required, Mr. Koman denies the allegations in this paragraph.

236.    The Co-Trustees failed to do any of these things. Instead, they concealed the Company's true financial condition and value (or lack thereof), and subsequently approved the Asset Sale which was not in the best interests of ESOP participants. Koman, Rand, and Bidwill ensured that the imprudent Asset Sale would occur by adopting the Stock Appreciation Rights scheme to incentivize the Co-Trustees to repay the loan to the Selling Shareholders as soon as possible. Koman, Rand, and Bidwill further ensured that the Co-Trustees would continue to act for the benefit of the Selling Shareholders, and against the best interest of the ESOP, by retaining authority (as CQH Board Members) to replace Watson and Barrows as Trustees.

**ANSWER:**    Mr. Koman denies the allegations in this paragraph.

237.    As a result, the Co-Trustees and Koman, Bidwill, and Rand breached their fiduciary duties under ERISA § 404(a)(1)(A) and (B), 29 U.S.C. § 1104(a)(1)(A) and (B), and caused losses to the ESOP and the individual retirement accounts of the participants in the ESOP.

**ANSWER:**   This paragraph states a legal conclusion to which no response is required. To the extent a response is required, Mr. Koman denies the allegations in this paragraph.

238.   Additionally, through their votes – on behalf of the ESOP – to approve the refinancing of the 2012 Transaction debt as part of the Asset Sale, which resulted in the transfers of ESOP assets to the Selling Shareholders, the Co-Trustees caused prohibited transactions in violation of ERISA § 406(a)(1)(D), 29 U.S.C. § 1106(a)(1)(D). These prohibited transactions caused losses to the ESOP and the individual retirement accounts of the participants in the ESOP. Koman, Rand, and Bidwill are also liable for the prohibited transaction by virtue of their retained control over the Co-Trustees and the Stock Appreciation Rights Plan that incentivized the Asset Sale.

**ANSWER:**   This paragraph states a legal conclusion to which no response is required. To the extent a response is required, Mr. Koman denies the allegations in this paragraph.

239.   The Co-Trustees and Koman, Bidwill, and Rand are liable for appropriate relief under ERISA § 409, 29 U.S.C. § 1109, and ERISA § 502(a)(2) and (3), 29 U.S.C. § 1132(a)(2) and (3), for these violations of ERISA § 404(a)(1)(A) and (B), 29 U.S.C. § 1104(a)(1)(A) and (B), and ERISA § 406(a)(1)(D), 29 U.S.C. § 1106(a)(1)(D).

**ANSWER:**   This paragraph states a legal conclusion to which no response is required. To the extent a response is required, Mr. Koman denies the allegations in this paragraph.

### Count V
### Failure to Monitor Appointed Fiduciaries
### Under ERISA § 404(a)(1)(A) and (B), 29 U.S.C. § 1104(a)(1)(A) and (B)
### (Against CQH Board Defendants in Connection With the 2012 Transaction & Asset Sale)

240.   Plaintiffs incorporate the preceding paragraphs as though set forth herein.

**ANSWER:**   Mr. Koman incorporates his prior answers as though set forth herein.

241.   The CQH Board Defendants had a duty to monitor any appointed fiduciary to ensure that such appointee is acting in accordance with ERISA and in compliance with the terms of the Plan. See 29 C.F.R. § 2509.75-8 (FR-17). If the appointed fiduciary has violated or continues

to violate ERISA, the monitoring fiduciary must remove the appointed fiduciary and attempt to restore any losses to the plan caused by the ERISA violations.

**ANSWER:**    This paragraph states a legal conclusion to which no response is required. To the extent a response is required, Mr. Koman denies the allegations in this paragraph.

242.    The CQH Board Defendants had the power to appoint and did appoint all fiduciaries acting on behalf of the ESOP during the 2012 Transaction, including the Co-Trustees and the Administrative Committee members. The CQH Board Defendants also had the power to remove any fiduciary acting on behalf of the ESOP during the 2012 Transaction if such fiduciary was not properly carrying out their duties.

**ANSWER:**    Mr. Koman denies the allegations in this paragraph.

243.    The CQH Board Defendants breached their duty to monitor the ESOP fiduciaries that they appointed. Among other things, the CQH Board Defendants:

1)    appointed the Co-Trustees and Administrative Committee merely to rubber stamp the 2012 Transaction (and the subsequent Asset Sale);

2)    failed to monitor and evaluate the performance of the ESOP fiduciaries they appointed, or have a system in place for doing so;

3)    failed to ensure that the fiduciaries they appointed to act for the ESOP in connection with the 2012 Transaction had complete, accurate and realistic financial information concerning the financial viability of the Company, including information concerning the Company's financial projections for cash flow and earnings upon which the valuation report was based;

4)    stood idly by while participants suffered substantial losses as a result of the ERISA violations caused by the fiduciaries they appointed;

5)    failed to implement a system to resolve conflicts of interest;

6)    failed to remove appointed fiduciaries whose performance was inadequate; and

7)    failed to ensure that these fiduciaries took appropriate remedial action to redress their violations of ERISA.

**ANSWER:**   This paragraph states a legal conclusion to which no response is required. To the extent a response is required, Mr. Koman denies the allegations in this paragraph.

244.   The foregoing monitoring failures by the CQH Board Defendants caused losses to the ESOP and the individual retirement accounts of the participants in the ESOP.

**ANSWER:**   This paragraph states a legal conclusion to which no response is required. To the extent a response is required, Mr. Koman denies the allegations in this paragraph.

245.   The CQH Board Defendants are liable for appropriate relief under ERISA § 409, 29 U.S.C. § 1109, and ERISA § 502(a)(2) and (3), 29 U.S.C. § 1132(a)(2) and (3), for these monitoring failures.

**ANSWER:**   This paragraph states a legal conclusion to which no response is required. To the extent a response is required, Mr. Koman denies the allegations in this paragraph.

### Alternatively, Count VI
### Co-Fiduciary Liability Under ERISA § 405(a)(1), 29 U.S.C. § 1105(a)(1)
### (Against CQH Board Defendants for 2012 Transaction & Asset Sale)

246.   Plaintiffs incorporate the preceding paragraphs as though set forth herein.

**ANSWER:**   Mr. Koman incorporates his prior answers as though set forth herein.

247.   ERISA § 405(a)(1), 29 U.S.C. § 1105(a)(1), provides that a fiduciary "with respect to a plan shall be liable for a breach of fiduciary responsibility of another fiduciary with respect to the same plan … if [s/he] participates knowingly in, or knowingly undertakes to conceal, an act or omission of such other fiduciary[.]"

**ANSWER:**   Mr. Koman admits that this paragraph purports to paraphrase, quote, and/or cite to a provision of ERISA, but relies on the statute to speak for itself. Mr. Koman denies the remaining allegations contained in this paragraph to the extent they are inconsistent with the statutory text.

248.   ERISA § 405(a)(2), 29 U.S.C. § 1105(a)(2), provides that a fiduciary "with respect to a plan shall be liable for a breach of fiduciary responsibility of another fiduciary with respect to the same plan . . . if [s/he] has enabled such other fiduciary to commit a breach[.]"

**ANSWER:**   Mr. Koman admits that this paragraph purports to paraphrase, quote, and/or cite to a provision of ERISA, but relies on the statute to speak for itself. Mr. Koman denies the remaining allegations contained in this paragraph to the extent they are inconsistent with the statutory text.

249.   ERISA § 405(a)(3), 29 U.S.C. § 1105(a)(3), provides that a fiduciary "with respect to a plan shall be liable for a breach of fiduciary responsibility of another fiduciary with respect to the same plan . . . if [s/he] has knowledge of a breach by such other fiduciary, unless [s/he] makes reasonable efforts under the circumstances to remedy the breach."

**ANSWER:**   Mr. Koman admits that this paragraph purports to paraphrase, quote, and/or cite to a provision of ERISA, but relies on the statute to speak for itself. Mr. Koman denies the remaining allegations contained in this paragraph to the extent they are inconsistent with the statutory text.

250.   The CQH Board Defendants were involved in and directed the preparation of the financial projections underlying the stock appraisal relied upon to justify the price of $170 million that the ESOP paid for CQH stock.

**ANSWER:**   Mr. Koman denies the allegations in this paragraph.

251.   The CQH Board Defendants also had responsibility for directing and monitoring Company executives and management, who assisted in preparing the financial projections underlying the valuation relied upon to approve the price that the ESOP paid for the Company.

**ANSWER:**   Mr. Koman denies the allegations in this paragraph.

252.   In addition, Koman, Bidwill, and Rand had unique knowledge about the Company's finances and the true value of the Company because they had unsuccessfully attempted to sell Casino Queen to other third-party buyers and engaged in significant pricing negotiations and due diligence requested by those potential buyers.

**ANSWER:**   Mr. Koman denies the allegations in this paragraph.

253.    Based on their responsibilities and their knowledge of the Company's finances, the CQH Board Defendants knew (1) that the financial projections underlying the stock appraisal were unrealistic and inflated and (2) that the 2012 Transaction was not in the best interest of the ESOP participants; they nonetheless knowingly participated in the Transaction and/or directed the Transaction, and did so independent of any other ESOP fiduciary that was formally directing the completion of the transaction.

**ANSWER:**    This paragraph states a legal conclusion to which no response is required. To the extent a response is required, Mr. Koman denies the allegations in this paragraph.

254.    The CQH Board Defendants also knew that the Asset Sale was not prudent nor in the best interest of the ESOP participants, and nonetheless knowingly participated in the sale and/or approved the sale, in violation of ERISA § 405(a)(1), 29 U.S.C. § 1105(a)(1).

**ANSWER:**    This paragraph states a legal conclusion to which no response is required. To the extent a response is required, Mr. Koman denies the allegations in this paragraph.

255.    Despite their knowledge that the 2012 Transaction and the Asset Sale constituted breaches of fiduciary duty by other fiduciaries, the CQH Board Defendants made no reasonable efforts to remedy those violations contrary to ERISA § 405(a)(3), 29 U.S.C. § 1105(a)(3). To the contrary, the CQH Board Defendants concealed such fiduciary violations and failed to ensure that ESOP participants received proper disclosures.

**ANSWER:**    This paragraph states a legal conclusion to which no response is required. To the extent a response is required, Mr. Koman denies the allegations in this paragraph.

256.    The CQH Board Defendants, by incentivizing the Co-Trustees to complete the 2012 ESOP Transaction and the 2013 Asset Sale through the Stock Appreciation Rights granted to Watson and Barrows, enabled those fiduciaries to commit breaches of fiduciary duties.

**ANSWER:**    This paragraph states a legal conclusion to which no response is required. To the extent a response is required, Mr. Koman denies the allegations in this paragraph.

257.    Through the actions and omissions alleged in this Count, the CQH Board Defendants caused losses to the ESOP and the individual retirement accounts of the participants in the ESOP.

**ANSWER:**    This paragraph states a legal conclusion to which no response is required. To the extent a response is required, Mr. Koman denies the allegations in this paragraph.

258.    By virtue of the foregoing, if the CQH Board Defendants are not found to have direct fiduciary responsibility for the prohibited transactions and fiduciary breaches committed in connection with the 2012 Transaction and the Asset Sale, then they nonetheless are jointly and severally liable as co-fiduciaries under ERISA § 405(a)(1), (2) and (3) 29 U.S.C. § 1105(a)(1), (2) and (3), for violations of other fiduciaries in connection with the 2012 Transaction and the Asset Sale.

**ANSWER:**    This paragraph states a legal conclusion to which no response is required. To the extent a response is required, Mr. Koman denies the allegations in this paragraph.

## VII.    PRAYER FOR RELIEF

Plaintiffs, on behalf of the Plan and the Class, pray that judgment be entered against Defendants on each Count and respectfully request that the Court award the following relief:

a.    Declare that the Fiduciary Defendants have breached their fiduciary duties to the Casino Queen ESOP and caused prohibited transactions in the manner described herein;

b.    Order rescission of all transactions that violate ERISA;

c.    Order Defendants to restore all losses to the ESOP, or pay such amount or surcharge to the ESOP as is necessary to make it whole for any losses to the ESOP, which resulted from said breaches and prohibited transactions;

d.    Order the Defendants to provide all accountings necessary to determine the amount of profits they must restore to the ESOP pursuant to ERISA §§ 409(a) and 502(a)(2) and (3), 29 U.S.C. §§ 1109(a) and 1132(a)(2) and (3), and further order that they make such a restoration of profits and/or disgorge all such profits;

e.      To the extent necessary, issue an injunction or order creating a constructive trust into which all ill-gotten gains, fees, and/or profits paid to any of the Defendants in violation of ERISA shall be placed for the sole benefit of the ESOP and its participants and beneficiaries;

f.      Appoint an independent fiduciary to manage the assets of the ESOP;

g.      Order that Defendants provide other appropriate equitable relief to the ESOP;

h.      Certify the Class, appoint Plaintiffs as class representatives, and appoint Cohen Milstein and Stris & Maher as Class Counsel;

i.      Award attorneys' fees and costs pursuant to ERISA § 502(g), 29 U.S.C. § 1132(g), and/or order payment of fees and expenses to Plaintiffs' counsel on the basis of the common benefit or common fund doctrine out of any money recovered for the Class;

j.      Award pre-judgment interest and post-judgment interest; and

k.      Award such other and further relief that the Court determines is appropriate pursuant to ERISA § 502(a)(2) and/or § 502(a)(3), 29 U.S.C. § 1132(a)(2) and/or 1132(a)(3), or pursuant to Rule 54(c) of the Federal Rules of Civil Procedure, or that is equitable and just.

**ANSWER:**     In response to Plaintiffs' Prayer for Relief and its subparagraphs (a) through (k), Mr. Koman denies that Plaintiffs are entitled to any of the relief requested or to any relief whatsoever.

**DEFENDANT JAMES G. KOMAN'S AFFIRMATIVE DEFENSES TO PLAINTIFFS'
FIRST AMENDED COMPLAINT**

**FIRST AFFIRMATIVE DEFENSE:** Plaintiffs' claims fail, in whole or in part, to plausibly allege entitlement to relief and/or to state a cause of action upon which relief can be granted under ERISA §§ 404 and 406.

**SECOND AFFIRMATIVE DEFENSE:** Plaintiffs' breach of fiduciary duty and prohibited transaction claims fail in whole or in part because Plaintiffs have failed to allege, and cannot establish, each of the elements of their claims under ERISA §§ 404, 405(a), 406(a), and 406(b).

**THIRD AFFIRMATIVE DEFENSE:** Plaintiffs' prohibited transaction claims fail in whole or in part because there is an applicable exemption to each of Plaintiffs' prohibited transaction claims arising under ERISA § 406(a) and (b).

**FOURTH AFFIRMATIVE DEFENSE:** Plaintiffs' claims are barred, in whole or in part, by the applicable statutes of limitations or repose including, but not limited to, ERISA § 413.

**FIFTH AFFIRMATIVE DEFENSE:** Plaintiffs' claims are barred because the ESOP and its participants have not suffered any loss or injury and/or due to lack of causation.

**SIXTH AFFIRMATIVE DEFENSE:** Plaintiffs' claims are barred, in whole or in part, because the damages alleged were caused by others.

**SEVENTH AFFIRMATIVE DEFENSE:** Plaintiffs' claims under *Harris Trust and Savings Bank v. Salomon Smith Barney, Inc.*, 530 U.S. 238, 241-43 (2000), fail because Plaintiffs cannot identify particular assets in Mr. Koman's possession to which they and/or the ESOP are entitled. *See Great-W. Life & Annuity Ins. Co. v. Knudson*, 534 U.S. 204 (2002).

**RESERVATION OF DEFENSES:** Mr. Koman reserves the right to assert additional affirmative defenses as they may become evident during the course of discovery or during further investigation into the background of this matter.

**CONTINGENT CROSSCLAIM PLAINTIFF JAMES G. KOMAN'S**
**CONTINGENT CROSSCLAIMS**

1.      In further answer to the First Amended Complaint, James G. Koman, pursuant to rule 13(g) of the Federal Rules of Civil Procedure, assumes the role of Contingent Crossclaim Plaintiff Against Contingent Crossclaim Defendants Timothy J. Rand, Charles Bidwill, III, Jeffrey Watson, and Robert Barrows, the Board of Directors of CQ Holding Company, Inc. (a/k/a CQH Board of Directors) ("CQH Board of Directors"), and the Administrative Committee of the Casino Queen Employee Stock Ownership Plan ("Administrative Committee" and collectively, "Contingent Crossclaim Defendants").

2.      As outlined in his Answer and Affirmative Defenses, Mr. Koman denies any liability for the actions described in the First Amended Complaint, including Plaintiffs' allegations that he had fiduciary obligations to the Casino Queen Employee Stock Ownership Plan ("ESOP") at any time. Mr. Koman's Contingent Crossclaims are therefore brought solely in the alternative: to the extent the Court finds that he had and breached fiduciary obligations to the ESOP, Mr. Koman alleges that the Contingent Crossclaim Defendants also acted as fiduciaries and are liable for contribution under ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3).

3.      Mr. Koman's Answer and Affirmative Defenses are realleged and incorporated by this reference in these Contingent Crossclaims.  Mr. Koman further reserves all rights; nothing in these Contingent Crossclaims is intended to waive any defense, nor should any allegation or statement in these Contingent Crossclaims be deemed an admission as to any claim or allegation against Mr. Koman and/or the other Defendants.

## FIRST CAUSE OF ACTION
**(AGAINST TIMOTHY J. RAND, CHARLES BIDWILL, III, JEFFREY WATSON, ROBERT BARROWS, THE BOARD OF DIRECTORS OF CQ HOLDING COMPANY, INC., AND THE ADMINISTRATIVE COMMITTEE OF THE CASINO QUEEN EMPLOYEE STOCK OWNERSHIP PLAN FOR CONTRIBUTION)**

4.      The Seventh Circuit permits ERISA fiduciaries to seek contribution pursuant to ERISA Section 502(a)(3), 29 U.S.C. § 1132 (a)(3).  *Chesemore v. Fenkell*, 829 F.3d 803, 811-12 (7th Cir. 2016) (citing *Free v. Briody*, 732 F.2d 1331, 1137 (7th Cir. 1984)).

5.      Mr. Koman denies that he is a fiduciary to the ESOP within the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A), that he breached or knowingly participated in any breach of fiduciary duties under ERISA, or that he engaged or knowingly participated in ERISA prohibited transactions in connection with either the ESOP Transaction or the Real Property Sale. To the extent that Mr. Koman is determined to be a fiduciary to the ESOP in connection with either the ESOP Transaction or the Real Property Sale, Mr. Koman has standing to bring this Contingent Crossclaim for contribution pursuant to ERISA Section 502(a)(3), 29 U.S.C. § 1132(a)(3) and/or federal common law.

6.      Plaintiffs allege that Mr. Koman, Charles Bidwill, III, and Timothy Rand, as members of CQH's board of directors and acting as the Administrative Committee, were fiduciaries to the ESOP with discretion to cause the ESOP to enter into the ESOP Transaction and to approve the Real Property Sale in violation of ERISA Sections 404, 405, and 406, 29 U.S.C. §§ 1104, 1105, and 1106, and who failed to conduct appropriate diligence of the ESOP Transaction in violation of ERISA Section 404, 29 U.S.C. § 1104.  *See, e.g.*, Dkt. 144 ¶¶ 10-11, 40-69, 81, 91-98, 113-14, 208-11, 216, 225-39.

7.      Plaintiffs further allege that Messrs. Koman, Bidwill, and Rand, as fiduciaries to the ESOP in their capacities as individual members of CQH's board of directors, and the CQH

Board of Directors, as a fiduciary to the ESOP, failed to monitor and/or remove the fiduciaries they appointed in connection with the ESOP Transaction and Real Property Sale in violation of ERISA Section 404, 29 U.S.C. § 1104.  *See, e.g.*, Dkt. 144 ¶¶ 44-46, 119, 203, 240-45.

8.      Plaintiffs further allege that Jeffrey Watson and Robert Barrows (together with Messrs. Koman, Bidwill, Rand, the CQH Board of Directors, and the Administrative Committee, the "Contingent Crossclaim Defendants"), as Co-Trustees of the ESOP, were fiduciaries to the ESOP with discretion to cause the ESOP to enter into the ESOP Transaction and to approve the Real Property Sale in violation of ERISA Sections 404, 405, and 406, 29 U.S.C. §§ 1104, 1105, and 1106, and who failed to conduct appropriate diligence of the Real Property Sale in violation of ERISA Section 404, 29 U.S.C. § 1104.  *See, e.g.*, Dkt. 144 ¶¶ 15, 54-63, 127-28, 139, 203, 209, 231-39.

9.      Plaintiffs further allege that the Mr. Koman and the Contingent Crossclaim Defendants concealed from ESOP participants and the Department of Labor their fiduciary violations and the effects of the ESOP Transaction and Real Property Sale.  *See, e.g.*, Dkt. 144 ¶¶ 3, 9, 11, 17-18, 147-86, 236.

10.      As described in Mr. Koman's Answer to Plaintiff's First Amended Complaint, Mr. Koman denies any liability to Plaintiffs and denies any allegation that he breached any duties imposed by ERISA or any other applicable law, and further denies that he participated in any concealment alleged in the First Amended Complaint.

11.      To the extent the Court finds that Mr. Koman is liable as a fiduciary in connection with Plaintiffs' allegations in the First Amended Complaint, Mr. Koman is entitled to contribution from the Contingent Crossclaim Defendants for their respective portions of the damages or other relief alleged against Mr. Koman.

## <u>PRAYER FOR RELIEF</u>

WHEREFORE, to the extent the Court finds that Mr. Koman is liable as a fiduciary in connection with Plaintiffs' allegations in the First Amended Complaint, Mr. Koman prays for the following relief:

A.      That this Court order the Contingent Crossclaim Defendants to pay James G. Koman all contribution monies to which James G. Koman is entitled, including prejudgment interest thereon, and all interest and earnings thereon.

B.      That this Court award James G. Koman his reasonable attorneys' fees and expenses available under applicable law, including ERISA Section 502(g), 29 U.S.C. § 1132(g), and any other applicable state law.

C.      That this Court award such other and further relief to James G. Koman as it deems equitable and just.


Dated: May 19, 2022                    Respectfully submitted,

                                       **GROOM LAW GROUP, CHTD.**

                                       <u>*/s/ Lars C. Golumbic*</u>
                                       Lars C. Golumbic, *pro hac vice*
                                       Sarah M. Adams, *pro hac vice*
                                       Andrew D. Salek-Raham, *pro hac vice*
                                       Meredith F. Kimelblatt, *pro hac vice*
                                       1701 Pennsylvania Ave., NW, Suite 1200
                                       Washington, DC 20006
                                       Tel: (202) 861-6615
                                       Fax: (202) 659-4503
                                       lgolumbic@groom.com
                                       sadams@groom.com
                                       asalek-raham@groom.com
                                       mkimelblatt@groom.com

                                       *Attorneys for Defendant James G. Koman*