## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| Tom Hensiek, *et al.*, <br><br>       Plaintiffs, <br><br>    v. <br><br> Board of Directors of CQ Holding Company, Inc.. *et al.*, <br><br>       Defendants. | Case No. 3:20-cv-0377-DWD |
| James G. Koman, <br><br>       Contingent Crossclaim Plaintiff, <br><br>    v. <br><br> Charles Bidwill, III, *et al.*, <br><br>       Contingent Crossclaim Defendants. | |
| Charles Bidwill, III, *et al.* <br><br>       Counterclaimants, Crossclaim Plaintiffs, Third-Party Plaintiffs, <br><br>    v. <br><br> Tom Hensiek, *et al.* <br><br>       Counterclaim Defendants, Crossclaim Defendants, Third Part Defendants. | |
| Board of Directors of CQ Holding Company, Inc., *et al.*, <br><br>       Crossclaim Plaintiffs, <br><br>    v. <br><br> Charles Bidwill, *et al.*, <br><br>       Crossclaim Defendants, Third Party Defendants. | |

**DEFENDANTS JAMES G. KOMAN, CHARLES BIDWILL, III, TIMOTHY J. RAND, BOARD OF DIRECTORS OF CQ HOLDING COMPANY, INC., AND THE ADMINISTRATIVE COMMITTEE OF THE CASINO QUEEN EMPLOYEE STOCK OWNERSHIP PLAN'S JOINT MOTION TO AMEND SCHEDULING AND DISCOVERY ORDER (DKT. 131)**

On February 10, 2022, this Court entered an Order Adopting the Joint Report and Proposed Scheduling and Discovery Order, (Dkt. 131, 131-1) ("Scheduling Order"), setting November 1, 2022 as the deadline for the close of all fact discovery, April 28, 2023 for the close of all expert discovery, and October 23, 2023 as start date for a bench trial on all issues.

Movants[1] seek to amend the Scheduling Order in light of three events that have occurred since entry of the Scheduling Order: (i) Plaintiffs have issued expansive discovery requests to three of the original defendants seeking information related to equitable relief available in connection with their claims arising under section 1132(a)(3) of the Employee Retirement Income Security Act of 1974, 29 U.S.C. §§ 1001 *et seq.* ("ERISA"); (ii) Plaintiffs added 28 new defendants alleged to be liable on the same legal theory when they filed the First Amended Complaint on April 14, 2022 (Dkt. 144) ("FAC"); and (iii) the CQ Defendants[2] asserted the same legal theory against eight new third party defendants in their third party complaint filed on May 19, 2022 (CQ Defendants' Third Party Complaint, Dkt. 153 ("CQ TPC") at 99). In short, the wide-ranging discovery that was originally directed only to three defendants—itself unduly burdensome—now applies to 39 parties, fundamentally changing the burdens associated with discovery and the Court's liability determinations at the bench trial set in this case.

To reduce the burdens associated with this shifted landscape, Movants seek to bifurcate this case into two phases: in Phase I, the parties would conduct fact and expert discovery and try

---

[1] "Movants" are the Board of Directors of CQ Holding Company, Inc., the Administrative Committee of the Casino Queen Employee Stock Ownership Plan, the Co-Trustees of the Casino Queen Employee Stock Ownership Plan, Jeffrey Watson, Robert Barrows, James G. Koman, Charles Bidwill, III, and Timothy J. Rand.

As of this filing, none of the newly added defendants or third party defendants (described in this paragraph) have made an appearance, so counsel for Movants do not know their position on this motion. Given the significant burden associated with tracing discovery, described *infra*, it is likely they would welcome bifurcation.

[2] The "CQ Defendants" are the Board of Directors of CQ Holding Company, Inc., the Administrative Committee of the Casino Queen Employee Stock Ownership Plan, the Co-Trustees of the Casino Queen Employee Stock Ownership Plan, Jeffrey Watson, and Robert Barrows.

all aspects of all claims, counterclaims, cross claims, and third party claims, ***except*** the narrow issue of whether equitable relief is available against nonfiduciary defendants alleged to have knowingly participated in a nonexempt transaction in violation of section 1132(a)(3).[3] In Phase II, any defendants found to have knowingly participated in a breach in violation of section 1132(a)(3) would engage in discovery and, if necessary, an evidentiary hearing to establish whether and to what extent any equitable remedies are available against them. To facilitate bifurcation, defendants would stipulate that, during Phase I summary judgment and/or trial, they will reserve any defenses related to available equitable remedies for Phase II.

Determining whether and to what extent equitable relief is available under section 1132(a)(3) will require (according to Plaintiffs' discovery requests to date) a sprawling inquiry into ten years'-worth of personal financial information for 39 of the 41 defendants and third party defendants. Consequently, it presents a tremendous discovery burden on the parties and, ultimately, will require the Court to devote an enormous amount of judicial resources to summary judgment and trial, including several days or even weeks of testimony from what are likely to be multiple financial accounting expert witnesses related to tracing proceeds.

Though it would command major resources in discovery and at trial, the equitable remedies issue represents only a small piece of the overall liability puzzle—it is just one element of one claim that itself hinges on the outcome of another technical ERISA cause of action. In short, it is the last issue in a multi-step liability determination, and it is not relevant to any other of the parties' numerous claims, counterclaims, crossclaims, and third party claims.

---

[3] ERISA's section numbers do not align with the section numbers codified in Title 29 of the U.S. Code—for example, ERISA section 502 was codified at section 1132 of Title 29. The citations used in this memorandum are to Title 29. For a cross-reference guide, see https://benefitslink.com/erisa/crossreference.html.

Though Plaintiffs declined to join this motion and have represented that they intend to oppose it, Plaintiffs' counsel previously sought this exact same relief in another employee stock ownership plan ("ESOP") matter involving just a handful of nonfiduciary defendants (instead of 39) and discovery spanning just a few years (instead of 10). Under the unique circumstances presented here, bifurcation is the best way to ensure that the parties and the Courts do not needlessly expend substantial resources on an issue that is likely to be narrowed or mooted entirely at a bench trial on all other issues.

Movants therefore respectfully request that the Court amend the Scheduling Order to bifurcate this case, as outlined herein.

## I.  BACKGROUND

### A.  Pertinent factual allegations and legal claims.

Relevant here, the FAC's allegations concern a multi-step transaction that occurred on December 26, 2012, in which the Casino Queen ESOP acquired a 100% interest in CQ Holding Company, Inc. ("CQH"), and CQH's former shareholders received $135 million in cash and notes in exchange ("2012 ESOP Transaction").[4] (*See* FAC ¶¶ 91-124). Plaintiffs allege that the 2012 ESOP Transaction occurred for greater than fair market value in violation of ERISA.

Plaintiffs' legal claims fall into two general categories: fiduciary and nonfiduciary. As to the former, Plaintiffs say that the ESOP's directed co-trustees, the CQH board, and the CQH board's members are liable under sections 1104, 1105, and 1106 because they supposedly had and exercised fiduciary discretion under ERISA to cause the ESOP to enter into the deal. (*See* FAC Counts I-III, VI).

---

[4] The FAC refers to the 2012 ESOP Transaction as a $170 million purchase, but this figure includes debt refinancing associated with the transaction, and is not the amount paid to the selling shareholders for their stock.

As to the latter, Plaintiffs allege that the selling shareholders in the 2012 ESOP Transaction are liable under section 1132(a)(3) as nonfiduciaries for "knowingly participat[ing]" in the violations of section 1106(a) alleged in Count I of the FAC. (*See* FAC ¶ 212). The CQ Defendants alleged the same nonfiduciary claims in the alternative against certain selling shareholders that Plaintiffs did not sue.[5] (*See* CQ TPC at 99). Under this theory, defendants allegedly must "make restitution by disgorging the amount of the ESOP's overpayment that they received, plus all earnings, profits and interest thereon." (*Id.* at 104). This motion concerns the section 1132(a)(3) claims brought by Plaintiffs and the CQ Defendants, which we refer to throughout this motion as "Nonfiduciary Claims."[6]

**B.      Nonfiduciary Claims.**

The Supreme Court first acknowledged Nonfiduciary Claims in *Harris Trust and Savings Bank v. Salomon Smith Barney, Inc.*, 530 U.S. 238 (2000). It held that, where a court has determined that an ERISA fiduciary caused a plan to enter into a transaction in violation of section 1106(a), section 1132(a)(3) authorizes a cause of action against nonfiduciaries who received "ill-gotten [plan] assets" in the subject transaction. *Id.* at 247-251. The Court essentially articulated a bona fide purchaser standard derived from trust law:

> [T]he transferee must be demonstrated to have had actual or constructive knowledge of the circumstances that rendered the transaction unlawful. Those circumstances, in turn, involve a showing that the *plan fiduciary,* with actual or constructive knowledge of the facts satisfying the elements of a § [11]06(a) transaction, caused the plan to engage in the transaction.

---

[5] The CQ Defendants brought these claims in the alternative. All defendants deny that any ERISA violation occurred in connection with any of the FAC's allegations.

[6] The parties have brought various other claims, counterclaims, crossclaims, and third party claims asserting other theories of recovery, which are not relevant here. (*See generally* Parties' Pleadings, Dkt. 144 (FAC), Dkt. 153 (CQ Defendants' Answer, Contingent Crossclaims, and Contingent Third Party Complaint), Dkt. 154 (Defendants Rand and Bidwill's Answer, Counterclaims, Contingent Crossclaims, and Contingent Third Party Complaint), Dkt. 157 (Defendant Koman's Answer and Contingent Crossclaims).

*Id.* at 250-251.

The Court emphasized that section 1132(a)(3) authorizes only equitable remedies— "appropriate equitable relief"—which the Court defined to mean the return of property rightfully belonging to another: "restitution of the property (if not already disposed of) or disgorgement of proceeds (if already disposed of), and disgorgement of the third person's profits derived therefrom." *Id.* at 250. Consequently, to recover against a recipient of ill-gotten plan assets, a court must invoke its equitable powers to "impress[] a constructive trust on the property thus acquired in favor of the one who is truly and equitably entitled to the same." *Id.*

For a court to establish a constructive trust over property rightfully belonging to a plaintiff, the plaintiff must first demonstrate the property can "clearly be traced to particular funds or property in the defendant's possession." *Great-W. Life & Annuity Ins. Co. v. Knudson*, 534 U.S. 204, 213 (2002). If, instead, "'the property . . . or its proceeds have been dissipated so that no product remains, [the plaintiff's] claim is only that of a general creditor,' and the plaintiff 'cannot enforce a constructive trust of or an equitable lien upon other property of the [defendant].'" *Id.* at 213-14 (alterations in original) (citing Restatement of Restitution § 215, Comment *a,* at 867). Though a plaintiff may seek an accounting of profits—the return of "profits due from use of [plaintiff's] property"— "even if he cannot identify a particular *res* containing the profits sought to be recovered," plaintiff "still must show entitlement 'to a constructive trust on particular property held by the defendant' that the defendant used to generate the profits." *Teets v. Great-W. Life & Annuity Ins. Co.*, 921 F.3d 1200, 1225-26 (10th Cir. 2019) (citing *Knudson*, 534 U.S. at 214 n.2).

**C.      Plaintiffs' discovery requests.**

To date, Plaintiffs have issued at least eight requests for production and four interrogatories seeking documents and information related to the final element of their Nonfiduciary Claims, tracing the proceeds of the 2012 ESOP Transaction. The discovery requests are:

- <u>RFP 21</u>: All account statements for any financial account (bank, investment, or otherwise) into or through which any of the Selling Shareholders received any asset, benefit, or thing of value, directly or indirectly, in connection with or as a result of the ESOP Transaction, including but not limited to any statements evidencing deposits, withdrawals, investments, gains or losses (realized or not), transfers, payments, or other transactions Related to the assets, benefits, or things of value received.

- <u>RFP 22</u>: Documents sufficient to show how any asset benefit, or thing of value not received in connection with or as a result of the ESOP Transaction was commingled with any asset, benefit, or thing of value that any of the Selling Shareholders received, directly or indirectly, in connection with or as a result of the ESOP Transaction.

- <u>RFP 23</u>: Documents sufficient to quantify any profits or gains (realized or not) derived from any asset, benefit, or thing of value that any of the Selling Shareholders received, directly or indirectly, in connection with or as a result of the ESOP Transaction.

- <u>RFP 24</u>: All Documents and Communications Related to any contention by any of the Selling Shareholders that any asset, benefit, or thing of value they received, directly or indirectly, in connection with or as a result of the ESOP Transaction has been dissipated or could not now be returned or disgorged.

- <u>RFP 38</u>: Documents sufficient to show the personal assets of all Defendants and all Selling Shareholders, including, but not limited to, the tax returns of all Defendants and Selling Shareholders for the past five years.

- <u>RFP 39</u>: All Documents and Communications Related to the Selling Shareholders' use of the money or assets they received, directly or indirectly, in connection with the ESOP Transaction.

- <u>RFP 40</u>: All Documents and Communications Related to the commingling of any money or asset that any of the Selling Shareholders received, directly or indirectly, in connection with or as a result of the ESOP Transaction with money or assets belonging to someone other than the Selling Shareholders.

- <u>RFP 41</u>: Documents sufficient to show how any money or assets commingled with the money or assets that any of the Selling Shareholders received, directly or indirectly, in connection with the ESOP Transaction have been spent or used from December 1, 2012, to the present.

- <u>Interrogatory 3</u>: Identify all Selling Shareholder(s) and provide: (a) how much in dollar value he/she received for his/her CQH Stock; (b) where the value of the funds, assets, property or money the Selling Shareholder received for his/her CQH Stock were deposited, invested or located after the ESOP Transaction, including the financial or investment institution and account name(s) and number(s) where the money or assets were deposited or invested; (c) to the extent that the money, assets, or property received from sale of CQH Stock were comingled with other funds or assets, the history of the transactions involving those funds or assets, and (d) if any Selling Shareholder contends that any amount has been dissipated or could not be returned or disgorged, set forth and explain the basis for that contention.

- <u>Interrogatory 4</u>: For each Selling Shareholder of CQH Stock, Identify any Person(s) to whom any money, funds, assets, property, or things of value were given by the Selling Shareholder after the sale of his/her CQH Stock. For each Person identified in response to this Interrogatory, please state the Person's: (a) name; (b) date of birth; (c) last known mailing and email addresses; (d) title or position at CQH and/or CQI if applicable; (e) relationship to James Koman, Charles Bidwill, III, Timothy J. Rand, Robert Barrows, and/or Jeff Watson if applicable; (f) the value of the money, funds, assets, property, or thing of value that was given to the Person by the Selling Shareholder; (g) relationship to the Selling Shareholder (h) the date the money, funds, assets, property, or thing of value was given to the Person by the Selling Shareholder; and (i) a description of the current location of the money, funds, assets, property, or thing of value that was given to the Person by the Selling Shareholder.

- <u>Interrogatory 7</u>: Identify any asset, benefit, or thing of value that each Selling Shareholder received, directly or indirectly, in connection with or as a result of the ESOP Transaction by (a) the amount (or value) each Selling Shareholder received; (b) the nature of the asset, benefit, or thing of value; (c) the Person who provided the asset, benefit, or thing of value; (d) where and how the asset, benefit, or thing of value was paid (e.g., the name and account number of the bank account or investment account); and (e) the present location of the proceeds from that asset, benefit, or thing of value and, if dissipated, how it was used.

- <u>Interrogatory 15</u>: Identify and itemize all trust assets of each of the Selling Shareholder Trusts for the period from January 1, 2011 to the present.

(*See* Declaration of A. Salek-Raham ("Salek-Raham Decl."), Ex. A, B, C, D).

Requests such as these apply (or will apply)[7] to all of the defendants and third party defendants against whom Plaintiffs and the CQ Defendants have brought Nonfiduciary Claims

_____

[7] Plaintiffs have issued this discovery to the defendants named in the original complaint. Plaintiffs and the CQ Defendants have not yet issued this discovery to the Nonfiduciary Claim Defendants that were added as new

("Nonfiduciary Claim Defendants"). In all, ***39 of 41 defendants*** are Nonfiduciary Claim

Defendants—namely:

- <u>Individuals</u>: Timothy J. Rand, Charles W. Bidwill, III, Mary C. Bidwill, Brian R. Bidwill, Patricia M. Bidwill, Shauna Bidwill-Valenzuela, and James G. Koman, Michael Gaughan, Franklin Toti, Phillip B. Kenny, James C. Kenny, John E. Kenny, Jr., Patrick B. Kenny, Joan Kenny Rose, and Mary Ann Kenny Smith.

- <u>Trusts</u>: William J. Koman, Sr. Living Trust, its Trustee, and any Beneficiaries; James G. Koman Irrevocable Trust, its Trustee, and any Beneficiaries; William J. Koman Irrevocable Trust, its Trustee, and any Beneficiaries; Karen L. Hamilton Irrevocable Trust, its Trustee, and any Beneficiaries; Janis A. Koman Irrevocable Trust, its Trustee, and any Beneficiaries; Elizabeth S. Koman Irrevocable Trust, its Trustee, and any Beneficiaries; Bidwill Succession Trust, its Trustee, and any Beneficiaries; Bidwill Kasino Trust, its Trustee, and any Beneficiaries.

(FAC Count I; CQ TPC at 99).

Defendants have objected to this discovery on multiple grounds, including overbreadth and

burden. Plaintiffs moved to compel on May 12, 2022. (Dkt. 151).

## II.    LEGAL STANDARD

A scheduling order "may be modified only for good cause and with the judge's consent."

Fed. R. Civ. P. 16(b)(4). "Rule 16(b)'s 'good cause' standard primarily considers the diligence of

the party seeking amendment." *Trustmark Ins. Co. v. Gen. & Cologne Life Re of Am.*, 424 F.3d

542, 553 (7th Cir. 2005) (quoting *Johnson v. Mammoth Recreations, Inc.,* 975 F.2d 604, 609 (9th

Cir. 1992)).

## III.    ARGUMENT

For the reasons explained more fully below, Movants propose that the Court amend the

Scheduling Order to bifurcate this case into two phases: Phase I would address discovery and

liability on all aspects of all claims except the equitable remedies available under the Nonfiduciary

---

defendants in the FAC on April 14, 2022 or in the CQ TPC on May 19, 2022 because, as of this filing, those parties have not yet appeared.

Claims. Phase II would begin after a liability determination in Phase I, and would address discovery and liability on the equitable remedies available against any Nonfiduciary Claim Defendant found liable in Phase I under section 1132(a)(3) for knowingly participating in a breach of section 1106(a) under Count I of the FAC. To facilitate bifurcation, the Nonfiduciary Claim Defendants would be precluded from raising any defenses at summary judgment or trial related to Plaintiffs' equitable remedies, including defenses related to their receipt, use, or dissipation of transaction proceeds.

**A.**     **Amending the Scheduling Order would preserve judicial resources and avoid imposing undue burdens on the parties.**

Courts adjudicating lawsuits challenging ESOP transactions regularly determine the precise nature of available equitable relief and related discovery issues after a determination of liability to avoid wasting judicial resources and imposing unnecessary burdens on the parties. For example, in *Chesemore v. All. Holdings, Inc.*, 948 F. Supp. 2d 928 (W.D. Wis. 2013),[8] the court addressed appropriate equitable relief and allowed the parties to resolve related discovery months *after* the bench trial on the merits of plaintiff's claims. (Salek-Raham Decl., Ex. E. *See also* Salek-Raham Decl., Ex. G (joint motion to bifurcate in *Woznicki v. Raydon Corp.*, No. 6:18-cv-2090 (M.D. Fla.) on the grounds that "judicial economy [would] be best served" by delaying consideration of appropriate equitable relief and any necessary discovery of the defendants' personal financial information until after trial)).

Although Plaintiffs' counsel has declined to join this motion, Plaintiffs' counsel moved to bifurcate when they represented Plaintiffs in the *Chesemore* matter, arguing to the *Chesemore* court that "judicial economy [would] be best served" by waiting until after the trial on the merits

---

[8] *Amended*, No. 09-CV-413, 2013 WL 6989526 (W.D. Wis. Oct. 16, 2013), and *aff'd sub nom. Chesemore v. Fenkell*, 829 F.3d 803 (7th Cir. 2016).

to evaluate the nature of any appropriate equitable relief to be awarded and determine the scope of any discovery regarding defendants' use of proceeds from the challenged transactions. (Salek-Raham Decl., Ex. F). What was beneficial for *Chesemore*'s case management is even more so here: The *Chesemore* suit involved just a handful of nonfiduciary defendants, and was filed just two years after the subject transaction; here, there are 39 nonfiduciary defendants who would be subject to over 10 years of detailed financial tracing discovery.

There are two main benefits that would accrue to the parties and the Court should it bifurcate this case. *First,* bifurcation would streamline discovery. The document requests and interrogatories Plaintiffs have served to date regarding equitable remedies are sprawling, onerous, and touch on highly sensitive and personal financial information. Distilled to its essence, Plaintiffs' discovery requests seek

(i)     all information about all "personal assets" (including tax returns), all holdings of any financial account through which transaction proceeds may have passed, all inflows and outflows of funds in all of those accounts, all earnings derived from any of the transaction's proceeds in all of those accounts, all "communications" about the way in which any of the transaction's proceeds were spent or transferred, and detailed identifying information about each and every person who may have received any of the transaction's proceeds,

(ii)    for the entirety of a ten year period (2012 to the present),

(iii)   from all 39 of the Nonfiduciary Claim Defendants.

(*See supra* Part I.D). Needless to say, satisfying these discovery requests would impose exorbitant costs on the parties—a likely waste, for the reasons explained below.

*Second*, bifurcation would ease the burden on the Court at summary judgment and at the bench trial. To demonstrate that equitable relief is available—*i.e.*, that the Nonfiduciary Claim Defendants are in possession of an ill-gotten res over which the Court may impose a constructive trust—Plaintiffs' discovery requests suggest that they intend to introduce documents and testimony

11

tracing the transaction's proceeds through financial accounts belonging to all 39 defendants' over a ten year period, calculating the amount earnings on any "ill-gotten" portion, and addressing whether and to what extent funds have been dissipated or commingled, among other things. This will almost certainly require numerous financial accounting experts and likely add multiple days— if not weeks—to the scheduled bench trial.

Though its burdens are heavy, the equitable relief issue represents a tiny piece of the liability puzzle: The only Count to which asset tracing is relevant is Count I, and even then the legal theory (Nonfiduciary Claim) is confined to just one paragraph (FAC ¶ 212) of Count I and dependent on the existence of an underlying breach of section 1106(a). As the last element in a multi-step liability determination, it is quite possible that the Court need never consider it. To prevail on a Nonfiduciary Claim, Plaintiffs must establish, at a bare minimum,

(i)     that a fiduciary caused an ERISA-covered plan to enter into a prohibited transaction under section 1106(a);

(ii)     that the transaction, though enumerated in section 1106(a), is not an exempt transaction under section 1108;

(iii)     the amount of any overpayment in the 2012 ESOP Transaction;

(iv)     that the defendant against whom plaintiff has asserted a Nonfiduciary Claim had "knowledge of the circumstances that rendered the transaction unlawful," *Harris Trust*, 530 U.S. at 251; and,

**(v)     that the nonfiduciary defendant is still in possession of the plan assets rightfully belonging to the plan, which includes a determination of**

**a.     what portion of the transaction's proceeds were "ill-gotten" (*i.e.*, what portion exceeded fair market value),**

**b.     whether some or all have been dissipated,**

**c.     whether some or all have been commingled with other assets, and**

**d.     to the extent an accounting for profits is sought, the amount of the profits generated from the property belonging to the plan.**

(*See supra* Part I.B (describing basics of Nonfiduciary Claims)).

Thus, if the Court were to find that there was no underlying violation of section 1106(a), or that the transaction were exempt under section 1108, or that Plaintiffs suffered no damages in connection with the 2012 ESOP Transaction, or that one or more of the 39 Nonfiduciary Claim Defendants did not have knowledge of the breach sufficient to trigger liability under section 1132(a), or any number of other findings,[9] then whether and to what extent equitable relief is available—including tracing issues—becomes moot, and the parties' and Courts' efforts in discovery and at trial would have been a waste.

Bifurcation, in contrast, would allow for the most efficient use of the parties' and Court's resources. In Phase I, the Court would determine liability on the Nonfiduciary Claims up to and including Step (iv), above—*i.e.*, whether a nonfiduciary knowingly participated in a nonexempt violation of section 1106(a). This is likely to reduce the burden associated with tracing and equitable remedies in Phase II in two ways.

*First,* only those Nonfiduciary Claim Defendants found liable would need to participate in Phase II, which could substantially whittle the field of 39 defendants and associated personal financial accounts that otherwise would be subject to discovery and a liability determination.

*Second*, a defendant found liable on a Nonfiduciary Claim need only disgorge the amount of the proceeds that are "ill-gotten," (*see supra* Part I.B), which, in an ESOP suit, is, generally speaking, the difference between the actual fair market value of the shares at issue and the fair

---

[9] For example, Plaintiffs have asserted both Nonfiduciary Claims under section 1132(a)(3) and claims based on fiduciary status against certain defendants. To the extent these defendants are found liable as fiduciaries, Plaintiffs are not limited to equitable remedies, but may recover "any losses to the plan resulting from each such breach." 29 U.S.C. § 1109(a). Consequently, the Court would not need to determine whether equitable remedies are available against them. *See Chesemore v. All. Holdings, Inc.*, 886 F. Supp. 2d 1007, 1059 (W.D. Wis. 2012), *aff'd sub nom. Chesemore v. Fenkell*, 829 F.3d 803 (7th Cir. 2016) ("With respect to Alliance and Fenkell, equitable relief under § 502(a)(3) is unnecessary in light of the finding that they were liable as co-fiduciaries under § 405.")

market value the ESOP paid. *See Chesemore*, 948 F. Supp. 2d at 942 ("The amount of overpayment may be an appropriate remedy when the purchase price exceeded fair market value because of a defendants' breach."). Likewise, should Plaintiffs seek an accounting of profits, only profits earned on the amount of the overpayment in a defendant's possession, as opposed to all transaction proceeds, would be the subject of discovery.[10] In short, the only financial accounts relevant to tracing discovery would be those containing the amount of the overpayment, which would significantly shrink the universe of financial accounts for the parties' and courts' consideration.

An example is instructive. Say a transferee received $100 in a transaction, then placed $50 in Account A and $50 in Account B. If a court were to determine that all of the $100 constituted "ill-gotten" assets, then discovery related to amounts in Accounts A and B would be warranted. If, however, the Court determined that $10 of the $100 was "ill-gotten," tracing discovery would be warranted as to one account only, and, in an accounting for profits inquiry, only on the profits earned from the $10.

Bifurcation would thus meaningfully reduce what would otherwise be a staggering burden on both the parties and the Court.

**B.     Movants have demonstrated good cause.**

The "good cause" requirement of Rule 16 is essentially a requirement that the moving party not unduly delay in seeking amendment. *Trustmark Ins. Co.*, 424 F.3d at 553. Movants have timely sought relief.

---

[10] While courts have held that accounting of profits is a type of equitable remedy, Movants do not concede that it is an appropriate form of equitable relief under the circumstances present in this lawsuit.

Movants seek to amend the Scheduling Order in light of three events that occurred subsequent to the Court's entry of the Scheduling Order: (i) on four occasions, Plaintiffs served expansive discovery related to the equitable relief available to them under their claims against three of the original defendants arising under section 1132(a)(3) (*see* Salek-Raham Decl., Ex. A, B, C, D); (ii) on April 14, 2022, Plaintiffs amended their complaint, adding 28 new defendants alleged to be liable on the same legal theory (*see* FAC Count I); and (iii) on May 19, 2022, the CQ Defendants filed third party claims asserting the same legal theory against eight new third party defendants, (CQ TPC at 99). In short, the wide-ranging discovery related to equitable relief under section 1132(a)(3) that Plaintiffs originally sought as to just three defendants now applies to 39, and has fundamentally changed the nature of discovery and liability in this case. Movants' present motion, brought a little more than a month after the FAC was filed and less than a week after the CQ TPC was filed, is therefore timely.

## IV.    CONCLUSION

The issue of whether equitable relief is available on the Nonfiduciary Claims constitutes a small portion of the parties' claims—one element of one derivative claim—but would consume an enormous portion of their discovery resources and the Court's resources at summary judgment and trial. Because the issue may be mooted or substantially narrowed by bifurcation, and because they have not delayed in bringing this motion, Movants have shown good cause to amend the Scheduling Order and respectfully request that the Court amend the Scheduling Order as described herein.

Dated: May 24, 2022                                    Respectfully submitted,

**LEWIS RICE LLC**                                **GROOM LAW GROUP, CHARTERED**

*/s/ Ronald A. Norwood* (with consent)       */s/ Lars C. Golumbic*

Ronald A. Norwood (#06197900)
Apollo D. Carey (#6291448)
600 Washington Avenue
Suite 2500
St. Louis, MO 63101
(314) 444-7600
rnorwood@lewisrice.com
acarey@lewisrice.com

*Attorneys for Defendants*
*Timothy J. Rand*
*and Charles Bidwill, III*

**FISHER & PHILLIPS LLP**

*/s/ Joel W. Rice* (with consent)
Joel W. Rice
Scott C. Fanning (*pro hac vice*)
10 South Wacker Drive, Suite 3450
Chicago, Illinois 60606
P: (312) 346-8061
F: (312) 346-3179
jrice@fisherphillips.com
sfanning@fisherphillips.com

*Attorneys for Defendants The Board of*
*Directors of CQ Holding Company, Inc., The*
*Administrative Committee of the Casino Queen*
*Employee Stock Ownership Plan, Jeff Watson,*
*and Robert Barrows*

Lars C. Golumbic
Sarah M. Adams, *pro hac vice*
Andrew D. Salek-Raham, *pro hac vice*
Meredith F. Kimelblatt, *pro hac vice*
1701 Pennsylvania Ave., NW, Suite 1200
Washington, DC 20006
Tel: (202) 861-6615
Fax: (202) 659-4503
lgolumbic@groom.com
sadams@groom.com
asalek-raham@groom.com
mkimelblatt@groom.com

*Attorneys for Defendant James G. Koman*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that a copy of the foregoing document was served on the below listed

parties on this 24th day of May 2022, via e-mail:

Michelle C. Yau, *pro hac vice*
Mary J. Bortscheller, Illinois Bar: 6304457
Ryan Wheeler, *pro hac vice*
Cohen Milstein Sellers & Toll PLLC
1100 New York Ave. NW ● Fifth Floor
Washington, DC 20005
(202) 408-4600
myau@cohemilstein.com
mborscheller@cohenmilstein.com
rwheeler@cohenmilstein.com

Radha A. Pathak, *pro hac vice*
Victor O'Connell, *pro hac vice*
John Stokes, *pro hac vice*
Stris & Maher LLP
777 S. Figueroa St., Ste. 3850
Los Angeles, CA 90017
(213) 995-6800
rpathak@stris.com
voconnell@stris.com
jstokes@stris.com

*/s/ Lars C. Golumbic*
Lars C. Golumbic