IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| TOM HENSIEK, *et al.*, | ) |
| | ) |
|      Plaintiffs, | ) |
| | ) |
| vs. | ) |
| | ) |
| BD. OF DIRECTORS OF CASINO QUEEN | ) |
| HOLDING CO., INC., *et. al.*, | ) |
| | ) |
|      Defendants. | ) |
| _____ | ) |
| BD. OF DIRECTORS OF CASINO QUEEN | ) |
| HOLDING CO., INC., *et. al.*, | ) |
| | ) |
|      Crossclaim/Third-Party Plaintiffs, | ) |
| | ) |
| vs. | ) |
| | ) |
| CHARLES BIDWILL, III, *et al.*, | ) |
| | ) |
|      Crossclaim/Third-Party Defendants. | )     Case No. 3:20-cv-377-DWD |
| _____ | ) |
| CHARLES BIDWILL, III, | ) |
| TIMOTHY J RAND, | ) |
| | ) |
|      Defendants/Counterclaimants, | ) |
|      Crossclaim/Third Party Plaintiffs, | ) |
| | ) |
| vs. | ) |
| | ) |
| TOM HENSIEK, *et. al.*, | ) |
| | ) |
|      Counterclaim/Crossclaim/Third-Party | ) |
|      Defendants. | ) |
| _____ | ) |
| JAMES G. KOMAN, | ) |
| | ) |
|      Crossclaim Plaintiff, | ) |
| vs. | ) |
| | ) |
| BD. OF DIRECTORS OF CASINO QUEEN | ) |

HOLDING CO., INC., *et al.*                              )
                                           )
       **Crossclaim Defendants.**         )
————————————————————— )

## MEMORANDUM & ORDER

**DUGAN, District Judge:**

This matter comes before the Court on several motions:

1. Plaintiffs' Motion to Certify Class (Doc. 391);

2. Defendants Bidwill and Rand's Motion to Certify Class of Counterclaim as to Counterclaim Counts I-IV (Doc. 389);

3. Defendants Bidwill and Rand's Motion to Dismiss for Lack of Jurisdiction (Doc. 402);

4. Defendants Koman and the James G. Koman Irrevocable Trust, its Trustee, and its Beneficiaries' Motion to Seal Opposition Brief to Plaintiffs' Motion for Class Certification (Doc. 405);

5. Defendants Bidwill and Rand's Motion to Seal Exhibits (Doc. 408);

6. All Defendants' Motion to Strike Plaintiff Wrobel's Deposition Errata Sheet (Doc. 414);

7. Plaintiffs' Motion to Supplement Motion for Class Certification (Doc. 480);

8. Plaintiffs' Motion to Seal Document 481 (Doc. 482); and

9. Plaintiffs' Motion for Status Conference (Doc. 508).

The Court has reviewed the briefing and materials submitted by the parties in support and opposition to these Motions (*See* Docs. 390, 391, 392, 397, 398, 399, 400, 401, 403, 404, 406, 407, 409, 411, 412, 412, 414, 415, 416, 419, 420, 425, 480, 481, 482, 483, 507).

## Preliminary Rulings

For good cause shown, the Motions to Seal Documents at Docs. 405, 408, and 482 are **GRANTED**. Further, Plaintiffs' Motion to Supplement their Motion for Class Certification (Doc. 480) is **GRANTED** over Defendants' objections. The Court has reviewed the supplemental materials and will give these materials their appropriate weight, if any, in issuing its rulings below. Similarly, Defendants' Motion to Strike Plaintiff Wrobel's Deposition Errata Sheet (Doc. 414) is **DENIED without prejudice**. Again, the Court has reviewed the materials and will address the representations and testimony as may be appropriate in issuing its rulings on the currently pending motions for class certification. If appropriate circumstances arise, Defendants are granted leave to refile their Motion to address potential evidentiary issues at summary judgment or trial.

Finally, Plaintiffs' Motion for Status Conference (Doc. 508) is **DENIED without prejudice**. After reviewing this Memorandum & Order, together with the Court's directives, the parties are granted leave to refile their Motion for Status Conference if appropriate circumstances exist to do so. Similarly, the parties are directed to review their previously submitted joint discovery report in light of these rulings, and if discovery issues remain in dispute, they **SHALL** submit an updated discovery report to the Court's proposed document email address that specifies the items requiring further rulings.

## Background

Plaintiffs Tom Hensiek, Jason Gill, and Lillian Wrobel bring this action pursuant to the Employee Retirement Income Security Act of 1974, 29 U.S.C. §§ 1001-1461 ("ERISA"), on behalf of a proposed class of participants and beneficiaries in the Casino

Queen Employee Stock Ownership Plan ("ESOP"), an ERISA-protected retirement plan. As alleged in their Amended Complaint (Doc. 144), Plaintiffs are current or former employees of Casino Queen Hotel & Casino, and participants and beneficiaries of the ESOP. Plaintiffs filed this putative class action in 2020 on behalf of themselves and all other participants in the ESOP. In January 2022, the Court denied Defendants' motion to dismiss for failure to state a claim. (Doc. 118). In April 2022, Plaintiffs filed an amended complaint, adding several new defendants whom Plaintiffs claim were former shareholders of Casino Queen, Inc. ("CQI"), and "parties in interest" under 29 U.S.C. § 1002(14). (Doc. 144, ¶¶ 64-66). Defendants again moved to dismiss Plaintiffs' amended complaint, and the Court issued detailed rulings denying these motions in March 2023. (Docs. 426 & 427). In this Memorandum & Order, the Court assumes familiarity with its prior rulings, so it will provide background when pertinent to the instant motions.

Defendants are generally comprised of two groups: the "Fiduciary Defendants" and the "Selling Shareholders." (Docs. 426 & 427). The Fiduciary Defendants include Defendants Charles Bidwill, Timothy J. Rand, James G. Koman, Jeffrey Watson, and Robert Barrows, who are all alleged to be fiduciaries of the ESOP. (Doc. 144, ¶ 203), in addition to the Board of Directors of the Casino Queen Holding Company, Inc. ("CQH"), and the Administrative Committee of the Casino Queen ESOP. The Selling Shareholders are alleged family members (or trust-related entities set up to benefit family members) of the five founding family groups of CQI and its subsequent holding company, CQH (Doc.

4

144, ¶¶ 2, 72).[1] These founding family groups included persons from the Bidwill family, the Rand family, the Koman family, the Kenny family, and the Gaughan/Toti group. (Doc. 144, ¶ 2). Before the transactions at issue, the five family groups owned an equal portion of CQI (20%) and controlled one of the five seats on the CQI Board of Directors. (Doc. 144, ¶¶ 2, 72). The Selling Shareholders are allegedly connected to the Koman and Bidwill family groups, with James Koman and Charles Bidwill III serving as their designated CQI Board Member. (Doc. 144, ¶ 73). Each Selling Shareholder Defendant also owned a percentage of CQI, ranging from 0.88% to 10.200%. (Doc. 144, ¶ 65).

From 2005 to 2011, the Selling Shareholders attempted to sell Casino Queen to various third parties, but they were not successful. Thus, in 2012 and 2013, the Selling Shareholders sold the Casino Queen and its assets in four general steps, which are more fully detailed in the Court's prior orders. Relevant here, in October 2012, the Selling Shareholders created CQH, the holding company for CQI. (Doc. 144, ¶ 79). The Selling Shareholders then exchanged their CQI stock for CQH stock and placed three former CQI Board Members on the newly formed CQH Board. (*Id.*).

In December 2012, the Selling Shareholders, acting in coordination with their family's CQH Board Member, established the ESOP, then facilitated the ESOP's purchase of their then-outstanding CQH stock for a sum of $170 million. (Doc. 144, ¶ 81).[2] To

---

[1] These Defendants also include Bidwill, Rand, James Koman, Watson, and Barrows, in addition to Mary C. Bidwill, Brian R. Bidwill, Patricia M. Bidwill, Shauna Bidwill Valenzuela, the Bidwill Succession Trust, the William J. Koman, Sr. Living Trust, the William J. Koman, Jr. Irrevocable Trust, the Karen L. Hamilton Irrevocable Trust, the Janis A. Koman Irrevocable Trust, the Elizabeth S. Koman Irrevocable Trust, and the James C. Koman Irrevocable Trust. (Doc. 144, ¶¶ 65-66).

[2] Plaintiffs allege that they were told that Casino Queen had been sold for $170 million but that it was actually worth $174 million. (Doc. 144 at ¶ 101).

facilitate the stock purchase, the ESOP borrowed $130 million in secured debt from Wells Fargo, $15 million from a third party, and $25 million from the Selling Shareholders. (*Id.*). CQH guaranteed the debt, which significantly increased its debt load. (Doc. 144, ¶¶ 80, 115-116). Plaintiffs allege that the Selling Shareholders' loans made to the ESOP carried "draconian interest rates as high as 17.5%." (Doc. 144, ¶ 6). This transaction is generally referred to as the "2012 Stock Purchase."

Finally, in 2013, the ESOP sold Casino Queen's real property to a third-party, Gaming and Leisure Properties, Inc. ("GLPI"), for $140 million. (Doc. 144, ¶¶ 127-129). CQH then agreed to lease the same property back to GLPI for $210 million, to be paid over 15 years. (Doc. 144, ¶ 130). This transaction is generally referred to as the "2013 Asset Sale." The Asset Sale provided CQH and the ESOP with cash to pay off the outstanding loans the ESOP owed to the Selling Shareholders. (Doc. 144, ¶¶ 134-135). Plaintiffs maintain that the Selling Shareholders' loans were fully repaid in 2014, and shortly thereafter, Defendants Bidwill, Rand, and Koman relinquished their CQH Board memberships. (Doc. 144, ¶¶ 145-46).

Plaintiffs allege that the 2012 Stock Purchase Transaction and the 2013 Asset Sale were conducted in violation of Defendants' fiduciary duties under ERISA. Specifically, as to the 2012 Stock Purchase, Plaintiffs allege that the price the ESOP paid for the CQH stock was dramatically inflated based on financial projections of Casino Queen's future profitability, which the Board of Directors knew or should have known were unrealistic because the Selling Shareholders had tried unsuccessfully for years to sell Casino Queen, and because Defendants knew or should have known that Casino Queen's revenue had

dropped significantly due to the decreasing market share it held as the number of competitors grew in the area. (Doc. 144, ¶¶ 108-111). Thus, the ESOP paid significantly more than fair market value for the stock, which was the ESOP's only asset. Further, the 2013 Asset Sale was based on unfavorable financial terms for the ESOP, and "left Casino Queen as a shell of a company that did not own any real property assets and did not have sufficient cash flow to service its remaining debts." (Doc. 144, ¶ 144).

Plaintiffs further allege that at least three ESOP transactions involving the Selling Shareholders were prohibited by 29 U.S.C. § 1106(a).[3] These alleged prohibited transactions include: the ESOP's purchase of the Selling Shareholders' CQH stock in 2012, the Selling Shareholders' subsequent loans to the ESOP "at draconian interest rates," and the individual payments the Selling Shareholders received in connection with the repayment of their loans. (Doc. 144, ¶¶ 6, 205-207). Plaintiffs also maintain every Selling Shareholder is a party in interest under ERISA, and "had actual or constructive knowledge" of the circumstances rendering these transactions unlawful since they knew:

(a) that CQI had received at least 6 prior offers to purchase the Company

---

[3]Section 1106 prohibits certain kinds of transactions between a plan and a "party in interest," including transactions that constitute a "direct or indirect" –

(A) sale or exchange, or leasing, of any property between the plan and a party in interest;

(B) lending of money or other extension of credit between the plan and a party in interest;

(C) furnishing of goods, services, or facilities between the plan and a party in interest;

(D) transfer to, or use by or for the benefit of a party in interest of any assets of the plan; or

(E) acquisition, on behalf of the plan, of any employer security or employer real property in violation of section 1107(a) of this title.

29 U.S.C. § 1106(a)(1)(B).

on worse terms than those paid in the ESOP Transaction,

(b) that the valuation supporting the 2012 ESOP Transaction was the product of improper, incomplete, unconsidered, and misleading information, and

(c) that the interest rates on the loan that the Selling Shareholders made to the ESOP through CQH were unreasonably high.

(Doc. 144, ¶ 66).[4] Thus, Plaintiffs seek to reclaim the proceeds that the Selling Shareholders received from the prohibited transactions. (Doc. 144, ¶¶ 198-212).

Finally, Plaintiffs allege that they exercised due diligence in reviewing their annual account balances and attending employee meetings concerning the ESOP, but they could not discover Defendants' breaches of fiduciary duty until 2019 because Defendants actively concealed their ERISA violations by misrepresenting the terms of the transactions or the effects of the transactions on the value of the stock. (Doc. 144, ¶ 181). Plaintiffs provide three examples of these misrepresentations. First, at various mandatory employee meetings, the Co-Trustees told employees, including Plaintiffs, that the ESOP would provide significant retirement savings and wealth for participants. (Doc. 144, ¶¶ 148-150). Second, in the ESOP's required annual filings with the Department of Labor (the Form 5500s), Defendants misreported the price of the CQH stock and the amount of debt the ESOP acquired to complete the 2012 Transaction. (Doc. 144, ¶¶ 152-170). Third, in annual reports produced by Defendants and distributed to the ESOP participants,

---

[4]Plaintiffs specifically allege that each Selling Shareholder is a party in interest because they were either "a member of the CQH Board of Directors, a 10% or more shareholder, a family member of a Board member or 10% shareholder [i.e., Defendant James Komen or Charles Bidwill], a trust in which 50% or more of the beneficial interest is owned directly or indirectly by such persons, or otherwise a party in interest" as defined in 29 U.S.C. § 1002(14) (Doc. 144, ¶¶ 65-66, 203-204).

Defendants misrepresented the growth of Casino Queen's value. (Doc. 4, ¶¶ 171-175).

Plaintiffs now seek an order pursuant to Federal Rule of Civil Procedure 23, certifying this case as a class action. (Doc. 391). However, before addressing the merits of Plaintiffs' Class Certification Motion, the Court will first address Defendant Bidwill and Rand's Motion to Dismiss for Lack of Jurisdiction (Doc. 402), as these arguments are also raised in response to Plaintiffs' Motion for Class Certification. (Doc. 409).

## Defendants Bidwill and Rand's Motion to Dismiss (Doc. 402)

Defendants Bidwill and Rand ask that the Court dismiss Plaintiffs' claims. (Docs. 402, 403). As with their prior motions to dismiss, Bidwill and Rand insist that the allegations in Plaintiffs' complaints are "egregious[ly]" distorted. This time, however, they argue that Plaintiffs lack standing such that the Court lacks subject matter jurisdiction over their claims. (Docs. 402, 403, 404). According to Bidwill and Rand, Plaintiffs "have not and cannot establish any concrete injury for standing purposes," and even if they could, these injuries cannot be traced back to Bidwill and Rand. (Doc. 403, pg. 7). Bidwill and Rand also argue that any alleged drop in stock value from 2018 cannot be traced back to the alleged fraudulent actions at issue in Plaintiffs' complaint. (*Id.* at pgs. 7-8). Instead, Bidwill and Rand argue that the decline in share value was caused by the Casino Queen's acquisition of another casino in 2017 and a subsequent decline in revenue, resulting in Casino Queen's inability to make certain loan payments and a subsequent bankruptcy filing. (Doc. 403, pgs. 9-10). In support of their arguments, Bidwill and Rand point to the depositions and other declarations in the record. (Doc. 404).

The Court finds the Seventh Circuit's instruction in *Abbott v. Lockheed Martin Corp.*,

725 F.3d 803 (7th Cir. 2013) is relevant here. In *Abbott*, Defendants argued that one of the original named plaintiffs in a class-action ERISA case lacked Article III standing because he could not show that he was injured using one measurement of damages, the Hueler Index. *Id.* at 808. The Seventh Circuit rejected the standing challenge as "one of many instances in which we must resist the urge to make a preliminary question depend on the final resolution of the merits." *Id.* (citing *Payton v. Cnty. of Kane*, 308 F.3d 673, 677 (7th Cir. 2002)). The Seventh Circuit continued by stating:

> Injury-in-fact for standing purposes is not the same thing as the ultimate measure of recovery. The fact that a plaintiff may have difficulty proving damages does not mean that he cannot have been harmed. DeMartini's lack of damages as measured by the Hueler Index suggests that he may have a problem proving the degree of his injury, but Lockheed overreads both Article III's injury-in-fact requirement and the facts in this case when it interprets the absence of damages under the Hueler Index as dispositive proof that DeMartini was not injured. (It is possible, for instance, that if the Plan had been managed prudently, it might have outperformed the Hueler Index at all times, and thus DeMartini would have done even better. All of that remains to be shown.)

> It is often the case in class litigation that by the time the remedial phase is reached, some of the original plaintiffs will not be entitled to recover, either because they lost on the merits or because they cannot show damages. Sometimes the reason a particular plaintiff cannot recover may be related to one of the three Article III standing requirements: the plaintiff may not have shown that the defendant caused her injury (in which case, we could also say that her injury was not "fairly traceable" to the defendant), or she might have failed to show that she suffered an injury at all. But in such cases, the plaintiff has lost on the merits; we do not reach back in time and enter a judgment dismissing the case for want of an Article III case or controversy. Yet that is effectively what Lockheed is asking us to do here; it wants us to use the hindsight acquired as the claims in this case have evolved to find that there was never jurisdiction over the case to begin with. We have previously rejected this unworkable view of Article III standing, and we do so again here. See, *e.g., Kohen v. Pac. Inv. Mgmt. Co. LLC*, 571 F.3d 672, 677 (7th Cir. 2009) ("Jurisdiction established at the pleading stage by a claim of injury that is not successfully challenged at that stage is not lost

> when at trial the plaintiff fails to substantiate the allegation of injury; instead the suit is dismissed on the merits."); *Bruggeman ex rel. Bruggeman v. Blagojevich*, 324 F.3d 906, 909 (7th Cir.2003) ("[I]f [a plaintiff's] claim has no merit, then he has not been injured by any wrongful conduct of the defendant; but if the consequence were that he lacked standing, then every decision in favor of a defendant would be a decision that the court lacked jurisdiction, entitling the plaintiff to start over in another court.").

*Id*. Defendants' arguments here are comparable to the merits-based standing challenge in *Abbott*. As in *Abbott*, the merits-based standing challenge will be denied in this case.

The "irreducible constitutional minimum" of standing requires that the plaintiff has "(1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016); *see also Albert v. Oshkosh Corp.*, 47 F.4th 570, 577 (7th Cir. 2022). Here, Plaintiffs' complaint alleged that they were harmed by Defendants' direct actions related to the 2012 and 2013 transactions. This was sufficient to establish injury-in-fact for pleading purposes. *See Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992) ("general factual allegations of injury resulting from the defendant's conduct may suffice" to establish standing at the pleading stage). To the extent that Defendants seek to delve into the merits of Plaintiffs' injuries, and Defendants defenses related to the involvement of outside advisors, these arguments are premature at this stage before discovery has been completed. However, Defendants may reraise these arguments at summary judgment. Defendants' Motion to Dismiss (Doc. 402) is therefore **DENIED**.

## Plaintiffs' Motion for Class Certification (Doc. 391)

Plaintiffs now seek an order pursuant to Rule 23, certifying this case as a class action and certifying the following class:

> All participants in the Casino Queen Employee Stock Ownership Plan who had shares of CQ Holding Company, Inc. stock in their ESOP account on December 31, 2018, and who had not received any distributions for any stock held in their ESOP account prior to that date, and those participants' beneficiaries. Excluded from the Class are Defendants and their immediate family members, any fiduciary of the ESOP, and any legal representatives, successors, and assigns of any such excluded persons.

(Doc. 391). Defendants oppose the Motion.

This Court may certify a class only if all of the following requirements are met: (1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the proposed class, and (4) the representative parties will fairly and adequately protect the interests of the class. Fed. R. Civ. P. 23(a). If the requirements of Rule 23(a) are met, then a class action may only be maintained if one of the following three factors are met:

> (1) separate actions would create a risk of (a) inconsistent or varying adjudications as to individual members of the class, which would establish incompatible standards of conduct for the party opposing the class, or (b) adjudications with respect to individual class members which would as a practical matter be dispositive of the interests of the other members not parties to the adjudications or substantially impair or impede their ability to protect their interest; or
>
> (2) the party opposed to the class has acted or refused to act on grounds generally applicable to the class so that final injunctive or declaratory relief in favor of the class as a whole is appropriate; or
>
> (3) the Court finds that questions of law or fact that are common to class

members predominate over any questions affecting only individual members, and that a class action is superior to other means of adjudicating the matter.

Fed. R. Civ. P. 23(b).

Here, Plaintiffs argue the requirements of Rule 23(b)(1)(A) and (B) are met. (Doc. 392). Plaintiffs also "bear the burden of proving, by a preponderance of the evidence, that their proposed class satisfies the requirements of Rule 23." *Howard v. Cook Cnty. Sheriff's Off.*, 989 F.3d 587, 597 (7th Cir. 2021).

District courts must "exercise caution before certifying a class." *Thorogood v. Sears, Roebuck & Co.*, 547 F.3d 742, 746 (7th Cir. 2008). Further, while district courts do not consider the merits of Plaintiffs' lawsuit at class certification, the court "must make whatever factual and legal inquiries are necessary to ensure that requirements for class certification are satisfied before deciding whether a class should be certified, even if those considerations overlap the merits of the case." *Am. Honda Motor Co. v. Allen*, 600 F.3d 813, 815 (7th Cir. 2010); *see also Howard v. Ray's LLC*, No. 8-cv-627, 2011 WL 4625735, *4 (S.D. Ind. Sept. 30, 2011) ("Though a district court is not prohibited from deciding the merits of a claim prior to addressing a motion seeking class certification of that claim, typically the preferred order is for the trial court to rule on a motion for class certification and then move forward to consider a motion challenging the merits of the case.").

Fiduciaries of a plan covered by ERISA "shall discharge…duties with respect to a plan solely in the interest of the participants and beneficiaries." 29 U.S.C. § 1104(a)(1). This duty of loyalty "is the 'highest known to the law.' " *Su v. Johnson*, 68 F.4th 345, 352 (7th Cir. 2023). "Fiduciary self-dealing is therefore prohibited '[e]xcept as provided in

section 1108 of this title.' " *Id.* (citing 29 U.S.C. § 1106(a)(1)(D)); *see also Leigh v. Engle*, 727 F.2d 113, 123 (7th Cir. 1984) (stating § 1106 "prohibits transactions where those dealing with the plan may have conflicting interests which could lead to self-dealing").

Fiduciaries may further breach this duty if they "mislead plan participants or misrepresent the terms or administration of a plan." *Bowerman v. Wal-Mart Stores, Inc.*, 226 F.3d 574, 590 (7th Cir. 2000). Not every error in communicating information regarding a plan will be a breach of fiduciary duty. *Id.* To determine if a fiduciary breached its duty, the Court examines " 'all alleged statements within the total mix of information available' to plaintiffs." *Gesell v. Commonwealth Edison Co.*, 216 F.R.D. 616, 621 (C.D. Ill. 2003) (citing *In re Sears Retiree Group Life Ins. Litig.*, 198 F.R.D. 487, 490 (N.D.Ill.2000) (quoting *Ballone v. Eastman Kodak Co.*, 109 F.3d 117, 126 (2d Cir.1997)).

An individual employee may bring a civil action to enjoin any practice which violates any provision of ERISA, including a breach of fiduciary duty. 29 U.S.C. § 1132(a)(3); *Varity Corp. v. Howe*, 516 U.S. 489 (1996); *Bowerman*, 226 F.3d at 591. As detailed above, Plaintiffs' action challenges two transactions: the 2012 sale of the Casino Queen to the ESOP, and the 2013 sale of the Casino Queen's assets to GLPI. (Doc. 392).[5] Plaintiffs seek various remedies under ERISA § 502(a)(2) and (3), codified at 29 U.S.C. § 1132(a)(2). (Doc. 144). Plaintiffs also seek prejudgment interest and attorneys' fees from Defendants in connection with most of their requested relief. (Doc. 144).

ERISA § 502(a)(2) provides that a plan participant or beneficiary may bring a civil

---

[5]In their briefing, Plaintiffs generally refer to the asset sale as occurring in 2014 (Doc. 392, pg. 3), although the allegations in the Amended Complaint state that the sale occurred in 2013 (Doc. 144) (consistently referring to the 2013 Asset Sale).

action for "appropriate relief" under ERISA § 409. 29 U.S.C. § 1132(a)(2). Section 409, in turn, provides that "[a]ny person who is a fiduciary with respect to a plan who breaches any of the responsibilities, obligations, or duties imposed upon fiduciaries by this subchapter shall be personally liable to make good to such plan any losses to the plan resulting from each such breach, and to restore to such plan any profits of such fiduciary which have been made through use of assets of the plan by the fiduciary, and shall be subject to such other equitable or remedial relief as the court may deem appropriate." 29 U.S.C. § 1109(a); *see also Chao v. Linder*, No. 5-cv-3812, 2007 WL 1655254, *8 (N.D. Ill. May 31, 2007) ("[T]he remedies provided by ERISA § 409 include not only damages, but equitable remedies."). This relief is available for the plan itself rather than individual beneficiaries. *Peabody v. Davis*, 636 F.3d 368, 373 (7th Cir. 2011) ("The default rule has long been that § 502(a)(2) authorizes recovery only on behalf of an entire plan, and not in favor of an individual participant.").

ERISA § 502(a)(3)(B) provides that a civil action may be brought "by a participant, beneficiary, or fiduciary…to obtain other appropriate equitable relief (i) to redress…violations [of ERISA or a plan's terms] or (ii) to enforce any provisions of this subchapter or the terms of the plan." 29 U.S.C. § 1132(a)(3). Section 502(a)(3) is a "catchall" provision that offers "appropriate equitable relief" when relief is unavailable under other ERISA sections. *Varity Corp.*, 516 U.S. at 512; *Smith v. Med. Benefit Administrators Grp., Inc.*, 639 F.3d 277, 283 (7th Cir. 2011). This section also allows for recovery from non-fiduciaries, including recovery from non-fiduciary parties to prohibited transactions under ERISA § 406. *See Harris Tr. & Sav. Bank v. Salomon Smith*

*Barney, Inc.*, 530 U.S. 238, 241 (2000); *Peabody*, 636 F.3d at 373; *Fish v. GreatBanc Tr. Co.*, 109 F. Supp. 3d 1037, 1043 (N.D. Ill. 2015).

### *Rule 23(a) Requirements*

Plaintiffs argue, as they must, all of Rule 23(a)'s prerequisites are satisfied. Also, as noted above, they argue the proposed class may be certified under Rule 23(b)(1)(A) and/or (B). (Doc. 392, pg. 24). As to numerosity, Plaintiffs argue that prerequisite is easily satisfied, as there were 529 active participants in the ESOP as of 2018. (Doc. 392, pg. 14).

As to commonality, Plaintiffs argue the prerequisite is "readily satisfied in ERISA cases," such as this one, "brought on behalf of a plan." (Doc. 392, pg. 14). In Plaintiffs' view, all plan participants are authorized to assert the same representative claim on behalf of the plan, and "these representative claims necessarily arise from the same common nucleus of operative facts without material factual variations between class members." (Doc. 392, pg. 14). Plaintiffs state, "[n]early every legal and factual question in this case is one that is common to the proposed Class as a whole." (Doc. 392, pg. 15).

With respect to typicality, Plaintiffs note they, like every proposed class member, were participants in the ESOP at the relevant time. (Doc. 392, pg. 16). Also, Plaintiffs' claims, along with those of all the proposed class members, purportedly arose from Defendants conduct in relation to the ESOP as a whole, *i.e.*, Defendants planning, executing, or participating in the ESOP Transaction and the Asset Sale. (Doc. 392, pg. 15). In short, Plaintiffs' claims allegedly share the essential characteristics of the claims of the larger class because the claims seek the same relief and are based on the same legal theory and conduct of Defendants. (Doc. 392, pg. 16).

16

Finally, as to the adequacy prerequisite, Plaintiffs argue they and their attorneys adequately represent the class as a whole. (Doc. 392, pgs. 21-24). Plaintiffs state they do not have any interests that are antagonistic to or out of line with those of the proposed class. (Doc. 392, pgs. 21-22). Further, Plaintiffs note they have been willing and able to "vigorously prosecute" the case, as shown by the information and documents tendered in discovery, their participation in mediations, their review and preparation of discovery responses, and their participation in depositions. (Doc. 392, pgs. 21-22). Also, Plaintiffs argue all considerations favor the appointment of their attorneys as class counsel, as the "lawyers and their respective firms have decades of experience in successfully handling ERISA class actions and class actions generally." (Doc. 392, pgs. 22-23). Those attorneys have also "devoted significant effort to identifying, investigating, and prosecuting the claims in this action," and they will continue to do so. (Doc. 392, pgs. 23-24).

In response, Defendants focus on the commonality and adequacy prerequisites. As to commonality, Defendants argue the proposed class does not satisfy the commonality prerequisite since Plaintiffs' tolling defenses require an examination of each class members' actions in order to determine whether their claims are time-barred. (Doc. 397, pg. 12). That is, the tolling defenses "require an individualized inquiry to determine whether each class member may rely on one or more of Plaintiffs' arguments to extend their facially untimely claims." (Doc. 397, pg. 13). In Defendants' view, the claims alleged against fiduciary Defendants under §§ 1104 and 1106 are time-barred because, as to the "fraud or concealment" exception, an active concealment theory requires proof of reliance by each class member and a self-concealing theory requires proof of diligence by

each class member. (Doc. 397, pgs. 13-23). Therefore, "even accepting as true Plaintiffs' concealment allegations," Defendants argue "those allegations do not apply to all ESOP participants uniformly," such that the commonality prerequisite cannot be satisfied. (Doc. 397, pgs. 15, 23). Defendants present a similar argument, and reach the same conclusion, with respect to Plaintiffs' nonfiduciary claims. (Doc. 397, pgs. 23-25).

As to the adequacy prerequisite, Defendants argue Plaintiffs Wrobel and Gill are not adequate representatives since they are subject to unique defenses. (Doc. 397, pgs. 25-26). Defendants also argue the proposed class is overbroad, as at least 17% of its members' claims are untimely. (Doc. 397, pg. 26). Defendants explain that the proposed class "includes a large subset of participants who cannot rely on the FAC's concealment exceptions to toll ERISA's six-year limitations period." (Doc. 397, pgs. 27-28) (Emphasis in original omitted.). Finally, Defendants argue, with respect to the adequacy of counsel, Plaintiffs' attorneys will not fairly and adequately represent the class due to violations of the Rules of Professional Conduct. (Doc. 397, pgs. 28-29). More specifically, Defendants allege Plaintiffs' attorneys failed to notify Plaintiff Wrobel of settlement offers, contacted an unrepresented party, and lacked candor with the Court. (Doc. 397, pgs. 29-36).

Now, the Court has carefully considered all of the above-summarized arguments of the parties. Having done so, the Court finds Plaintiffs failed to satisfy the commonality prerequisite. By virtue of this finding, and the fact that Plaintiffs must satisfy each of Rule 23(a)'s prerequisites, the Court limits the remaining discussion to that of commonality.

Rule 23(a)(2) requires "questions of law or fact common to the class." "One common question is enough, but not just any question will do." *Howard*, 989 F.3d at 598

(citing *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 359 (2011)); *see also Rosario v. Livaditis*, 963 F.2d 1013, 1018 (7th Cir. 1992).

> [T]he commonality inquiry is easy to misinterpret, as "[a]ny competently crafted class complaint literally raises common 'questions.' " *Wal-Mart Stores, Inc.*, 564 U.S. at 349 (quoting Richard A. Nagareda, *Class Certification in the Age of Aggregate Proof*, 84 N.Y.U. L. Rev. 97, 132 (2009)). Superficial common questions like whether each class member "suffered a violation of the same provision of law" do not suffice. *Id.* at 350; *Jamie S. v. Milwaukee Pub. Sch.*, 668 F.3d 481, 497 (7th Cir. 2012). Rather, the class claims "must depend on a common contention" that is "capable of classwide resolution—which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Wal-Mart Stores, Inc.*, 564 U.S. at 350; *accord* 1 Newberg and Rubenstein on Class Actions § 3:18 (6th ed.) (the common question must "not be peripheral but important to most of the individual class member's claims"). "Dissimilarities within the proposed class are what have the potential to impede the generation of common answers." *Wal-Mart Stores, Inc.*, 564 U.S. at 350 (quoting Nagareda, *Id.* at 132).

*Howard*, 989 F.3d at 598

> In this case, Plaintiffs provide the following examples of "common questions":
>
> • Whether Defendants James Koman, Charles Bidwill III, and Timothy Rand were *de facto* fiduciaries or named fiduciaries to the ESOP under ERISA;
>
> • Whether the ESOP Transaction was a prohibited transaction under 29 U.S.C. § 1106;
>
> • Whether the ESOP purchased CQH stock for more than fair market value;
>
> • Whether the Asset Sale was a prohibited transaction under 29 U.S.C. § 1106;
>
> • Whether James Koman, Charles Bidwill III, and Timothy Rand engaged in self-dealing in connection with the ESOP Transaction;
>
> • Whether Defendants concealed any of their unlawful conduct and ERISA violations;

> • Whether James Koman, Charles Bidwill III, Timothy Rand, Robert Barrows, and Jeffrey Watson failed to properly monitor appointed fiduciaries; and

> • Whether the losses that the ESOP suffered as a whole were due to Defendants' unlawful conduct.

(Doc. 392, pg. 9).

Generally, Plaintiffs argue commonality exists because the appropriate focus of their breach of fiduciary duty claims is on the conduct of Defendants, not on that of Plaintiffs. (Doc. 392, pg. 9) (citing *Lively v. Dynegy, Inc.*, No. 5-cv-00063, 2007 WL 685861, *8 (S.D. Ill. Mar. 2, 2007) ("[T]he appropriate focus in a breach of fiduciary duty claim is the conduct of the defendants, not the plaintiffs.").

As discussed above, though, Defendants argue Plaintiffs' claims and theory of the case will require "highly individualized inquiries" because their individual claims necessarily rely on ERISA's fraud or concealment tolling provision. Normally, an ERISA action must be commenced within six years after the breach or violation or three years after Plaintiff had actual knowledge of the breach or violation. *See* 29 U.S.C. § 1113. However, the "fraud or concealment" exception allows an ERISA action to be commenced six years after plaintiff discovered the breach or violation. *See Laskin v. Siegel*, 728 F.3d 731, 735 (7th Cir. 2013). Specifically, 29 U.S.C. § 1113 provides:

> No action may be commenced under this subchapter with respect to a fiduciary's breach of any responsibility, duty, or obligation under this part, or with respect to a violation of this part, after the earlier of—

> (1) six years after (A) the date of the last action which constituted a part of the breach or violation, or (B) in the case of an omission the latest date on which the fiduciary could have cured the breach or violation, or

20

(2) three years after the earliest date on which the plaintiff had actual knowledge of the breach or violation;

except that in the case of fraud or concealment, such action may be commenced not later than six years after the date of discovery of such breach or violation.

Again, Plaintiffs' case challenges two allegedly unlawful transactions: the 2012 sale of the Casino Queen to the ESOP and the 2013 sale of the Casino Queen's assets to GLPI. (Doc. 392). Plaintiffs filed their original complaint in this matter (Doc. 1) on April 27, 2020, and more than six years after the alleged unlawful transactions. Central to the issue here, Plaintiffs' theory of the case is premised on the assumption that "the statute of limitations did not begin to run until October 2019 when Plaintiffs discovered Defendants' illegal acts through the disclosure that the CQH stock in their ESOP accounts had dropped in value by 95%." (Doc. 392, pgs. 11-12). Accordingly, under Plaintiffs' current theory of the case, without the invocation of the fraud or concealment exception in § 1113, Plaintiffs' claims would be time barred. Therefore, Defendants argue they will need to determine whether each individual class member's claims were properly extended under this exception, and such individual inquiry defeats commonality. *See, e.g., McFields v. Dart*, 982 F.3d 511, 517 (7th Cir. 2020) (commonality is not met when "the claims of every class member will not rise or fall on the resolution" of the common question, but instead "requires an individualized plaintiff-specific assessment.").

In focusing solely on Defendants' conduct, as Plaintiffs suggest is appropriate for their claims, the Court is not convinced that answering any of the Defendant-specific common questions would resolve the litigation on a class wide basis and without

individualized inquiries related to the alleged fraud or concealment. For example, even if the Court answered any of the Defendant-specific "common questions" in the affirmative, Plaintiffs' theory of the case still depends on the assumption that all purported class members were impacted by the fraud or concealment. *See Resnick v. Schwartz*, 430 F. Supp. 3d 492, 499 (N.D. Ill. 2019) ("Although the statute of limitations is, generally speaking, an affirmative defense, fraudulent concealment is an expansion of the ordinary statute of limitations, so it is the plaintiff's burden to show that the exception applies."); *see also Laskin*, 728 F.3d at 735 ("In order to extend the statute of limitations period [under 29 U.S.C. § 1113, Plaintiff] must first show that fraud or concealment actually occurred."). Because Plaintiffs' claims, as pled, necessarily require the application of the fraud or concealment exception to survive, the Court finds that some inquiry into how Defendants' fraud or concealment impacted Plaintiffs is relevant.[6] While certain circumstances may exist where the fraud or concealment exception can be resolved on a class-wide basis, the specific facts here do not lend themselves to such uniform resolution. Indeed, the current record reveals that the alleged fraud and concealment efforts were made by various Defendants in various forms and at different times. Further, Plaintiffs were impacted by these concealment efforts in vastly different ways, with little, if any, apparent overlap.

---

[6]In making this observation, the Court is cognizant that at class certification it "should not accept Plaintiffs' allegations and statements in lockstep," while also not weighing evidence and determining merits. *See Stoll v. Kraft Foods Glob., Inc.*, No. 9-cv-0364, 2010 WL 3613828, *4 (S.D. Ind. Sept. 6, 2010) (internal citations omitted). Therefore, the Court has endeavored to strike an appropriate balance in assessing the arguments under Rule 23 without prying into and adjudicating the actual merits of the case.

Plaintiffs' fraudulent concealment argument is not based on a single uniform fraudulent statement or action. Instead, Plaintiffs allege that Defendants fraudulently concealed the 2012 and 2013 transactions in three ways: (1) through statements made to employees during mandatory employee meetings about the ESOP, (2) through misrepresenting or misreporting information in the ESOP's Form 5500s filed with the Department of Labor for plan years 2012-2019, and (3) through the preparation and dissemination of fraudulent or inaccurate account statements, which misrepresented the value of the stock held in the individual ESOP accounts, to ESOP participants from 2014 to 2019. (Doc. 144, ¶¶ 147-186). Due to these fraudulent concealment efforts, Plaintiffs insist they—and their purported class members—could not have discovered the unlawful acts until October 2019. (Doc. 392, pp. 11-12). However, this assumption is not readily apparent from the record. Indeed, testimony from the class representatives show key factual variations in their own experiences, which illustrates this issue.

First, the alleged fraudulent statements made to Plaintiffs during the mandatory employee meetings about the ESOP in 2013 and 2014 were not all uniform or in writing. Instead, the statements occurred at different meeting times, with different presenters and different attendees, and did not include identical information. Following the 2012 Stock Purchase, Casino Queen held four different sessions of meetings at different times of day on February 6, 2013, to ensure all employees had an opportunity to attend. (Doc. 398-2). Similarly, after the 2013 Asset Sale, Casino Queen held four different meeting sessions, spread out on July 30 and August 1, 2014. (Doc. 398-5; Doc. 391-2, pgs. 13-15). Plaintiffs Hensiek and Wrobel did not attend the same meetings. (Doc. 391-2, pgs. 13-14; Doc. 398-

23

1, pgs. 8, 15). Further, Plaintiff Gill did not attend any of the February 2013 meetings, as he did not begin his employment with Casino Queen until July 2013. (Doc. 391-3, pg. 7).

Further, one of the fraudulent statements Plaintiff Hensiek testified to hearing, namely, that employees "would be able to purchase second homes with the money they would earn as employee-owners" (Doc. 144, ¶ 148), was actually an oral statement made by Jeffrey Watson at the employee meeting he attended in February 2013. (Doc. 391-2, pg. 16). This statement was not otherwise contained in the written materials presented at the 2013 meetings. (Doc. 398-3; Doc. 415-5). Plaintiff Wrobel also testified that this statement was not made during the meeting she attended. (Doc. 398-1, pg. 10). Plaintiff Wrobel further testified that the 2013 meeting sessions included question-and-answer portions, and employees were given opportunities to have one-on-one conversations with the Attorney Bill Vandersand following the meeting. (Doc. 391-4, pgs. 10-12). Accordingly, because various meetings were held, slight variations in the statements made at any of those meetings could well have conveyed different impressions to the employees. Thus, the degree to which an employee heard or relied on these statements, generally, as opposed to other factors personal to them, specifically, would vary significantly from person to person. Moreover, these differences do not even account for those potential class members, like Plaintiff Gill, who were not hired until after the meetings were held.

Similarly, the record evidence shows significant variations in how the named Plaintiffs interacted with the alleged inaccurate 5500 forms and annual account statements. The 5500 forms were not sent to all plan participants, but they were made publicly available on the Department of Labor's website. Plaintiff Hensiek testified to

never reviewing a Form 5500 until 2018 or 2019. (Doc. 398-7, pg. 5). Plaintiff Gill, by comparison, never reviewed a Form 5500 at all. (Doc. 398-8, pgs. 9-10). Plaintiff Wrobel recalls reviewing certain Forms 5500 several years after the 2012 ESOP Transaction, but she only did so to determine the number of employees and the amount of benefits paid in each plan year; she not otherwise understand the line items showing the transaction debt or ESOP's net assets. (Doc. 391-4, pp. 14-17; Doc. 398-1, pp. 15-17). Accordingly, whether or not the ESOP participants encountered the 5500 forms underlying their concealment arguments appears to vary significantly from person to person.

The same is true for the alleged inaccurate account statements. These ESOP account statements were sent annually to participants. However, only Plaintiffs Hensiek and Wrobel testified to reviewing their annual account statements. (Doc. 398-7, pg. 7; Doc. 391-4, pgs. 13-14). Plaintiff Gill, though, had no recollection of receiving any ESOP account statements and likely never reviewed any that he may have received, as he had a practice of filing all ESOP-related material in a drawer without ever reading it. (Doc. 398-8, pgs. 4, 6; Doc. 391-3, pg. 11).

Defendants argue these differences illustrate the need to conduct individual inquiries into each purported class-member's knowledge of fraud or concealment, rendering commonality impossible. The Court agrees. *See Thorn v. Jefferson-Pilot Life Ins. Co.*, 445 F.3d 311, 319 (7th Cir. 2006) ("A question is not common…if its resolution 'turns on a consideration of the individual circumstances of each class member.' ") (quoting 7A Charles Allen Wright, Arthur R. Miller & Mary Kay Kane, *Federal Practice and Procedure* § 1763 (3d ed. 2005)). Because Plaintiffs' claims rely on a variety of alleged misstatements,

25

both written and oral, occurring at different times with different variations, and accessed or attended by different employees, it is likely that each employee learned different pieces of information that might have affected their knowledge of their claims at different times. Commonality does not exist when different employees receive a different mix of various communications. *See, e.g., Gesell*, 216 F.R.D. 616 (finding no commonality when Plaintiffs based their fraudulent claims on only oral statements allegedly made at different meetings held by different company officials, and where attendance at the meetings varied because "[t]he degree to which an employee relied on the statements, as opposed to factors personal to him, in making his decision would vary significantly from person to person"); *In re Sears Retiree Grp. Life Ins. Litig.*, 198 F.R.D. 487, 490–91 (N.D. Ill. 2000) (citing *Frahm v. Equitable Life Assur. Soc. of U.S.*, 137 F.3d 955 (7th Cir. 1998) (noting different retirees received a different mix of communications, such that the myriad of variations of communications meant there was no commonality in the plaintiffs' claim); *West v. Prudential Sec., Inc.*, 282 F.3d 935, 937 (7th Cir. 2002) (finding appeal presented novel but potentially important question related to fraud cases as a class, where, *inter alia*, "oral frauds have not been allowed to proceed as class actions, for the details of the deceit differ from victim to victim, and the nature of the loss also may be statement-specific").[7]

While Plaintiffs contend there is an abundance of commonality in a number of necessary inquiries (Doc. 415, pg. 8), it must not be ignored that "dissimilarities within

---

[7] *See also Hudson v. Delta Air Lines, Inc.*, 90 F.3d 451, 457 (11th Cir. 1996) (affirming district court's denial of class certification when plaintiffs did not show commonality based on alleged oral promises, and finding that even if plaintiffs proved that defendant "disseminated a false and uniform message" to all potential class members, the plaintiffs would also have to show that all potential class members acted based on that message).

the proposed class are what have the potential to impede the generation of common answers." *Wal-Mart Stores, Inc.*, 564 U.S. at 350. Because Plaintiffs' claims depend on a variety of written and oral misrepresentations and documents made available to employees in different ways and at different times, and access to those communications and documents varied across the class, the decision of whether or not each Plaintiff's claims would be properly extended under § 1113's "fraud or concealment" provision will require some form of individualized inquiry, likely resulting in an array of possible answers, regardless of whether Defendants' actions were fraudulent. *See Haley v. Kolbe & Kolbe Millwork Co., Inc.*, No. 14-cv-99, 2015 WL 9255571, *12 (W.D. Wisc. Dec. 18, 2015) (finding the large number of individual questions of law and fact, necessary to determine the accrual and tolling of the limitations period for each class member, precluded certification of any class with respect to those issues, where "resolving issues of accrual, tolling[,] and equitable estoppel would require an analysis of each potential class member's individual experiences and interactions with defendant"); *Broussard v. Meineke Discount Muffler Shops, Inc.*, 155 F.3d 331, 342 (4th Cir. 1998) (same); *Barnes v. Am. Tobacco Co.*, 161 F.3d 127, 149 (3d Cir. 1998) (stating the determination of whether each class member's claim was barred by the statute of limitations raised individual issues preventing class certification, as "[t]he need to conduct such a determination for each plaintiff augur[ed] that a class action w[ould] devolve into a lengthy series of individual trials and therefore make[] a class action an improper method for resolving the[] claims").

Plaintiffs have not satisfied the commonality requirement; therefore, the Motion for Class Certification should be denied. [8]

The Court notes, when arguing against this conclusion, Plaintiffs point to a number of cases that purportedly stand for the proposition that "courts in and out of this Circuit routinely certify classes asserting prohibited transaction and fiduciary breach claims under ERISA that are substantively identical to those Plaintiffs assert here." (Doc. 392, pgs. 8, 14-15). However, having now reviewed those cases, the Court finds they do not present commonality issues, stemming from the need to conduct individualized inquiries due to divergent factual circumstances, of the sort or magnitude discussed here. *See*, *e.g.*, *Neil v. Zell*, 275 F.R.D. 256, 260-61 (N.D. Ill. 2011) (finding the commonality requirement was satisfied where the allegations arose from the "exact same" nucleus of operative facts "without variations between class members," the legal claims were identical for all class members, the allegations "questionably stemm[ed] from the same occurrence," and the questions of fact that needed answering were "the same as to every member of the proposed…class"); *Brieger v. Tellabs, Inc.*, 245 F.R.D. 345, 349-50, 353-54 (N.D. Ill. 2007) (finding, where the defendants addressed commonality as a requirement intertwined with typicality, the defendants' actions and decisions pertaining to a plan amounted to a common course of conduct in relation to the proposed class, and the

---

[8]The same result would be reached if the Court attempted to create "subclasses" of Plaintiffs. Given the variety and nature of the alleged frauds and concealments, homogeneity across subclass members cannot be achieved without deep individualized assessments of each member's circumstances. *See Johnson v. Meriter Health Services Employee Retirement Plan*, 702 F.3d 364, 368 (7th Cir. 2012) ("[A]as long as each subclass is homogeneous, in the sense that every member of the subclass wants the same relief, and each subclass otherwise satisfies the requirements for certifying a class, so that each could be the plaintiff class in a separate class action, there is no objection to combining them in a single class action.").

defendants' undisputed distribution of information in a plan-wide manner indicated individual determinations as to the plaintiffs' reliance on that information would be unnecessary for claims of nondisclosure or misrepresentation); *Godfrey v. GreatBanc Trust Co.*, No. 18-cv-7918, 2021 WL 679068, *4 (N.D. Ill. Feb. 21, 2021) (noting, in commonality inquiry, "all claims concern the defendants' identical actions"); *Nistra v. Reliance Trust Co.*, No. 16-cv-4773, 2018 WL 835341, *2-3 (N.D. Ill. Feb. 13, 2018) (noting, in commonality and typicality inquiries, the class members' claims arose out of the same transaction, allowed a determination of legality under ERISA that would resolve an issue central to the validity of each claim "in one stroke," and each plan participant "could bring the same claim based on the same conduct").

Plaintiffs also contend that the nonfiduciary claims made pursuant to ERISA § 502(a)(3) survive the commonality requirement notwithstanding the statute of limitations question. Claims made pursuant to § 502(a)(3) are subject to the state's limitations period. *Young v. Verizon's Bell Atlantic Cash Balance Plan,* 615 F.3d 808, 815 (7th Cir. 2010) ("ERISA does not provide a limitations period for actions brought under § 502, 29 U.S.C. § 1132, so we borrow the most analogous statute of limitations from state law."). Because there is no specific Illinois statute governing ERISA nonfiduciary claims under ERISA § 502, 735 ILCS 5/13-205, which provides for limitations for "all civil actions not otherwise provided for," applies and requires that such actions be commenced within 5 years next after the cause of action accrued. However, "even when relying on an analogous state statute of limitations, [a court should] look to federal common law for

purposes of deciphering the accrual date of a cause of action under a federal statute." *Tolle v. Carroll Touch, Inc.*, 977 F.2d 1129, 1138 (7th Cir. 1992).

The Seventh Circuit has held that "[t]he general federal common law rule is that an ERISA claim accrues when the plaintiff knows or should know of conduct that interferes with the plaintiff's ERISA rights." *Thompson v. Retirement Plan for Employees of S.C. Johnson & Son, Inc.*, 651 F.3d 600, 604 (7th Cir. 2011). Similar to that which has been discussed above, the inquiry into this issue will necessarily involve individual assessments for each class member that cannot be addressed by a class-wide analysis. Where, as here, questions of each member's diligence in discovery or reliance on representations emanate from the defense of the expiration of the statute of limitations, which is not otherwise defeated facially, class treatment is not appropriate.

For these reasons, Plaintiffs' Motion for Class Certification (Doc. 391) is DENIED.


**Defendants Bidwill and Rand's Motion to Certify Class of Counterclaim Defendants**

Defendants/Counterclaim Plaintiffs Bidwill and Rand seek to conditionally certify a class of Counterclaim Defendants as to Counterclaims I-IV in Doc. 154. (Doc. 389). However, Bidwill and Rand clarified that they only seek this relief "to the extent the Court certifies a Plaintiff class." (Doc. 389). Specifically, Bidwill and Rand state they "do not seek to certify a class of Counterclaim Defendants if the Court declines to certify a Plaintiff class." (Doc. 389, n. 1). The Court declined to certify Plaintiffs' class, so it also **DENIES** the Motion to Certify Class of Counterclaim Defendants. (Doc. 389).

**SO ORDERED.**

Dated: February 26, 2024

DAVID W. DUGAN
United States District Judge
